UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

CROSSLINK-D, INC., a Delaware Corporation,

        Plaintiff,

    v.                          CASE NO. 07-0088

JOSEPH LARGEY,

        Defendant

_____/

**ANSWER, AFFIRMATIVE DEFENSES, AND
COUNTERCLAIM OF DEFENDANT, JOSEPH LARGEY**

Defendant, Joseph Largey, answers the plaintiff's verified complaint as follows:

1.      Denied.

2.      Denied.

3.      Admitted.

4.      Denied, in that Largey remains a director and the rightful CEO of CrossLink-D.

5.      Admitted that the company's main focus is the development and sales of hemostatic devices, that Cochrum developed the concept for the products, that at some point Cochrum held the intellectual property rights to the research, that Cochrum was involved in forming Ares Laboratories, LLC, and that Sueflohn and Cochrum were members of Ares. Defendant is without sufficient information or knowledge to form a belief as to the balance of the averment and, therefore, denies the same.

6.      Admitted that Ares needed professional management, that Largey was identified as one of two potential candidates, that Ares negotiated and entered into an employment agreement with Largey that is dated November 1, 2004. Defendant is without sufficient

information or knowledge to form a belief as to the balance of the averment and, therefore, denies the same.

7.      Admitted that Largey entered into the Employment Agreement, the terms of which speak for themselves and, therefore, no answer is required.  To the extent an answer is required, Defendant denies.

8.      Admitted that Leberman incorporated CrossLink-D by filing a certificate of incorporation with the Delaware Secretary of State, that the intellectual property of Ares was transferred to CrossLink-D in exchange for stock in the company, and that the Largey Employment Agreement was assigned to CrossLink-D.  Defendant is without sufficient information or knowledge to form a belief as to the balance of the averment and, therefore, denies the same.

9.      Admitted except as to the exact date of the Organizational Meeting.

10.      Admitted that following the election of the directors Mr. Leberman resigned as incorporator, that the three directors, Cochrum, Sueflohn, and Largey approved a set of bylaws for the corporation, the language of which provided for only one director, that the three directors authorized the issuance of common stock in the manner set forth in the Organizational Meeting minutes, and that Largey was issued 200,000 shares of common stock, which represented 10% of the outstanding shares of the Company at the time. Defendant is without sufficient information or knowledge to form a belief as to the balance of the averment and, therefore, denies the same.

11.      Admitted that Largey, along with Cochrum, signed the stock certificate for 200,000 shares to be issued to Largey.  The balance of the averment is denied.

12.      Denied.

13.    Admitted that in late May 2006, Cochrum presented Leberman with written consents executed by certain shareholders of the Company. The balance of the averment is denied.

14.    Defendant is without sufficient information or knowledge to form a belief as to the balance of the averment and, therefore, denies the same.

15.    Admitted that Sueflohn maintained his support for retaining Largey in his positions as director and CEO. The balance of the averment is denied.

16.    Admitted that Leberman wrote the June 1 Letter, the contents of which speak for themselves and, therefore, no answer is required. To the extent an answer is required, defendant denies.

17.    Admitted that Leberman wrote letters dated June 2, 2006 and June 5, 2006, the contents of which speak for themselves and, therefore, no answer is required. To the extent an answer is required, defendant denies.

18.    Admitted that at one time, a meeting of the board of directors had been scheduled for June 6, 2006. Admitted that Dr. Cochrum took the position on June 6 and 7 that he was the sole director of CrossLink-D, that on June 6 Cochrum agreed to meet with Largey and Sueflohn, that Mr. Leberman was present on June 6, that the purpose of the meeting on June 6 was to review Largey's vision for the company and to discuss the Company's pending application for FDA approval of its initial product, and that Douglas Evans was present at the June 6 meeting. Defendant is without sufficient information or knowledge to form a belief as to the balance of the averment and, therefore, denies the same.

19.    Admitted that on June 6, 2006, Largey gave a presentation on his vision for the Company and that Evans left the meeting. Defendant is without sufficient information or knowledge to form a belief as to the balance of the averment and, therefore, denies the same.

20.    Admitted that a meeting of the board took place on June 7, 2006, and that Cochrum left the meeting. Admitted that share certificates were signed by Largey and Sueflohn and that Sueflohn signed as assistant secretary. Defendant is without sufficient information or knowledge to form a belief as to the balance of the averment and, therefore, denies the same.

21.    Denied.

22.    Denied.

23.    Denied.

24.    Denied.

25.    Denied.

### COUNT I
#### (Breach of Fiduciary Duties Against Mr. Largey)

26.    Defendant incorporates and reasserts his responses to paragraphs 1-25 above.

27.    This paragraph states a legal conclusion to which no reply is required.

28.    Denied.

29.    Denied.

30.    Denied.

### COUNT II
#### (Invalidity of Stock Issued to Mr. Largey)

31.    Defendant incorporates and reasserts his responses to paragraphs 1-30 above.

32.     Denied.

33.     This paragraph states a legal conclusion to which no reply is required.

34.     Denied.

COUNT III
(In The Alternative, 77,778 Shares of Common Stock Are Subject to Repurchase)

36.     Defendant incorporates and reasserts his responses to paragraphs 1-35 above.

37.     Denied.

38.     Denied.

39.     Denied.

**First Affirmative Defense**

CrossLink-D is equitably estopped from denying the Valid Issuance of 200,000 shares to Largey.

**Second Affirmative Defense**

Largey had authority to take action as a director at the June 2006 board meeting.

**Third Affirmative Defense**

The Written Consents and all subsequent actions taken unilaterally by Kent Cochrum on behalf of CrossLink-D are void.

**COUNTERCLAIM AND DEMAND FOR JURY TRIAL**

Defendant/Counterclaimant, Joseph Largey ("Largey"), sues Plaintiff/ Counterdefendant, CrossLink-D, Inc. ("CrossLink-D") and says:

1.     This is a cause of action for declaratory and injunctive relief and for breach of contract and tort damages.

5

**THE PLAINTIFF**

2.    Largey, a Virginia resident, is a former Johnson & Johnson Marketing Executive with extensive experience in the development, marketing, sales and promotion of medical products.  Largey is the rightful CEO and member of the board of directors of CrossLink-D and its predecessor company, ARES Laboratories, LLC ("ARES").

**THE DEFENDANT**

3.    Defendant, CrossLink-D, is a Delaware corporation. One of the founders of CrossLink-D, Dr. Kent Cochrum ("Cochrum"), conceptualized a new medical invention---a product with the potential to dramatically reduce blood loss by accelerating the body's own clotting process (the "Product").

4.    At all times material, Cochrum was a founder, officer, and member of the board of directors of CrossLink-D.

**OPERATIVE EVENTS**

5.    Despite having worked for almost ten years on developing the Product and trying to develop a business plan to market it, by October 2004, Cochrum still had no patents, no registered trademarks, no FDA approvals, and no marketing plan.  Without those, the Product was going nowhere.  In October 2004, Cochrum approached Largey about becoming the CEO and member of the board of directors of ARES given his experience in the marketing of medical products.

6.    In November 2004, ARES entered into an Employment Agreement with Largey under which Largey became the CEO and member of the board of directors of ARES.  A copy of the Employment Agreement is attached as **Exhibit A**.

7.     At all times material, the members of the board of directors of ARES were Largey, Cochrum, and Daniel Sueflohn (Cochrum's brother-in-law).

8.     As part of the negotiations leading to the Employment Agreement, Cochrum had told Largey that he would only hire a CEO who would be willing to move to Jacksonville, Florida, where he intended to consolidate the company's operations.

9.     In November 2004, Largey began his duties as CEO of ARES.  In November 2004, ARES established an office for the management of all of its business-related activities in Tampa, Florida.  Between November 2004 and May 2005, Largey managed all of ARES' business operations from the Tampa, Florida office.

10.     At the outset of his employment with ARES, Largey communicated his business objectives and marketing plan for the company to Cochrum and Sueflohn, both of whom approved the plan.  The business plan focused mainly on accomplishing key objectives. Its primary focus was on securing intellectual property (patents & trademarks) and gaining FDA approval for the Product, which would increase the value and marketability of both the Product and the company and thereby attract new investors willing to take the company to the next level.  Other objectives included the creation of a comprehensive marketing video and registration of trademarks.

11.     Under Largey's direction, within approximately one year from his hire, the company had met all of the milestones and objectives in its business plan.

12.     In May 2005, ARES ceased its business operations and a newly created Delaware corporation called CrossLink-D was formed.  The Original Bylaws of CrossLink-D are attached as **Exhibit B**.

13.    CrossLink-D assumed ARES' obligations under the Employment Agreement, and beginning in May 2005, Largey became CrossLink-D's CEO and member of its board of directors. A copy of the Employment Contract Assignment is attached as **Exhibit C**.

14.    As with ARES, the members of CrossLink-D's board of directors were Cochrum, Largey, and Sueflohn.

15.    In May 2005, Largey was granted 200,000 shares of CrossLink-D. A copy of the share certificate is attached as **Exhibit D**. Cochrum, Sueflohn, and Largey all voted in May 2005 to issue Largey 200,000 shares of CrossLink-D. This issuance of shares to Largey was unrelated to the previous employee share incentive program that had been offered in Largey's employment agreement. All of the directors, and the company's corporate counsel, Robert Leberman, understood and acknowledged that prior to the issuance of the 200,000 shares of CrossLink-D stock to Largey that Largey had already paid adequate valid consideration for the shares by having already foregone significant salary and expense reimbursement, and all understood that the shares issued to Largey were fully paid.

16.    Between May 2005 and May 2006, Largey managed all of CrossLink-D's business operations from CrossLink-D's office in Tampa, Florida.

17.    In April 2006, pursuant to Cochrum's statements that the company would soon be consolidating its operations in Jacksonville, Largey began the process of trying to sell his home in Tampa and finding a home in and moving to Jacksonville.

18.    Around this time, Largey informed Cochrum that he was in the process of moving his home from Tampa to Jacksonville and would be unavailable or difficult to reach around the time of his move.

### Cochrum and Evans Secretly Plan to Oust
### Largey as Director, Officer and Shareholder

19.    Unbeknownst to Largey at the time, while Largey was in the process of selling his house in Tampa and moving to Jacksonville, Cochrum was engaging in secret discussions with a person named Douglas Evans. At a time when Cochrum had taken no action to oust Largey and Sueflohn as members of the board of CrossLink-D, Cochrum had reached a secret agreement to pay Evans, with company funds, a significant monthly fee and other compensation, including stock options and indemnification, in exchange for Evans' assistance in devising a scheme to oust Largey and Sueflohn as directors, terminating Largey as CEO, and divesting Largey of his shares in CrossLink-D. Cochrum never advised Sueflohn and Largey of this secret agreement to pay Evans with company money for his advice to oust them from the company.

### Wrongful Actions to Oust Largey as a Director

20.    Pursuant to the plan put in place by Evans and Cochrum, in May 2006, unbeknownst to Largey and Sueflohn, Cochrum and Evans prepared and sent documents to several shareholders of CrossLink-D entitled "Action by Majority Written Consent to Remove Director of CrossLink-D, Inc." (hereinafter referred to as the "Written Consents", attached as **Composite Exhibit E**). Several shareholders, including Cochrum, executed the "Written Consents" in an attempt to oust Largey and Sueflohn as directors of CrossLink-D.

21.    After these shareholders signed the Written Consents, Cochrum sealed them in an envelope and gave them to CrossLink-D's corporate counsel, Bob Leberman, with an instruction not to open the envelope until the date of the next CrossLink-D board meeting in early June 2006.

22.    At the June 2006 meeting of the board of directors, the Written Consents were revealed to Sueflohn and Largey, and Cochrum took the position that they constituted sufficient majority action by the shareholders of CrossLink-D to remove Largey and Sueflohn as directors.

23.    Thereafter, Cochrum proclaimed himself the sole director of CrossLink-D and began to take unilateral action on behalf of CrossLink-D, including taking action to terminate Largey as CEO of CrossLink-D and divesting him of his shares in CrossLink-D.

24.    Contrary to Cochrum's claim, the shareholders signing the "Written Consents" did not even constitute a simple majority of the shareholders entitled to vote. Months prior to the time Cochrum and the other shareholders executed the "Written Consents," CrossLink-D had already entered into a binding written agreement to issue a number of additional shares of CrossLink-D to a group of investors called "Silverback7" and had a current contractual obligation to do so. A copy of CrossLink-D's contract with Silverback7 is attached as **Exhibit F**. Taking the Silverback7 shares into account, the Written Consents did not constitute a vote by even a simple majority of the shares entitled to vote. However, in order to create an argument that a majority of the current shareholders had voted to remove Largey and Sueflohn, Cochrum wrongfully and intentionally prevented the shares from being issued to Silverback7.

25.    In an e-mail to Silverback7, Cochrum admitted his illicit purpose in preventing issuance of the shares to Silverback7 was so that he could "reconstitute" the board.

26.    CrossLink-D's corporate counsel, Leberman, advised Cochrum that the "Written Consents" were legally ineffective to remove Largey and Sueflohn as directors. Cochrum ignored this advice and instead unilaterally relieved Leberman of his position as corporate counsel.

27.    As Leberman pointed out, the Written Consents were a nullity because they did not constitute sufficient majority action by the shareholders to remove Largey and Sueflohn because CrossLink-D had cumulative voting with respect to election of board members.

28.    Despite the fact that Cochrum disseminated the Written Consents to shareholders to remove Largey and Sueflohn as directors, when Leberman opined that the Written Consents were ineffective to remove them as directors, Cochrum then took a nonsensical "fallback" position that he did not even need to remove Largey and Sueflohn as directors because they had never been directors in the first place.  Cochrum referenced a provision in the bylaws of CrossLink-D that stated that there was only to be one director of CrossLink-D.  This "fallback" position makes no sense as Sueflohn and Largey were clearly elected as directors of CrossLink-D in May 2005, and Cochrum, Sueflohn, and Largey had been operating and voting on matters collectively as CrossLink-D's board of directors since the company's inception in May 2005.

29.    Following the Written Consents, Cochrum took the position that he was the sole director of CrossLink-D and then in late July 2006 unilaterally purported to call a "Special Meeting" of the shareholders of CrossLink-D to be held on August 1, 2006.  Because Largey and Sueflohn were rightful members of the board of directors of CrossLink-D, Cochrum's actions in unilaterally calling for and noticing the "Special Meeting" were invalid and invalidated all of the actions taken at the Special Meeting.  Further, the notice for the "Special Meeting" (**Exhibit G**) was deficient in that it gave inadequate advance notice of the meeting under the company's bylaws and failed to properly follow the procedures for the nomination of new directors.  Neither Largey, Sueflohn, nor Silverback7 was given proper notice or opportunity to participate in the Special Meeting.

30.     Paradoxically, Cochrum's stated purpose in calling for the "Special Meeting" was to remove "all" the directors of CrossLink-D and elect himself as the sole director of CrossLink-D. This is despite Cochrum's earlier pronouncements that the Written Consents had already effectively rendered him the sole director and removed Largey and Sueflohn, or alternatively, that Cochrum had always been the sole director and that Largey and Sueflohn had never even been directors.

31.     At the unauthorized "Special Meeting" Cochrum called a vote of shareholders, which did not include the Silverback7 shareholders. Those shareholders present in person or by proxy purportedly voted to remove "all" of the directors of CrossLink-D and to elect Cochrum as the sole director of CrossLink-D.

## Wrongful Actions to Remove Largey as CEO

32.     Despite the legal insufficiency of the Written Consents, Cochrum nevertheless began to take unilateral action on behalf of CrossLink-D.  In accordance with the plan that Evans and Cochrum had put into place, sometime prior to August 2006, Cochrum retained Florida counsel who sent Largey a  letter on behalf of CrossLink-D to inform him that he was being terminated as CEO "for cause."  A copy of the Termination Letter is attached as **Exhibit H**.

33.     Prior to the termination letter, neither Sueflohn, Cochrum, nor any other person acting on behalf of CrossLink-D had ever communicated to Largey that he had in any way breached his duties as CEO.

34.     CrossLink-D failed to comply with the requirements of a "for cause" termination as outlined in Largey's Employment Agreement, and in fact, there was no valid reason to terminate Largey's employment.  Cochrum's motivation to terminate Largey as CEO

was a product of his illicit plan to seize control of the company for himself through wrongful means in violation of his fiduciary duties to CrossLink-D, its shareholders and Largey.

### Wrongful Actions to Divest Largey of his Shares in CrossLink-D

35.     With Cochrum's approval, in September 2006, Evans sent an e-mail to shareholders other than Largey stating that Largey no longer owned 200,000 shares of the company but only 122,222 shares.  Evans declared in this e-mail that CrossLink-D had exercised a right to repurchase 77,778 shares and that it had the right to take away even more shares because, Evans wrongly claimed, Largey had given no value for the shares.  A copy of the September 8, 2006, e-mail is attached as **Exhibit I**.

36.     With Cochrum's approval, in July and August 2006, Evans sent correspondence to shareholders of CrossLink-D other than Largey, including Sueflohn, which contained false and defamatory statements about Largey to the other shareholders.

37.     Evans and Cochrum also prevented CrossLink-D from sending shareholder information to Largey, including withholding (to this day) the tax forms Largey needs to complete his federal income tax returns.

38.     Largey is entitled to and seeks indemnification from CrossLink-D, pursuant to the Bylaws of CrossLink-D, 8 Del. C., § 145 (2006), and other applicable law, including payment of his attorneys' fees and costs incurred in this and other legal matters involving CrossLink-D.

### COUNT I

### For Entry of a Declaration that Largey Owns 200,000 Shares of CrossLink-D

39.     Plaintiff incorporates the allegations of paragraphs 1- 38 above.

40.    There is presently a dispute between Largey and CrossLink-D as to Largey's entitlement to some or all of his shares of CrossLink-D.

41.    In May 2005, Largey was granted 200,000 shares as a Founder of CrossLink-D, and a share certificate representing these shares was issued to Largey.  CrossLink-D and Cochrum represented to Largey and to others that this share certificate was appropriately issued and fully paid.  All three directors of CrossLink-D voted to issue Largey the 200,000 shares; officer and director, Cochrum, signed the share certificate issuing the shares to Largey, and CrossLink-D delivered the share certificate into Largey's possession.

42.    In August 2006, after Cochrum proclaimed himself the sole director of CrossLink-D, Evans and he first began to take actions to attempt to divest Largey of some portion or all of his shares of CrossLink-D.  This was done for the purpose of attempting to maintain for Cochrum sole control of CrossLink-D.

43.    Relying on the terms of the Employment Agreement, Cochrum and Evans reported to shareholders other than Largey that Largey was not entitled to some portion or all of the shares he was granted in CrossLink-D because i) "the company has no record of...Mr. Largey...having paid for..." his shares, and ii) the company was entitled to repurchase "unvested shares."  An e-mail sent by Evans to shareholders other than Largey outlining the plans and actions taken to divest Largey of his shares is attached as **Exhibit H**.

44.    Contrary to the claim of CrossLink-D, the issuance of the 200,000 shares of CrossLink-D stock was not subject to the terms of the share repurchase provisions under the Employment Agreement.

45.    Despite claiming a right to repurchase shares from Largey, CrossLink-D never paid Largey for the shares the defendants claim were repurchased.

46.    The defendants' position that Largey gave no value for his shares is without merit. To get the company up and running, Largey agreed to waive a total of $250,000 of his base salary for the entire first two years of his employment. On top of that, Largey worked *without any compensation* for salary or expenses between his commencement date of November 1, 2004 and the end of May 2005. This amount totaled $107,088. In September 2005, the board of directors formally recognized the $107,088 salary and expenses foregone by Largey as a financial investment in the company.

47.    CrossLink-D's share grant to Largey was made at the time of CrossLink-D's formation in consideration of his prior foregone salary and expenses, and no further payment was required of him for those shares. Largey has given value for his shares and disputes that he is required to pay any additional sums for the 200,000 shares he was granted in May 2005. Largey also disputes that CrossLink-D has any right to take any portion of his 200,000 shares, whether by repurchase or otherwise.

48.    Largey is entitled to a declaration of the status of his ownership of the shares he has been granted in CrossLink-D and his entitlement to a certain percentage of ownership of CrossLink-D.

WHEREFORE, Plaintiff, Joseph Largey, respectfully requests that this Court enter a Declaratory Judgment establishing that he alone owns the 200,000 shares of CrossLink-D that were granted to him in May 2005, that those shares are not subject to repurchase by CrossLink-D, and that those shares are not otherwise subject to be taken from Largey by CrossLink-D or anyone else for any reason. Largey requests that this Court permanently enjoin CrossLink-D and any of its employees, officers, directors or agents from taking action to divest Largey of his shares or percentage ownership in CrossLink-D. Largey further

requests that this Court order CrossLink-D to provide Largey all appropriate and necessary documentation and information so that Largey can complete his federal income tax returns.

## COUNT II

### Breach of Employment Agreement

49.     Plaintiff incorporates the allegations of paragraphs 1- 38 above.

50.     CrossLink-D and Largey are parties to the Employment Agreement attached as **Exhibit A**.

51.     The Employment Agreement provides for both termination "for cause" and "without cause."

52.     On August 4, 2006, CrossLink-D (under the illegitimate unilateral direction of Cochrum) sent notice to Largey of his termination "for cause."

53.     The Employment Agreement defines "for cause" termination as follows:

> For purpose of this Agreement, termination for "Cause" will mean, in each case as determined in good faith by the Board after consultation with you to assess the validity of the basis for such termination, termination because of (A) your conviction of a felony, (B) your willful breach of fiduciary duty to ARES, or (C) your breach of this Agreement which continues or remains uncured after written notice from the Board, which shall include the completion or satisfaction of mutually established milestones or objectives, to be established by you and the Board during the first 90 days of employment and which may be amended from time to time by mutual agreement of you and the Board.

54.     Defendant, CrossLink-D, has breached the Employment Agreement by, among other things, terminating Largey as CEO purportedly "for cause" without meeting the substantive or procedural requirements of a "for cause" termination.

55.     As the proximate result of CrossLink-D's breach, Largey has been damaged.

56.     All conditions precedent to this action have been met, have been waived, or have occurred.

16

WHEREFORE, Plaintiff, Joseph Largey, demands judgment against Defendant, CrossLink-D, for damages plus pre-judgment interest, costs, and such other relief as the Court deems just and appropriate.

PHILLIPS, GOLDMAN & SPENCE, P.A.

JOHN C. PHILLIPS, JR., ESQUIRE (#110)
1200 North Broom Street
Wilmington, DE 19806
(302) 655-4200

and

VOLPE, BAJALIA, WICKES,
ROGERSON, & WACHS, P.A.
Timothy W. Volpe
Florida Bar No. 358185
Matthew P. McLauchlin
Florida Bar No. 484180
1301 Riverplace Boulevard
Suite 1700
Jacksonville, Florida 32207
(904) 355-1700 Telephone
(904) 355-1797 Facsimile
Attorneys for Plaintiff

DATE: March 13, 2007

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing has been furnished to Peter B. Ladig, Esquire, The Bayard Firm, P.A., 222 Delaware Avenue, Suite 900, P.O. Box 25130, Wilmington, DE 19899 via electronic service this 13th day of March, 2007.

John C. Phillips, Jr., Esquire (#110)

November 1, 2004

Joseph A. Largey
1147 Abbeys Way
Tampa, FL 33602

Re: Employment Agreement

<u>Personal & Confidential</u>
Delivered via Fax

This letter sets forth the binding Employment Agreement ("Agreement") between ARES Laboratories, LLC ("ARES") or a company to be formed as a Delaware corporation and Joseph A. Largey ("JAL").

1. DUTIES.

(a) Duties. During the Employment Term (as defined in Section 3 below), you will serve as President and Chief Executive Officer of ARES, reporting to the Board of Director of ARES (the "Board"). You will have such duties and authority as delegated to you by the Board, including such duties and authority as are customary for, and commensurate with such position, including general management of ARES, and such other reasonable duties and authority as prescribed from time to time by the Board.

(b) Board of Directors. You will be elected as a member of the Board as soon as practicable after the Commencement Date (as defined in Section 3 below), and in no event later than the first Board meeting after the Commencement Date. Your directorship will terminate automatically upon termination of this Agreement.

2. COMPENSATION.

(a) Base Salary. ARES will pay you a base salary during the Employment Term of $300,000 per year commencing 90 days following your start date of November 1, 2005. You have agreed to waive $125,000 of your base salary for the first two (2) years in order to get the company funded and operating. Your remaining salary of $175,000 per year for those two years will be paid in accordance with ARES's



PLAINTIFF'S
EXHIBIT

A

normal payroll procedures. Your base salary will be reviewed by the Board on or before your second anniversary, and in any event at least once per year after that. The Board may increase your salary at its discretion. Nothing in this paragraph or in the body of this letter modifies the at-will term of employment, which is described in Section 3(b) of this letter.

(b) Bonus. In addition to the base salary, you will be eligible during the Employment Term for an annual bonus payable at the end of each fiscal year in an amount up to 50% of your base salary, with payment based upon achievement of certain performance milestones to be mutually agreed upon annually by you and the board. The milestones will be agreed upon and communicated to you in writing, reasonably in advance of the commencement of the performance period for which such bonus relates.

(c) Other Benefits. You will be entitled during the Employment Term to participate in and receive benefits under ARES's standard company benefits plans in effect from time to time for senior management, including medical and dental insurance, sick leave and vacation time, subject to and on a basis consistent with the terms, conditions and overall administration of such plans.

(d) Expenses. You will be entitled during the Employment Term to receive prompt reimbursement from ARES for all reasonable business-related expenses incurred by you, in accordance with ARES's policies and procedures.

(e) Deductions and Withholding. Amounts payable or that become payable under this Agreement will be subject to any deductions authorized in writing by you and any deductions and withholdings required by law.

3. EMPLOYMENT TERM.

(a) Employment Term. The term of employment with ARES (the "Employment Term") will commence on November 1, 2004(the "Commencement Date") and end on the date your employment is terminated (the "Termination Date") pursuant to the terms of this Agreement.

(b) Termination without Cause. Your employment with ARES under this Agreement is "at will" and may be terminated by the Board at anytime during

the Employment Term, for any reason and without Cause (as defined below), upon delivery of two weeks' written notice. Upon termination without Cause, (i) you will be paid all amounts to which you are entitled under Section 2 above that have accrued as of the Termination Date but have not yet been paid by ARES and (ii) if you are terminated without Cause anytime after your first anniversary, as a severance payment you will receive (A) your base salary from ARES for a period of twelve months, payable monthly, from and after the Termination Date (the "Severance Period") and (B) health benefits in effect as of the Termination Date during the Severance Period, the costs of which will be paid by ARES and (C) a refund of all personal monies invested in ARES at original value (7b). During the Severance Period, you will cooperate with ARES in providing for the orderly transition of your duties and responsibilities to other individuals, as reasonably requested by ARES, provided that the payments made by ARES during the Severance Period are not and will not be deemed to be compensation for such cooperation. For purposes of the Agreement, termination without Cause shall include termination by you after any of the following events shall have occurred: (1) any reduction of your base salary greater than 20% or any material reduction of any of your other benefits, unless such reduction is precipitated by the financial condition of the company; (2) any reduction of title or position; (3) any material reduction of duties or responsibilities; or (4) any relocation of place of employment outside of the state of Florida or beyond 50 miles from ARES's current headquarters unless such relocation is effected based on your recommendation or cooperation.

(c) Termination for Cause. Your employment by ARES under this agreement may be terminated for Cause by the Board immediately and without notice. Upon termination of your employment for Cause, (i) you will be paid all amounts to which you are entitled under Section 2 above that have accrued as of the Termination Date but have not yet been paid by ARES, less any debts, liabilities or damages for which you are liable, and (ii) all other salary and employment benefits under this Agreement will cease. For purpose of this Agreement, termination for "Cause" will mean, in each case as determined in good faith by the Board after consultation with you to assess the validity of the basis for such termination, termination because of (A) your conviction of a felony, (B) your willful breach of fiduciary duty to ARES, or (C) your breach of this Agreement which continues or remains uncured after written notice from the Board, which shall include the completion or satisfaction of mutually established milestones

or objectives, to be established by you and the Board during the first 90 days of employment and which may be amended from time to time by mutual agreement of you and the Board.

(d) **Termination Due to Death or Disability.**   Your employment under this Agreement will terminate immediately upon your death. If by reason of injury, illness or other physical or mental impairment you are unable to perform the essential functions of your position for an aggregate period of sixty (60) days occurring within a rolling six month period, then ARES may terminate your employment under this Agreement by delivery to you of written notice of such termination. Upon termination of your employment due to death or disability, as defined in this section, (A) you will be paid all amounts to which you are entitled under Section 2 above that have accrued as of the Termination Date but have not yet been paid by ARES and (B) all other salary and employment benefits under this Agreement will cease.

(e) **Resignation.**   As an at will employee, you are free to resign from your employment at anytime by delivering to the company two weeks' written notice of your resignation. Upon resignation of your employment (other than as described in Section 3(b) above) (A) you will be paid all amounts to which you are entitled under Section 2 above that have accrued as of the Termination Date but have not yet been paid by ARES and (B) all other salary and employment benefits under this agreement will cease.

## 4. RELOCATION AND RELATED MATTERS.

(a) **Relocation Expenses.** After you have completed at least one year of your employment with ARES, should the company's headquarters be permanently located greater than 50 miles from your current residence in Tampa and should you desire to relocate and/or the Board requires you to relocate, you will be paid to do so as follows.   The Company will pay, or reimburse you upon your presentation of invoices, for the following: (i) reasonable travel and lodging expenses for you and your wife for house hunting trips in connection with any relocation for company purposes and (ii) reasonable costs of moving to the location, including transportation of your household goods, automobile and personal effects and travel, lodging and other related costs and expenses. To the extent that any such amount is taxable to you, ARES will reimburse you for the

grossed up amount, such that you will be fully reimbursed after payment of all applicable federal and state taxes.

## 5. RESTRICTED SHARE GRANT.

(a) Initial Grant. As soon as practicable after the Commencement Date, and in no event later than the date of the first Board meeting after the Commencement Date, ARES will sell you 670,000 shares of ARES shares (the "Shares"), constituting, after such issuance, 10% of the outstanding shares of capital stock of ARES on a fully diluted and converted basis as of the date of and after such issuance, at the fair market value of a share of ARES Common Stock reasonably determined in good faith by the Board, but in no event greater than $0.01 per share (the "Purchase Price"). The issuance of the Shares will be effected under the ARES equity incentive plan. You will also have the opportunity to purchase, at fair market value, two additional blocks of stock in increments of 165,000 shares each based upon achieving certain milestones (as determined by you and the Board of Directors within 90 days of your start date) set on your first and second anniversary dates as President & CEO. You may pay for Shares with cash, cancellation of indebtedness owed to you by ARES or a full recourse promissory note, bearing interest of 6% per annum, compounded annually, or any combination of the foregoing. If at any time within 36 months after the Commencement Date, ARES issues Common Stock at a price per share less than the Purchase Price or issues options for the purchase of shares of Common Stock at an exercise price less than the Purchase Price, ARES will execute and deliver to you a repricing agreement to which the Purchase Price will be adjusted to equal such lower price, as the cause may be and ARES will reimburse the excess to you. Such reimbursements may be made in cash, by promissory note or cancellation of indebtedness owed to ARES by you or any combination of the foregoing.

(b) Percentage Maintenance Shares. If at any time within 36 months after the Commencement Date ARES issues any shares of capital stocks or grants any rights to acquire or convert into shares of capital stock of ARES (other than pursuant to (A) the ARES equity incentive plan, (B) a merger or acquisition of another company or (C) the initial public offering of shares of Common Stock of ARES), ARES will offer, and you will have the right to purchase , (1) if such issuance or increase occurs within 36 months after the Commencement Date,

that number of shares of Common Stock such that you will continue to own at least 5% of the outstanding shares of capital stock of ARES on a fully diluted and converted basis as of the date of and after such issuance, at per share price equal to the then current fair market value of a share of ARES Common Stock reasonably determined in good faith by the Board. The issuance of the Percentage Maintenance Shares will be effected under the ARES equity incentive plan. You may pay for Percentage Maintenance Shares with cash, cancellation on indebtedness owed to you by ARES or a full recourse promissory note, bearing interest of 6% per, annum, compounded annually, or any combination the foregoing.

(c) Repurchase Option. ARES will have the option to repurchase (the "Repurchase Option") all or a portion of the Unvested Shares (as defined below) within 30 days after termination of your employment. The per share purchase price will be the same as that paid by you for such Unvested Shares repurchased by ARES and will be payable in cash or by cancellation of indebtedness owed to ARES by you. ARES will have a Repurchase Option only with respect to Unvested Shares. ARES will have no Repurchase Option with respect to any Vested Shares (as defined below)

(d) Vesting; Terminating of Repurchase Option. As of the Commencement Date, all of the Shares and Percentage Maintenance Shares, if any, are "Unvested Shares" On the first anniversary of the Commencement Date, one-third of the Shares and Percentage Maintenance Shares, if any, will no longer be subject to the Repurchase Option (such shares being "Vested Shares") One-thirty sixth of the Shares and the Percentage Maintenance Shares, if any will become Vested Shares on the first day of each month after the first anniversary of the Commencement Date. In addition, if your employment is terminated without Cause, (i) if such termination occurs after the first anniversary but on or prior to the second anniversary, two-thirds of the Shares and Percentage Maintenance Shares, if any, will become Vested Shares (in addition to any other then Vested Shares) and (ii) if such termination occurs after the second anniversary, all of the Shares and Percentage Maintenance Shares, if any, become Vested Shares (in addition to any other then Vested Shares) The Repurchase Option will, in any event, terminate on the earliest to occur of (l) the liquidation, dissolution or indefinite cessation of the business operations of ARES; (ii) the execution by the Company of a general assignment for the benefit of creditors or the

appointment of a receiver or a trustee to take position of the property and assets of the Company; (iii) the sale, conveyance, or encumbrance of all or substantially all of ARES's property or business; (iv) the Company's merger into or consolidation with any other entity (other than a wholly owned subsidiary of ARES) and (v)whether in one transaction or a series of transactions effected by ARES or its stockholders, the sale or other disposition of the outstanding capital stock constituting more than 50% of the voting power of ARES.

(c) **Additional Grants.** You also will be eligible, under ARES's equity incentive plan, for the grant of options and other stock-rights from time to time pursuant to ARES's normal policies with respect to option and other stock rights granted to senior executives of ARES.

## 6. RESTRICTED COVENANTS.

(a) **Restriction on Disclosure and Use of Confidential Information.** You understand and agree that Confidential Information constitutes a valuable asset of the Company and its affiliated entities, and may not be converted to your own use. Accordingly, you hereby agree that you shall not, directly or indirectly, at any time reveal, divulge, or disclose to any person not expressly authorized by ARES any Confidential Information, and you shall not, directly or indirectly, at any time use or make use of any Confidential Information in connection with any business activity other than that of the ARES. Notwithstanding the above, this covenant shall expire upon the occurrence of a Change of Control.

(b) **Non-competition with the Company.** Following your employment with ARES for a period of two years, unless acting in accordance with the Company's prior written consent, you will not directly provide any Competitive Services to, and will not, directly or indirectly, (i) own, manage, operate, join, control, finance or participate in the ownership, management, operation, control or financing of, or (ii) be connected as a Principal or Representative or otherwise with, or (iii) permit your name to be used by or in connection with any competitive company or product line. Notwithstanding the above, this covenant shall expire upon the occurrence of a Change of Control.

(c) **Exceptions from Disclosure Restrictions.** You shall not be restricted from disclosing or using Confidential Information that (A) is or becomes generally



appointment of a receiver or a trustee to take position of the property and assets of the Company; (iii) the sale, conveyance, or encumbrance of all or substantially all of ARES's property or business; (iv) the Company's merger into or consolidation with any other entity (other than a wholly owned subsidiary of ARES) and (v)whether in one transaction or a series of transactions effected by ARES or its stockholders, the sale or other disposition of the outstanding capital stock constituting more than 50% of the voting power of ARES.

(e) **Additional Grants.** You also will be eligible, under ARES's equity incentive plan, for the grant of options and other stock rights from time to time pursuant to ARES's normal policies with respect to option and other stock rights granted to senior executives of ARES.

## 6. RESTRICTED COVENANTS.

(a) **Restriction on Disclosure and Use of Confidential Information.** You understand and agree that Confidential Information constitutes a valuable asset of the Company and its affiliated entities, and may not be converted to your own use. Accordingly, you hereby agree that you shall not, directly or indirectly, at any time reveal, divulge, or disclose to any person not expressly authorized by ARES any Confidential Information, and you shall not, directly or indirectly, at any time use or make use of any Confidential Information in connection with any business activity other than that of the ARES. Notwithstanding the above, this covenant shall expire upon the occurrence of a Change of Control.

(b) **Non-competition with the Company.** Following your employment with ARES for a period of two years, unless acting in accordance with the Company's prior written consent, you will not directly provide any Competitive Services to, and will not, directly or indirectly, (i) own, manage, operate, join, control, finance or participate in the ownership, management, operation, control or financing of, or (ii) be connected as a Principal or Representative or otherwise with, or (iii) permit your name to be used by or in connection with any competitive company or product line. Notwithstanding the above, this covenant shall expire upon the occurrence of a Change of Control.

(c) **Exceptions from Disclosure Restrictions.** You shall not be restricted from disclosing or using Confidential Information that: (A) is or becomes generally

available to the public other than as a result of an unauthorized disclosure by you; (B) becomes available to you in a manner that is not in contravention of applicable law from a source (other than ARES or its affiliated entities or one of its or their officers, employees, agents or representatives) that is not bound by a confidential relationship with ARES or its affiliated entities or by a confidentiality or other similar agreement; (C) was known to you on a non-confidential basis and not in contravention of applicable law or a confidentiality or other similar agreement before its disclosure to you by ARES or its affiliated entities or one of its or their officers , employees, agents or representatives; or (D) is required to be disclosed by law, court order or other legal process; provided, however, that in the event disclosure is required by law, you shall provide the Company with prompt notice of such requirement so that ARES may seek an appropriate protective order prior to any such required disclosure by you.

(d) Assignment if Inventions and Intellectual Property. You agree to execute, at the time of execution of this Agreement, an assignment of all inventions, discoveries and other intellectual property, in the form attached hereto as Schedule D.

## 7. MISCELLANEOUS.

(a) Employment Agreement Expenses. ARES will pay, with the submission of appropriate receipts, up to $1,000 of the legal and other professional fees and expenses incurred by you in negotiating the terms of this Agreement.

(b) Investment in ARES. As a sign of commitment to ARES and to potential investors in the company, you have agreed to invest a minimum of $50,000 in the company within 90 days of your Commencement Date. If you are terminated without cause, your investment will be returned to you as a part of your severance from the company (3b).

(c) Entire Agreement. This Agreement contains the entire understanding and sole and entire agreement between us with respect to the subject matter of this Agreement, and supersedes any and all prior agreements, negotiations and

rom J. Largey          to 1-904-355-1797          at 8/15/2006 9:23 AM          014/01

discussions between us with respect to the subject matter covered hereby and may only be modified by an agreement in writing signed by ARES and you. If any provision of this Agreement is held to be invalid or otherwise unenforceable in whole or in part, the remainder of such provision and the remainder of this Agreement will not be affected thereby and will be enforced to the fullest extent permitted by law.

(d) Assignment; Successors and Assigns. Neither this Agreement nor the rights or obligations under this Agreement will be assigned by you. ARES may assign this Agreement to any successor of ARES, and upon such assignment any such successor will be deemed substituted for ARES upon the terms and subject to the conditions of this agreement. This Agreement will be binding upon our respective successors and assigns and upon your heirs, executors and administrators.

(e) Governing Law.   This Agreement will be governed by and construed in accordance with the laws of the State of Florida, without regard to conflict of laws.

(f) Notice. Any notice, request, demand or other communication required or permitted under this Agreement will be deemed to be properly given when personally served in writing, or three days after deposit in the United States mail, postage pre-paid, addresses to ARES or you, as the case may be, at the applicable address shown at the beginning f this letter. Each of us may change our respective address for notice purposes by written notice to the other in accordance with this Section 6(e)

If the foregoing accurately sets forth the terms and conditions of your employment, please sign the enclosed copy of this letter and return it to the undersigned.

Sincerely,


Kent Cochrum
Founder

# BYLAWS OF

# CROSS LINK-D, INC.



**PLAINTIFF'S EXHIBIT**

B

# INDEX TO BYLAWS OF

# CROSS LINK-D, INC.

Page

ARTICLE I ................................................................................................ 1
    Section 1.  PRINCIPAL OFFICE ........................................................ 1
    Section 2.  OTHER OFFICES ............................................................. 1

ARTICLE II ............................................................................................... 1
    Section 1.  PLACE OF MEETINGS .................................................... 1
    Section 2.  ANNUAL MEETING ........................................................ 1
    Section 3.  SPECIAL MEETING ......................................................... 1
    Section 4.  NOTICE OF SHAREHOLDERS' MEETINGS ................... 2
    Section 5.  MANNER OF GIVING NOTICE; AFFIDAVIT OF NOTICE ... 2
    Section 6.  QUORUM ......................................................................... 3
    Section 7.  ADJOURNED MEETING; NOTICE ................................. 3
    Section 8.  VOTING ........................................................................... 3
    Section 9.  WAIVER OF NOTICE OR CONSENT BY ABSENT
              SHAREHOLDERS ........................................................... 4
    Section 10.  SHAREHOLDER ACTION BY WRITTEN CONSENT
              WITHOUT A MEETING ................................................. 5
    Section 11.  RECORD DATE FOR SHAREHOLDER NOTICE, VOTING,
              AND GIVING CONSENTS .............................................. 6
    Section 12.  PROXIES ........................................................................ 6
    Section 13.  INSPECTORS OF ELECTION ....................................... 7

ARTICLE III .............................................................................................. 7
    Section 1.  POWERS .......................................................................... 7
    Section 2.  NUMBER AND QUALIFICATION OF DIRECTORS .......... 7
    Section 3.  ELECTION AND TERM OF OFFICE OF DIRECTORS ...... 7
    Section 4.  VACANCIES; RESIGNATION ......................................... 7
    Section 5.  PLACE OF MEETINGS AND MEETINGS BY TELEPHONE ... 8
    Section 6.  ANNUAL MEETING ........................................................ 8
    Section 7.  OTHER REGULAR MEETINGS ....................................... 8
    Section 8.  SPECIAL MEETINGS ...................................................... 8
    Section 9.  QUORUM ......................................................................... 9
    Section 10.  WAIVER OF NOTICE ..................................................... 9
    Section 11.  ADJOURNMENT ............................................................ 9
    Section 12.  NOTICE OF ADJOURNMENT ....................................... 9

i

Section 13. ACTION WITHOUT MEETING ............................................ 10
Section 14. FEES AND COMPENSATION OF DIRECTORS ........................ 10
Section 15. PERMITTED LOANS ...................................................... 10

ARTICLE IV .................................................................................. 10
Section 1. COMMITTEES OF DIRECTORS ........................................ 10
Section 2. MEETINGS AND ACTION OF COMMITTEES ........................ 11

ARTICLE V ................................................................................... 11
Section 1. OFFICERS .................................................................... 11
Section 2. ELECTION OF OFFICERS ................................................ 12
Section 3. SUBORDINATE OFFICERS ............................................. 12
Section 4. REMOVAL AND RESIGNATION OF OFFICERS ..................... 12
Section 5. VACANCIES IN OFFICES ................................................ 12
Section 6. PRESIDENT ................................................................. 12
Section 7. VICE PRESIDENTS ....................................................... 13
Section 8. SECRETARY ................................................................ 13
Section 9. TREASURER ................................................................ 13

ARTICLE VI .................................................................................. 14

ARTICLE VII ................................................................................ 14
Section 1. MAINTENANCE AND INSPECTION OF RECORD OF
           SHAREHOLDERS ........................................................ 14
Section 2. MAINTENANCE AND INSPECTION OF BYLAWS .................. 15
Section 3. MAINTENANCE AND INSPECTION OF OTHER
           CORPORATE RECORDS ............................................... 15
Section 4. INSPECTION BY DIRECTORS .......................................... 15
Section 5. ANNUAL REPORT TO SHAREHOLDERS ............................ 15
Section 6. FINANCIAL STATEMENTS .............................................. 15
Section 7. ANNUAL STATEMENT OF GENERAL INFORMATION ............ 16

ARTICLE VIII ............................................................................... 16
Section 1. RECORD DATE FOR PURPOSES OTHER THAN NOTICE
           AND VOTING ........................................................... 16
Section 2. CHECKS, DRAFTS, EVIDENCES OF INDEBTEDNESS ............ 16
Section 3. CORPORATE CONTRACTS AND INSTRUMENTS; HOW
           EXECUTED ............................................................... 16
Section 4. CERTIFICATES FOR SHARES ........................................... 17
Section 5. LOST CERTIFICATES ..................................................... 17

Section 6. REPRESENTATION OF SHARES OF OTHER
          CORPORATIONS .................................................................17
Section 7. CONSTRUCTION AND DEFINITIONS ...........................17
Section 8. EMERGENCY PROVISIONS..........................................18

ARTICLE IX ...................................................................................18
Section 1. AMENDMENT BY SHAREHOLDERS .......................18
Section 2. AMENDMENT BY DIRECTORS ...............................18

CERTIFICATE OF ADOPTION OF BYLAWS .................................20

BYLAWS OF

CROSS-LINK-D, INC.

ARTICLE I

OFFICES

Section 1. PRINCIPAL OFFICE. The Board of Directors shall fix the location of the principal executive office of the corporation at any place within or outside the State of California. If the principal executive office is located outside this state, and the corporation has one or more business offices in this state, the Board of Directors shall fix and designate a principal business office in the State of California.

Section 2. OTHER OFFICES. The Board of Directors may at any time establish branch or subordinate offices at any place or places in this state or otherwise.

ARTICLE II

MEETING OF SHAREHOLDERS

Section 1. PLACE OF MEETINGS. Meetings of shareholders shall be held at any place within or outside the State of California designated by the Board of Directors. In the absence of any such designation, shareholders' meetings shall be held at the principal executive office of the corporation.

Section 2. ANNUAL MEETING. The annual meeting of shareholders shall be held each year on a date and at a time designated by the Board of Directors which shall be not more than fifteen (15) months after its last annual meeting. At each annual meeting, directors shall be elected, and any other proper business which is within the powers of the shareholders may be transacted.

Section 3. SPECIAL MEETING.

A.    A special meeting of the shareholders may be called at any time by the Board of Directors, or by the President, or by one or more shareholders holding shares in the aggregate entitled to cast not less than ten percent (10%) of the votes at that meeting.

B.    If a special meeting is called by any person or persons other than the Board of Directors, the request shall be in writing, specifying the time of such meeting and the general nature of the business proposed to be transacted, and shall be delivered personally or sent by registered mail or by telegraphic or other facsimile transmission to the President, any Vice President or the Secretary of the corporation. The officer receiving the request shall cause notice to be promptly given to the shareholders entitled to vote, in accordance

with the provisions of Sections 4 and 5 of this Article II, that a meeting will be held at the time requested by the person or persons calling the meeting, not less than thirty-five (35) nor more than sixty (60) days after the receipt of the request. If the notice is not given within twenty (20) days after receipt of the request, the person or persons requesting the meeting may give the notice. Nothing contained in this subparagraph B of this Section shall be construed as limiting, fixing or affecting the time when a meeting of shareholders called by action of the Board of Directors may be held.

Section 4. NOTICE OF SHAREHOLDERS' MEETINGS.

A.    All notices of meetings of shareholders shall be sent or otherwise given in accordance with Section 5 of this Article II and, except as set forth in subparagraph B of Section 3 of this Article II, shall be sent or otherwise given not less than ten (10) nor more than sixty (60) days before the date of the meeting. The notice shall specify the place, date and hour of the meeting and (i) in the case of a special meeting, the general nature of the business to be transacted, or (ii) in the case of the annual meeting, those matters which the Board of Directors, at the time of giving the notice, intends to present for action by the shareholders. The notice of any meeting at which directors are to be elected shall include the name of any nominee or nominees whom, at the time of the notice, management intends to present for election.

B.    If action is proposed to be taken at any meeting for approval of (i) a contract or transaction in which a director has a direct or indirect financial interest, pursuant to Section 310 of the California Corporations Code, (ii) an amendment of the Articles of Incorporation, pursuant to Section 902 of that Code, (iii) a reorganization of the corporation, pursuant to Section 1201 of that Code, (iv) a voluntary dissolution of the corporation, pursuant to Section 1900 of that Code, or (v) a distribution in dissolution other than in accordance with the rights of outstanding preferred shares, pursuant to Section 2007 of that Code, the notice shall also state the general nature of that proposal.

Section 5. MANNER OF GIVING NOTICE; AFFIDAVIT OF NOTICE. Notice of any meeting of shareholders shall be given either personally or by first-class mail or telegraphic or other written communication, charges prepaid, addressed to the shareholder at the address of that shareholder appearing on the books of the corporation or given by the shareholder to the corporation for the purpose of notice. If no such address appears on the corporation's books or is given, notice shall be deemed to have been given if sent to that shareholder by first-class mail or telegraphic or other written communication to the corporation's principal executive office, or if published at least once in a newspaper of general circulation in the county where that office is located. Notice shall be deemed to have been given at the time when delivered personally or deposited in the mail or sent by telegram or other means of written communication. To constitute prima facie evidence of the giving of such notice, the Secretary, Assistant Secretary, or any transfer agent of the corporation giving the notice, may execute and file in the Minute Book of the corporation

2

an affidavit of the mailing or other means of giving notice. If any notice or report addressed to the shareholder at the address of such shareholder appearing on the books of the corporation is returned to the corporation by the United States Postal Service marked to indicate that the United States Postal Service is unable to deliver the notice or report to the shareholder at such address, all future notices or reports shall be deemed to have been duly given without further mailing if the same shall be available for the shareholder upon written demand of the shareholder at the principal executive office of the corporation for a period of one year from the date of the giving of the notice or report to all other shareholders.

Section 6.  QUORUM.  The presence in person or by proxy of the holders of a majority of the shares entitled to vote at any meeting of shareholders shall constitute a quorum for the transaction of business.  The shareholders present at a duly called or held meeting at which a quorum is present may continue to do business until adjournment, notwithstanding the withdrawal of enough shareholders to leave less than a quorum, if any action taken (other than adjournment) is approved by at least a majority of the shares required to constitute a quorum.  In accordance with Section 112 of the California Corporations Code, if the corporation has shares outstanding which are accorded greater than or less than one vote per share, references in these Bylaws to "shares" shall mean the number of votes entitled to be cast with respect to such shares, unless the context otherwise requires.

Section 7.  ADJOURNED MEETING; NOTICE.  Any shareholders' meeting, annual or special, whether or not a quorum is present, may be adjourned from time to time by the vote of the majority of the shares represented at that meeting, either in person or by proxy, but in the absence of a quorum, no other business may be transacted at that meeting, except as provided in Section 6 of this Article II.  When any meeting of shareholders, either annual or special, is adjourned to another time and place, notice need not be given of the adjourned meeting if the time and place are announced at a meeting at which the adjournment is taken, unless a new record date for the adjourned meeting is fixed, or unless the adjournment is for more than forty-five (45) days from the date set for the original meeting, in which case the Board of Directors shall set a new record date.  Notice of any such adjourned meeting shall be given to each shareholder of record entitled to vote at the adjourned meeting in accordance with the provisions of Sections 4 and 5 of this Article II.  At any adjourned meeting the corporation may transact any business which might have been transacted at the original meeting.

Section 8.  VOTING.

A.     The shareholders entitled to vote at any meeting of shareholders shall be determined in accordance with the provisions of Section 11 of this Article II, subject to the provisions of Sections 702 to 704, inclusive, of the California Corporations Code (relating to voting shares held by a fiduciary, in the name of a corporation, or in joint ownership).

3

The shareholders' vote may be by voice or by ballot; provided, however, that any election for directors must be by ballot if demanded by any shareholder before the voting has begun. On any matter other than elections of directors, any shareholder may vote part of the shares in favor of the proposal and refrain from voting the remaining shares or vote them against the proposal, but, if the shareholder fails to specify the number of shares which the shareholder is voting affirmatively, it will be conclusively presumed that the shareholder's approving vote is with respect to all shares that the shareholder is entitled to vote. If a quorum is present, the affirmative vote of the majority of the shares represented at the meeting and entitled to vote on any matter (other than the election of directors) shall be the act of the shareholders, unless the vote of a greater number or voting by classes is required by California Corporations Code or by the Articles of Incorporation. In accordance with Section 112 of the California Corporations Code, if the corporation has shares outstanding which are accorded greater than or less than one vote per share, references in these Bylaws to "shares" shall mean the number of votes entitled to be cast with respect to such shares, unless the context otherwise requires.

B.      At a shareholders' meeting at which directors are to be elected, no shareholder shall be entitled to cumulate votes (i.e., cast for any one or more candidates a number of votes greater than the number of the shareholder's shares) unless the candidates' names have been placed in nomination prior to commencement of the voting and a shareholder has given notice prior to commencement of the voting of the shareholder's intention to cumulate votes. If any shareholder has given such a notice, then every shareholder entitled to vote may cumulate votes for candidates in nomination and give one candidate a number of votes equal to the number of directors to be elected multiplied by the number of votes to which that shareholder's shares are entitled, or distribute the shareholder's votes on the same principle among any or all of the candidates, as the shareholder thinks fit. The candidates receiving the highest number of votes, up to the number of directors to be elected, shall be elected.

Section 9.      WAIVER OF NOTICE OR CONSENT BY ABSENT SHAREHOLDERS. The transactions of any meeting of shareholders, either annual or special, however called and noticed, and wherever held, shall be as valid as though had at a meeting duly held after regular call and notice, if a quorum be present either in person or by proxy, and if, either before or after the meeting, each person entitled to vote, who was not present in person or by proxy, signs a written waiver of notice or a consent to a holding of the meeting, or an approval of the Minutes. The waiver of notice, consent or approval of the Minutes need not specify either the business to be transacted or the purpose of any annual or special meeting of shareholders, except that if action is taken or proposed to be taken for approval of any of those matters specified in subparagraph B of Section 4 of this Article II, the waiver of notice or consent shall state the general nature of the proposal. All such waivers, consents or approvals shall be filed with the corporate records or made a part of the Minutes of the meeting. Attendance by a person at a meeting shall also constitute a waiver of notice of that meeting, except when the person objects, at the beginning of the

4

meeting, to the transaction of any business because the meeting is not lawfully called or convened, and except that attendance at a meeting is not a waiver of any right to object to the consideration of matters not included in the notice of the meeting if that objection is expressly made at the meeting.

Section 10.  SHAREHOLDER ACTION BY WRITTEN CONSENT WITHOUT A MEETING.

A.    Any action which may be taken at any annual or special meeting of shareholders may be taken without a meeting and without prior notice, if a consent in writing, setting forth the action so taken, is signed by the holders of outstanding shares having not less than the minimum number of votes that would be necessary to authorize or take that action at a meeting at which all shares entitled to vote on that action were present and voted.  In the case of election of directors, such a consent shall be effective only if signed by the holders of all outstanding shares entitled to vote for the election of directors; provided, however, that a director may be elected at any time to fill a vacancy on the Board of Directors that has not been filled by the directors other than a vacancy caused by removal, by the written consent of the holders of a majority of the outstanding shares entitled to vote for the election of directors.  All such consents shall be filed with the Secretary of the corporation and shall be maintained in the corporate records.  Any shareholder giving a written consent, or the shareholder's proxy holders, or a transferee of the shares or a personal representative of the shareholder or their respective proxy holders, may revoke the consent by a writing received by the Secretary of the corporation before written consents of the number of shares required to authorize the proposed action have been filed with the Secretary.

B.    If in the case of action taken pursuant to subparagraph A of Section 10 of this Article II the consents of all shareholders entitled to vote have not been solicited in writing, or if the unanimous written consent of all such shareholders shall not have been received, the Secretary shall give prompt notice of the corporate action approved by the shareholders without a meeting.  This notice shall be given in the manner specified in Section 5 of this Article II.  In the case of approval of (i) contracts or transactions in which a director has a direct or indirect financial interest, pursuant to Section 310 of the California Corporations Code, (ii) indemnification of agents of the corporation, pursuant to Section 317 of that Code, (iii) a reorganization of the corporation, pursuant to Section 1201 of that Code, and (iv) a distribution in dissolution other than in accordance with the rights of outstanding preferred shares, pursuant to Section 2007 of that Code, the notice shall be given at least ten (10) days before the consummation of any action authorized by that approval.

C.    A written consent may be revoked as provided in Section 603(c) of the California Corporations Code.

Section 11. RECORD DATE FOR SHAREHOLDER NOTICE, VOTING, AND GIVING CONSENTS. For purposes of determining the shareholders entitled to notice of any meeting or to vote or entitled to give consent to corporate action without a meeting, the Board of Directors may fix, in advance, a record date, which shall not be more than sixty (60) days nor less than ten (10) days before the date of any such meeting nor more than sixty (60) days before any such action without a meeting, and in this event only shareholders of record on the date so fixed are entitled to notice and to vote or to give consents, as the case may be, notwithstanding any transfer of any shares on the books of the corporation after the record date, except as otherwise provided in the California Corporations Code. If the Board of Directors does not so fix a record date:

(a) The record date for determining shareholders entitled to notice of or to vote at a meeting of shareholders shall be at the close of business on the business day next preceding the day on which notice is given or, if notice is waived, at the close of business on the business day next preceding the day on which the meeting is held.

(b) The record date for determining shareholders entitled to give consent to corporate action in writing without a meeting, (i) when no prior action by the Board has been taken, shall be the day on which the first written consent is given, or (ii) when prior action of the Board has been taken, shall be at the close of business on the day on which the Board adopts the resolution relating to that action, or the sixtieth (60th) day before the date of such other action, whichever is later.

Provisions governing record dates for other purposes are located in Section 1 of Article VIII.

Section 12. PROXIES. Every person entitled to vote for directors or on any other matter shall have the right to do so either in person or by one or more agents authorized by a written proxy signed by the person and filed with the Secretary of the corporation. A proxy shall be deemed signed only if the shareholder's name is placed on the proxy by manual signature, by the shareholder or the shareholder's attorney in fact provided, however, that a facsimile (telefax) copy shall be deemed manually signed if confirming hard copy has been received by the corporation within two business days after the meeting at which the facsimile was used. A validly executed proxy which does not state that it is irrevocable shall continue in full force and effect unless (i) revoked by the person executing it, before the vote pursuant to that proxy, by a writing delivered to the corporation stating that the proxy is revoked, or by a subsequent proxy executed by, or attendance at the meeting and voting in person by, the person executing the proxy; or (ii) written notice of the death or incapacity of the maker of that proxy is received by the corporation before the vote pursuant to that proxy is counted; provided, however, that no proxy shall be valid after the expiration of eleven (11) months from the date of the proxy, unless otherwise provided in the proxy. The revocability of a proxy that states on its face that it is irrevocable shall be governed by the provisions of Sections 705(e) and 705(f) of the California Corporations Code.

6

Section 13. INSPECTORS OF ELECTION. Before any meeting of shareholders, the Board of Directors may appoint any persons other than nominees for office to act as inspectors of election at the meeting or its adjournment. If no inspectors of election are so appointed, the chairman of the meeting may, and on the request of any shareholder or a shareholder's proxy shall, appoint inspectors of election at the meeting. The number, method of appointment and duties shall be as set forth in Section 707 of the California Corporations Code.

## ARTICLE III

## DIRECTORS

Section 1. POWERS. Subject to the provisions of the California Corporations Code and any limitations in the Articles of Incorporation and these Bylaws relating to action required to be approved by the shareholders or by the outstanding shares (which terms, as used in these Bylaws, shall have the meanings ascribed to them in Sections 152 and 153 of the California Corporations Code), the business and affairs of the corporation shall be managed and all corporate powers shall be exercised by or under the direction of the Board of Directors.

Section 2. NUMBER AND QUALIFICATION OF DIRECTORS. The authorized number of directors shall be one (1) until changed by an amendment to this Bylaw approved by the shareholders; provided, however, that an amendment reducing the number of directors to a number less than five (5) cannot be adopted if the votes cast against its adoption at a meeting, or the shares not consenting in the case of action by written consent, are equal to more than sixteen and two-thirds percent (16-2/3%) of the outstanding shares entitled to vote.

Section 3. ELECTION AND TERM OF OFFICE OF DIRECTORS. Directors shall be elected at each annual meeting of the shareholders to hold office until the next annual meeting. Each director, including a director elected to fill a vacancy, shall hold office until the expiration of the term for which elected and until a successor has been elected and qualified.

Section 4. VACANCIES; RESIGNATION.

A.    A vacancy or vacancies in the Board of Directors shall be deemed to exist in the event of the death, resignation, or removal of any director, or if the Board of Directors by resolution declares vacant the office of a director who has been declared of unsound mind by an order of court or convicted of a felony, or if the authorized number of directors is increased, or if the shareholders fail, at any meeting of shareholders at which any director

7

or directors are elected, to elect the number of directors to be voted for at that meeting, or if any director duly elected shall refuse in writing to accept the position.

B.     Vacancies in the Board of Directors may be filled by a majority of the remaining directors, though less than a quorum, or by a sole remaining director, except that a vacancy created by the removal of a director may be so filled if and only if these Bylaws have then been adopted by the shareholders. The shareholders may elect a director or directors at any time to fill any vacancy or vacancies not filled by the directors; provided, however, that to fill any vacancy created by the removal of a director shall require the approval of the shareholders (as defined in Corporations Code § 153). Each director elected to fill a vacancy shall hold office until the expiration of the term for which elected and until a successor has been elected and qualified. Any director may resign effective on giving written notice to the President, the Secretary, or the Board of Directors, unless the notice specifies a later time for that resignation to become effective. If the resignation of a director is effective at a future time, the Board of Directors may elect a successor to take office when the resignation becomes effective. No reduction of the authorized number of directors shall have the effect of removing any director before that director's term of office expires.

Section 5. PLACE OF MEETINGS AND MEETINGS BY TELEPHONE. Regular meetings of the Board of Directors may be held at any place within or outside the State of California that has been designated from time to time by resolution of the Board. In the absence of such a designation, regular meetings shall be held at the principal executive office of the corporation. Special meetings of the Board shall be held at any place within or outside the State of California that has been designated in the notice of the meeting or, if not stated in the notice or there is no notice, at the principal executive office of the corporation. Any meeting, regular or special, may be held by conference telephone or similar communication equipment, so long as all directors participating in the meeting can hear one another, and all such directors shall be deemed to be present in person at the meeting.

Section 6. ANNUAL MEETING. Immediately following each annual meeting of shareholders, the Board of Directors shall hold a regular meeting for the purpose of organization, any desired election of officers, and the transaction of other business. Notice of this meeting shall not be required.

Section 7. OTHER REGULAR MEETINGS. Other regular meetings of the Board of Directors shall be held without call at such time as shall from time to time be fixed by the Board of Directors. Such regular meetings may be held without notice.

Section 8. SPECIAL MEETINGS. Special meetings of the Board of Directors for any purpose or purposes may be called at any time by the President or any Vice President or the Secretary or any one (1) director. Notice of the time and place of special meetings shall be delivered personally or by telephone to each director or sent by first-class mail or

telegram, charges prepaid, addressed to each director at that director's address as it is shown on the records of the corporation. In case the notice is mailed, it shall be deposited in the United States mail at least four (4) days before the time of the holding of the meeting. In case the notice is delivered personally, or by telephone or telegram, it shall be delivered personally or by telephone or to the telegraph company at least forty-eight (48) hours before the time of the holding of the meeting. Any oral notice given personally or by telephone may be communicated either to the director or to a person at the office of the director who the person giving the notice has reason to believe will promptly communicate it to the director. The notice need not specify the purpose of the meeting.

Section 9.  QUORUM.  A majority of the authorized number of directors shall constitute a quorum for the transaction of business, except to adjourn as provided in Section 11 of this Article III. Every act or decision done or made by the majority of the directors present at a meeting duly held at which a quorum is present shall be regarded as the act of the Board of Directors, subject to the provisions of Section 310 of the California Corporations Code (as to approval of contracts or transactions in which a director has a direct or indirect material financial interest), Section 311 of that Code (as to appointment of committees), and Section 317(e) of that Code (as to indemnification of directors). A meeting at which a quorum is initially present may continue to transact business notwithstanding the withdrawal of directors, if any action taken is approved by at least a majority of the required quorum for that meeting.

Section 10.  WAIVER OF NOTICE.  The transactions of any meeting of the Board of Directors, however called and noticed or wherever held, shall be as valid as though had at a meeting duly held after regular call and notice if a quorum is present and if, either before or after the meeting, each of the directors not present signs a written waiver of notice, a consent to holding the meeting or an approval of the Minutes. The waiver of notice, consent or approval of the Minutes need not specify the purpose of the meeting. All such waivers, consents, and approvals shall be filed with the corporate records or made a part of the Minutes of the meeting. Notice of a meeting shall also be deemed given to any director who attends the meeting without protesting before or at its commencement, the lack of notice to that director.

Section 11.  ADJOURNMENT.  A majority of the directors present, whether or not constituting a quorum, may adjourn any meeting to another time and place.

Section 12.  NOTICE OF ADJOURNMENT.  Notice of the time and place of holding an adjourned meeting need not be given, unless the meeting is adjourned for more than twenty-four (24) hours, in which case notice of the time and place shall be given before the time of the adjourned meeting, in the manner specified in Section 8 of this Article III, to the directors who were not present at the time of the adjournment.

Section 13.   ACTION WITHOUT MEETING.  Any action required or permitted to be taken by the Board of Directors may be taken without a meeting, if all members of the Board shall individually or collectively consent in writing to that action.  Such action by written consent shall have the same force and effect as a unanimous vote of the Board of Directors, and any resolution so adopted may be certified as having been adopted at a meeting of the Board of Directors held on the date of the last signature to consent at the principal executive office of the corporation.  Such written consent or consents shall be filed with the Minutes of the Proceedings of the Board.

Section 14.   FEES AND COMPENSATION OF DIRECTORS.  Directors and members of committees may receive such compensation, if any, for their services, and such reimbursement of expenses, as may be fixed or determined by resolution of the Board of Directors.  This Section 14 shall not be construed to preclude any director from serving the corporation in any other capacity as an officer, agent, employee, or otherwise, and receiving compensation for those services.

Section 15.   PERMITTED LOANS.  The Board of Directors shall be able to authorize the corporation to (A) make a loan of money or property to, or guarantee the obligation of, any officer, whether or not a director, of the corporation (or its parent or subsidiary, as such terms are defined in the California Corporations Code) and (B) adopt and implement an employee benefit plan authorizing such loans and guaranties if the Board of Directors determines that such loan, guarantee or employee benefit plan may reasonably be expected to benefit the corporation and approves such loan, guarantee or employee benefit plan by a vote sufficient without counting the vote of any interested director or directors, and no approval by the shareholders of such loan, guarantee or employee benefit plan shall be required if on the date of such approval by the Board of Directors, the corporation has outstanding shares held of record by 100 or more persons.

ARTICLE IV

COMMITTEES

Section 1.   COMMITTEES OF DIRECTORS.  The Board of Directors may, by resolution adopted by a majority of the authorized number of directors, designate one or more committees, each consisting of two or more directors, to serve at the pleasure of the Board.  The Board may designate one or more directors as alternate members of any committee, who may replace any absent member at any meeting of the committee.  The appointment of members or alternate members of any committee requires the vote of a majority of the authorized number of directors.  Any committee, to the extent provided in the resolution of the Board, shall have all the authority of the Board, except with respect to:

10

(a)    the approval of any action which, under the California Corporations Code, also requires shareholders' approval or approval of the outstanding shares (as defined in said Code);

(b)    the filling of vacancies on the Board of Directors or in any committee;

(c)    the fixing of compensation of the directors for serving on the Board or on any committee;

(d)    the amendment or repeal of Bylaws or the adoption of new Bylaws;

(e)    the amendment or repeal of any resolution of the Board of Directors which by its express terms is not so amendable or repealable;

(f)    a distribution to the shareholders of the corporation, except at a rate or in a periodic amount or within a price range determined by the Board of Directors; or

(g)    the appointment of any other committees of the Board of Directors or the members of these committees.

Section 2.    MEETINGS AND ACTION OF COMMITTEES.    Meetings and action of committees shall be governed by, and held and taken in accordance with, the provisions of Article III of these Bylaws, Sections 5 (place of meetings), 7 (regular meetings), 8 (special meetings and notice), 9 (quorum), 10 (waiver of notice), 11 (adjournment), 12 (notice of adjournment), and 13 (action without meeting), with such changes in the context of those Bylaws as are necessary to substitute the committee and its members for the Board of Directors and its members, except that the time of regular meetings of committees may be determined either by resolution of the Board of Directors or by resolution of the committee; special meetings of committees may also be called by committee. The Board of Directors may adopt rules for the government of any committee not inconsistent with the provisions of these Bylaws.

ARTICLE V

OFFICERS

Section 1.    OFFICERS.    The officers of the corporation shall be a President, a Secretary and a Treasurer. The corporation may also have, at the discretion of the Board of Directors, a Chairman of the Board, one or more Vice Presidents, one or more Assistant Secretaries, one or more Assistant Treasurers, and such other officers as may be appointed in accordance with the provisions of Section 3 of this Article V. Any number of offices

11

may be held by the same person.

Section 2. ELECTION OF OFFICERS. The officers of the corporation, except such officers as may be appointed in accordance with the provisions of Section 3 or Section 5 of this Article V, shall be chosen by the Board of Directors, and each shall serve at the pleasure of the Board, subject to the rights, if any, of an officer under any contract of employment.

Section 3. SUBORDINATE OFFICERS. The Board of Directors may appoint, and may empower the President to appoint, such other officers as the business of the corporation may require, each of whom shall hold office for such period, have such authority and perform such duties as are provided in the Bylaws or as the Board of Directors may from time to time determine.

Section 4. REMOVAL AND RESIGNATION OF OFFICERS.

A.     Subject to the rights, if any, of an officer under any contract of employment, any officer may be removed, either with or without cause, by the Board of Directors, at any regular or special meeting of the Board, or, except in case of an officer chosen by the Board of Directors, by any officer upon whom such power of removal may be conferred by the Board of Directors.

B.     Any officer may resign at any time by giving written notice to the corporation. Any resignation shall take effect at the date of the receipt of that notice or at any later time specified in that notice; and, unless otherwise specified in that notice, the acceptance of the resignation shall not be necessary to make it effective. Any resignation is without prejudice to the rights, if any, of the corporation under any contract to which the officer is a party.

Section 5. VACANCIES IN OFFICES. A vacancy in any office because of death, resignation, removal, disqualification or any other cause shall be filled in the manner prescribed in these Bylaws for regular appointments to that office.

Section 6. PRESIDENT. The President shall, if present, preside at meetings of the Board of Directors and exercise and perform such other powers and duties as may be from time to time assigned to him by the Board of Directors or prescribed by the Bylaws. The President shall be the General Manager of the corporation and shall, subject to the control of the Board of Directors, have general supervision, direction and control of the business and the officers of the corporation. He shall preside at all meetings of the shareholders and at all meetings of the Board of Directors. He shall have the general powers and duties of management usually vested in the office of President of a corporation, and shall have such other powers and duties as may be prescribed by the Board of Directors or the Bylaws.

12

Section 7.  VICE-PRESIDENTS.  In the absence or disability of the President, the Vice Presidents, if any, in order of their rank as fixed by the Board of Directors or, if not ranked, a Vice President designated by the Board of Directors, shall perform all the powers of, and be subject to all the restrictions upon, the President.  The Vice Presidents shall have such other powers and perform such other duties as from time to time may be prescribed for them respectively by the Board of Directors, the President or the Bylaws.

Section 8.  SECRETARY.  The Secretary shall keep or cause to be kept, at the principal executive office or such other place as the Board of Directors may direct, a Minute Book of all meetings and actions of directors, committees of directors and shareholders, with the time and place of holding, whether regular or special and, if special, how authorized, the notice given, the names of those present at directors' meetings or committee meetings, the number of shares present or represented at shareholders' meetings, and the Proceedings.  The Secretary shall also keep, or cause to be kept, at the principal executive office or at the office of the corporation's transfer agent or registrar, as determined by resolution of the Board of Directors, a record of shareholders, or a duplicate record of shareholders, showing the names of all shareholders and their addresses, the number and classes of shares held by each, the number and date of certificates issued for the same, and the number and date of cancellation of every certificate surrendered for cancellation.  The Secretary shall also give, or cause to be given, notice of all meetings of the shareholders and of the Board of Directors required by the Bylaws or by law to be given, and he shall keep the seal of the corporation if one be adopted, in safe custody, and shall have such other powers and perform such other duties as may be prescribed by the Board of Directors, the President or the Bylaws.

Section 9.  TREASURER.  The Treasurer shall keep and maintain, or cause to be kept and maintained, adequate and correct books and records of accounts of the properties and business transactions of the corporation, including accounts of its assets, liabilities, receipts, disbursements, gains, losses, capital, retained earnings and shares.  The Treasurer shall deposit all monies and other valuables in the name and to the credit of the corporation with such depositaries as may be designated by the Board of Directors.  He shall disburse the funds of the corporation as may be ordered by the Board of Directors, shall render to the President and directors, whenever they request it, an account of all of his transactions as Treasurer and of the financial condition of the corporation, and shall have other powers and perform such other duties as may be prescribed by the Board of Directors, the President or the Bylaws.

13

## ARTICLE VI

## INDEMNIFICATION OF DIRECTORS, OFFICERS, EMPLOYEES AND OTHER AGENTS

The corporation shall indemnify each of its agents to the fullest extent permitted by the California Corporations Code. In addition, and without limiting the generality of the foregoing sentence, the corporation:

(a)     is authorized to provide indemnification of agents in excess of that expressly permitted by Section 317 of the California Corporations Code for those agents of the corporation for breach of duty to the corporation and its shareholders; provided, however, that the corporation is not authorized to provide indemnification of any agent for any acts or omissions or transactions from which a director may not be relieved of liability as set forth in the exception to Section 204(a)(10) of the California Corporations Code or as to the circumstances in which indemnity is expressly prohibited by Section 317 of the California Corporations Code; and

(b)     shall have the power to purchase and maintain insurance on behalf of any agent of the corporation against any liability asserted against or incurred by the agent in such capacity or arising out of the agent's status as such, whether or not the corporation would have the power to indemnify the agent against such liability under the provisions of Section 317 of the California Corporations Code, and shall have the power to advance the expenses reasonably expected to be incurred by such agent in defending any such proceeding upon receipt of the undertaking required by subdivision (f) of such Section.

The term "agent" as used in this Article VI shall have the same meaning as such term is given in Section 317 of the California Corporations Code.

## ARTICLE VII

## RECORDS AND REPORTS

Section 1.    MAINTENANCE AND INSPECTION OF RECORD OF SHAREHOLDERS. The corporation shall keep at its principal executive office, or at the office of its transfer agent or registrar, if either be appointed and as determined by resolution of the Board of Directors, a record of its shareholders, giving the names and addresses of all shareholders and the number and class of shares held by each shareholder. The right of shareholders to inspect the record of shareholders shall be as set forth in the California Corporations Code.

14

Section 2. MAINTENANCE AND INSPECTION OF BYLAWS. The corporation shall keep at its principal executive office, or if its principal executive office is not in the State of California, at its principal business office in this state, the original or a copy of the Bylaws as amended to date, which shall be open to inspection by the shareholders at all reasonable times during office hours. If the principal executive office of the corporation is outside the State of California and the corporation has no principal business office in this state, the Secretary shall, upon the written request of any shareholder, furnish to that shareholder a copy of the Bylaws as amended to date.

Section 3. MAINTENANCE AND INSPECTION OF OTHER CORPORATE RECORDS. The accounting books and records and Minutes of Proceedings of the shareholders and the Board of Directors and any committee or committees of the Board of Directors shall be kept at such place or places designated by the Board of Directors, or, in the absence of such designation, at the principal executive office of the corporation. The Minutes shall be kept in written form and the accounting books and records shall be kept either in written form or in any other form capable of being converted into written form. The Minutes and accounting books and records shall be open to inspection upon the written demand of any shareholder or holder of a voting trust certificate, at any reasonable time during usual business hours, for a purpose reasonably related to the holder's interests as a shareholder or as the holder of a voting trust certificate. The inspection may be made in person or by an agent or attorney, and shall include the right to copy and make extracts. These rights of inspection shall extend to the records of each subsidiary corporation of the corporation.

Section 4. INSPECTION BY DIRECTORS. Every director shall have the absolute right at any reasonable time to inspect all books, records, and documents of every kind and the physical properties of the corporation and each of its subsidiary corporations. This inspection by a director may be made in person or by an agent or attorney and the right of inspection includes the right to copy and make extracts of documents.

Section 5. ANNUAL REPORT TO SHAREHOLDERS. The annual report to shareholders referred to in Section 1501 of the California Corporations Code is expressly dispensed with, but nothing herein shall be interpreted as prohibiting the Board of Directors from issuing annual or other periodic reports to the shareholders of the corporation as they consider appropriate.

Section 6. FINANCIAL STATEMENTS. A copy of any annual financial statement and any income statement of the corporation for each quarterly period of each fiscal year, and any accompanying balance sheet of the corporation as of the end of each such period, that has been prepared by the corporation shall be kept on file in the principal executive office of the corporation for twelve (12) months and each such statement shall be exhibited at all reasonable times to any shareholder demanding an examination of any such statement or a copy shall be mailed to any such shareholder. Shareholders shall have such additional

15

rights to obtain financial statements as are set forth in the California Corporations Code.

Section 7.   ANNUAL STATEMENT OF GENERAL INFORMATION.   The corporation shall timely file with the Secretary of State of the State of California, on the prescribed form, a statement setting forth the authorized number of directors, the names and complete business or residence addresses of all incumbent directors, the names and complete business or residence addresses of the President, Secretary and Treasurer, the street address of its principal executive office or principal business office in this state, and the general type of business constituting the principal business activity of the corporation, together with a designation of the agent of the corporation for the purpose of service of process, all in compliance with Section 1502 of the California Corporations Code.

ARTICLE VIII

GENERAL CORPORATE MATTERS

Section 1.   RECORD DATE FOR PURPOSES OTHER THAN NOTICE AND VOTING.   For purposes of determining the shareholders entitled to receive payment of any dividend or other distribution or allotment of any rights or entitled to exercise any rights in respect of any other lawful action (other than action by shareholders by written consent without a meeting), the Board of Directors may fix, in advance, a record date, which shall not be more than sixty (60) days before any such action, and in that case only shareholders of record on the date so fixed are entitled to receive the dividend, distribution, or allotment of rights or to exercise the rights, as the case may be, notwithstanding any transfer of any shares on the books of the corporation after the record date so fixed, except as otherwise provided in the California Corporations Code.  If the Board of Directors does not so fix a record date, the record date for determining shareholders for any such purpose shall be at the close of business on the day on which the Board adopts the applicable resolution or the sixtieth (60th) day before the date of that action, whichever is later.

Section 2.   CHECKS, DRAFTS, EVIDENCES OF INDEBTEDNESS.   All checks, drafts, or other orders for payment of money, notes, or other evidences of indebtedness, issued in the name of or payable to the corporation, shall be signed or endorsed by such person or persons and in such manner as, from time to time, shall be determined by resolution of the Board of Directors.

Section 3.   CORPORATE CONTRACTS AND INSTRUMENTS; HOW EXECUTED.   The Board of Directors, except as otherwise provided in these Bylaws, may authorize any officer or officers, agent or agents, to enter into any contract or execute any instrument in the name of and on behalf of the corporation, and this authority may be general or confined to specific instances; and, unless so authorized or ratified by the Board of Directors or within the agency power of an officer, no officer, agent, or employee shall

16

have any power or authority to bind the corporation by any contract or engagement or to pledge its credit or to render it liable for any purpose or for any amount.

Section 4. CERTIFICATES FOR SHARES. A certificate or certificates for shares of the capital stock of the corporation shall be issued to each shareholder when any of these shares are fully paid, and the Board of Directors may authorize the issuance of certificates or shares as partly paid provided that these certificates shall state the amount of the consideration to be paid for them and the amount paid. All certificates shall be signed in the name of the corporation by the President or Vice President and by the Treasurer or an Assistant Treasurer or the Secretary or any Assistant Secretary, certifying the number of shares and the class or series of shares owned by the shareholder. Any or all of the signatures on the certificate may be facsimile. In case any officer, transfer agent, or registrar who has signed or whose facsimile signature has been placed on a certificate shall have ceased to be that officer, transfer agent, or registrar before that certificate is issued, it may be issued by the corporation with the same effect as if that person were an officer, transfer agent, or registrar at the date of issue.

Section 5. LOST CERTIFICATES. Except as provided in this Section 5, no new certificates for shares shall be issued to replace an old certificate unless the latter is surrendered to the corporation and cancelled at the same time. The Board of Directors may, in case any share certificate or certificate for any other security is lost, stolen, or destroyed, authorize the issuance of a replacement certificate on such terms and conditions as the Board may require, including provision for indemnification of the corporation secured by a bond or other adequate security sufficient to protect the corporation against any claim that may be made against it, including any expense or liability, on account of the alleged loss, theft, or destruction of the certificate or the issuance of the replacement certificate.

Section 6. REPRESENTATION OF SHARES OF OTHER CORPORATIONS. The President or any Vice President or any other person authorized by resolution of the Board of Directors or by any of the foregoing designated officers, is authorized to vote on behalf of the corporation any and all shares of any other corporation or corporations, foreign or domestic, standing in the name of the corporation. The authority granted to these officers to vote or represent on behalf of the corporation any and all shares held by the corporation in any other corporation or corporations may be exercised by any of these officers in person or by any person authorized to do so by a proxy duly executed by these officers.

Section 7. CONSTRUCTION AND DEFINITIONS. Unless the context requires otherwise, the general provisions, rules of construction, and definitions in the California Corporations Code as in effect from time to time shall govern the construction of these Bylaws and references to particular sections of the California Corporations Code shall include any successor provisions. Without limiting the generality of this provision, the singular number includes the plural, the plural number includes the singular, the term "person" includes both a corporation and a natural person and pronouns of the masculine

gender include pronouns of the feminine gender.

Section 8. EMERGENCY PROVISIONS. During any emergency resulting from an attack on the United States or on a locality in which the corporation conducts its business or customarily holds meetings of its Board of Directors or its shareholders, or during any nuclear or atomic disaster, or during the existence of any catastrophe, or other similar emergency condition, as a result of which a quorum of the Board of Directors or of the executive committee, if any, cannot readily be convened for action, a meeting of the Board of Directors or of said committee may be called by any officer or director. Such notice may be given only to such of the directors or members of the committee, as the case may be, as it may be feasible to reach at the time and by such means as may be feasible at the time including, without limitation, publication or radio. The director or directors in attendance at the meeting of the Board of Directors and the member or members of the executive committee, if any, in attendance at the meeting of the committee, shall constitute a quorum. If none are in attendance at the meeting, the officers or other persons designated on a list approved by the Board of Directors before the emergency, all in such order of priority and subject to such conditions and for such period of time (not longer than reasonably necessary after the termination of the emergency) as may be provided in the resolution approving the list, shall, to the extent required to provide a quorum at any meeting of the Board of Directors or of the executive committee, be deemed directors or members of the committee, as the case may be, for such meeting. In the absence of a designation by the Board of Directors, the order of priority of such officers shall be as follows: President, Vice President, Treasurer, Secretary, Assistant Treasurer, Controller and Assistant Secretary. The Board of Directors, either before or during any such emergency, may provide, and from time to time modify, lines of succession in the event that during such emergency any or all officers or agents of the corporation shall for any reason be rendered incapable of discharging their duties. The Board of Directors, either before or during any such emergency, may, effective in the emergency, change the principal executive office or designate several alternative offices or authorize the officers so to do.

## ARTICLE IX

## AMENDMENTS

Section 1. AMENDMENT BY SHAREHOLDERS. New Bylaws may be adopted or these Bylaws may be amended or repealed by the vote or written consent of holders of a majority of the outstanding shares entitled to vote; provided, however, that if the Articles of Incorporation of the corporation set forth the number of authorized directors of the corporation, the authorized number of directors may be changed only by an amendment of the Articles of Incorporation.

Section 2. AMENDMENT BY DIRECTORS. In addition to the rights of the

18

shareholders as provided in Section 1 of this Article IX, Bylaws, other than a Bylaw or an amendment of a Bylaw changing the authorized number of directors, may be adopted, amended, or repealed by the Board of Directors.

## CERTIFICATE OF ADOPTION OF BYLAWS

I, the undersigned, the Incorporator of CROSS LINK-D, INC., a California corporation, do hereby certify that the foregoing Bylaws were adopted as the Bylaws of the corporation on the _____ day of March, 2005, and the same do now constitute the Bylaws of said corporation.

IN WITNESS WHEREOF, I have hereunto subscribed my name this _18_ day of March, 2005.

_____, Incorporator

dao:dao:KEC.4902\155788_1.DOC

20



**BYLAWS**
**OF**
**CROSSLINK-D, INC.,**
a Delaware corporation

(as amended and restated by shareholder vote on August 1, 2006)

# BYLAWS
# OF
# CROSSLINK-D; INC.,
## a Delaware corporation

---

## TABLE OF CONTENTS

| | | |
|---|---|---|
| **1.** | **CORPORATE OFFICES** | 1 |
| 1.1. | REGISTERED OFFICE | 1 |
| 1.2. | OTHER OFFICES | 1 |
| **2.** | **DIRECTORS** | 1 |
| 2.1. | POWERS | 1 |
| 2.2. | NUMBER AND TERM OF OFFICE OF DIRECTORS | 1 |
| 2.3. | ELECTION AND QUALIFICATION OF DIRECTORS | 1 |
| 2.4. | RESIGNATION AND VACANCIES | 2 |
| | 2.4.1.   Resignation | 2 |
| | 2.4.2.   Increase in Board Size – One Class of Voting Shares | 2 |
| | 2.4.3.   Increase in Board Size – Multiple Classes of Voting Shares | 2 |
| | 2.4.4.   Death or Resignation | 2 |
| | 2.4.5.   Vacancy of a Majority of the Positions Authorized | 2 |
| 2.5. | PLACE OF MEETINGS; MEETINGS BY TELEPHONE | 3 |
| 2.6. | FIRST MEETINGS | 3 |
| 2.7. | REGULAR MEETINGS | 3 |
| 2.8. | SPECIAL MEETINGS; NOTICE | 3 |
| 2.9. | QUORUM | 3 |
| 2.10. | WAIVER OF NOTICE | 3 |
| 2.11. | BOARD ACTION BY WRITTEN CONSENT WITHOUT A MEETING | 4 |
| 2.12. | FEES AND COMPENSATION OF DIRECTORS | 4 |
| 2.13. | APPROVAL OF LOANS TO OFFICERS | 4 |
| 2.14. | REMOVAL OF DIRECTORS | 4 |
| **3.** | **COMMITTEES** | 5 |
| 3.1. | COMMITTEES OF DIRECTORS | 5 |
| 3.2. | COMMITTEE-MINUTES | 5 |
| 3.3. | MEETINGS AND ACTION OF COMMITTEES | 5 |
| **4.** | **OFFICERS** | 6 |
| 4.1. | OFFICERS | 6 |
| 4.2. | APPOINTMENT OF OFFICERS | 6 |
| 4.3. | SUBORDINATE OFFICERS | 6 |
| 4.4. | REMOVAL AND RESIGNATION OF OFFICERS | 6 |
| | 4.4.1.   Removal | 6 |
| | 4.4.2.   Resignation | 6 |
| 4.5. | VACANCIES IN OFFICES | 7 |
| 4.6. | CHAIRMAN OF THE BOARD | 7 |
| 4.7. | CHIEF EXECUTIVE OFFICER | 7 |
| 4.8. | PRESIDENT | 7 |
| 4.9. | VICE PRESIDENTS | 7 |
| 4.10. | SECRETARY | 8 |
| | 4.10.1.   Minutes | 8 |
| | 4.10.2.   Share Register | 8 |
| | 4.10.3.   Notice of Meetings | 8 |

Bylaws of
CrossLink-D, Inc.
Table of Contents (continued)

| | | |
|---|---|---|
| 4.11. | TREASURER | 8 |
| | 4.11.1.  Chief Financial Officer | 8 |
| | 4.11.2.  Deposits | 8 |
| 4.12. | ASSISTANT SECRETARY | 9 |
| 4.13. | ASSISTANT TREASURER | 9 |
| 4.14. | REPRESENTATION OF SHARES OF OTHER CORPORATIONS | 9 |
| 4.15. | AUTHORITY AND DUTIES OF OFFICERS | 9 |
| **5.** | **MEETINGS OF STOCKHOLDERS** | **9** |
| 5.1. | PLACE OF MEETINGS | 9 |
| 5.2. | ANNUAL MEETING | 9 |
| 5.3. | SPECIAL MEETINGS | 10 |
| | 5.3.1.  Called by the Board or Authorized Officers | 10 |
| | 5.3.2.  Called by Other Persons | 10 |
| 5.4. | NOTICE OF STOCKHOLDERS' MEETINGS | 10 |
| 5.5. | NOTICE PROCEDURE | 10 |
| | 5.5.1.  Manner of Giving Notice; Affidavit of Notice | 10 |
| | 5.5.2.  Undeliverable Notices | 10 |
| 5.6. | QUORUM | 11 |
| 5.7. | ADJOURNED MEETING; NOTICE | 11 |
| 5.8. | CONDUCT OF BUSINESS | 11 |
| 5.9. | VOTING | 11 |
| | 5.9.1.  Percentage Required | 11 |
| | 5.9.2.  Voting Power | 12 |
| 5.10. | WAIVER OF NOTICE | 12 |
| 5.11. | STOCKHOLDER ACTION BY WRITTEN CONSENT WITHOUT A MEETING | 12 |
| | 5.11.1.  Written Consent Authorized | 12 |
| | 5.11.2.  Notice of Action by Written Consent | 12 |
| 5.12. | RECORD DATE FOR STOCKHOLDER NOTICE; VOTING; GIVING CONSENTS | 12 |
| | 5.12.1.  Designation of Record Date | 12 |
| | 5.12.2.  Deemed Record Date Where None is Set | 13 |
| 5.13. | PROXIES | 13 |
| 5.14. | LIST OF STOCKHOLDERS ENTITLED TO VOTE | 14 |
| 5.15. | INSPECTORS OF ELECTION | 14 |
| **6.** | **INDEMNITY** | **15** |
| 6.1. | THIRD PARTY ACTIONS | 15 |
| 6.2. | ACTIONS BY OR IN THE RIGHT OF THE CORPORATION | 15 |
| 6.3. | SUCCESSFUL DEFENSE | 16 |
| 6.4. | DETERMINATION OF CONDUCT | 16 |
| 6.5. | PAYMENT OF EXPENSES IN ADVANCE | 16 |
| 6.6. | INDEMNITY NOT EXCLUSIVE | 16 |
| 6.7. | INSURANCE INDEMNIFICATION | 16 |
| 6.8. | THE CORPORATION | 17 |
| 6.9. | EMPLOYEE BENEFIT PLANS | 17 |
| 6.10. | INDEMNITY FUND | 17 |
| 6.11. | INDEMNIFICATION OF OTHER PERSONS | 17 |
| 6.12. | SAVINGS CLAUSE | 17 |
| 6.13. | CONTINUATION OF INDEMNIFICATION AND ADVANCEMENT OF EXPENSES | 18 |
| **7.** | **RECORDS AND REPORTS** | **18** |
| 7.1. | MAINTENANCE AND INSPECTION OF RECORDS | 18 |
| | 7.1.1.  Records | 18 |
| | 7.1.2.  Shareholder Inspection | 18 |
| 7.2. | INSPECTION BY DIRECTORS | 18 |
| 7.3. | ANNUAL STATEMENT TO STOCKHOLDERS | 19 |

Bylaws of
CrossLink-D, Inc.
Table of Contents (continued)

8.    GENERAL MATTERS ..................................................................................................... 19
8.1.    CHECKS ......................................................................................................................... 19
8.2.    EXECUTION OF CORPORATE CONTRACTS AND INSTRUMENTS ........................... 19
8.3.    STOCK CERTIFICATES ................................................................................................ 19
8.4.    PARTLY PAID SHARES .............................................................................................. 20
8.5.    DESIGNATION ON CERTIFICATES ........................................................................... 20
8.6.    LOST CERTIFICATES ................................................................................................. 20
8.7.    CONSTRUCTION; DEFINITIONS ............................................................................... 20
8.8.    DIVIDENDS .................................................................................................................. 21
          8.8.1.    Declaration ................................................................................................ 21
          8.8.2.    Reserves .................................................................................................... 21
8.9.    FISCAL YEAR .............................................................................................................. 21
8.10.    SEAL ........................................................................................................................... 21
8.11.    TRANSFER OF STOCK ............................................................................................... 21
8.12.    STOCK TRANSFER AGREEMENTS .......................................................................... 21
8.13.    REGISTERED STOCKHOLDERS ............................................................................... 21

9.    NOTICES ...................................................................................................................... 22
9.1.    METHOD ....................................................................................................................... 22
9.2.    WAIVER ....................................................................................................................... 22

10.    DISSOLUTION ............................................................................................................. 22
10.1.    BOARD ACTION .......................................................................................................... 22
10.2.    SHAREHOLDER ACTION ........................................................................................... 22
10.3.    ACTION WITHOUT MEETING ................................................................................... 23

11.    CUSTODIAN ................................................................................................................. 23
11.1.    APPOINTMENT OF THE CUSTODIAN IN CERTAIN CASES ..................................... 23
11.2.    DUTIES OF CUSTODIAN ............................................................................................ 23

12.    AMENDMENTS ............................................................................................................ 24
12.1.    AMENDMENTS BY THE BOARD ............................................................................... 24
12.2.    AMENDMENTS BY STOCKHOLDERS ....................................................................... 24

BYLAWS
OF
CROSSLINK-D, INC.,
a Delaware corporation

——  ————————————

(as amended and restated by shareholder vote on August 1, 2006)


## 1. CORPORATE OFFICES

**1.1.   Registered Office.**

The initial registered office of the corporation is Paracorp Incorporated, 3500 South DuPont Highway, in the City of Dover, County of Kent. The name of the initial registered agent of the corporation at such location is Paracorp Incorporated. The officers of the corporation may change the registered agent and the registered office of the corporation in the State of Delaware to that of any reputable professional agent.

**1.2.   Other Offices.**

The corporation may also have offices at such other places both within and without the State of Delaware as the board of directors of the corporation (the "Board") may from time to time determine or the business of the corporation may require.


## 2. DIRECTORS

**2.1.   Powers.**

Subject to the provisions of the Delaware General Corporation Law (the "GCL") and any limitations in the Certificate of Incorporation or these Bylaws relating to action required to be approved by the stockholders or by the outstanding shares, the business and affairs of the corporation shall be managed and all corporate powers shall be exercised by or under the direction of the Board.

**2.2.   Number and Term of Office of Directors.**

The Board shall consist of one or more members, the number thereof to be determined from time to time by the Board. The initial number of directors shall be one (1). Except as provided in Section 2.4, a director shall be elected at each annual meeting of stockholders to hold office until a successor is elected and qualified.

**2.3.   Election and Qualification of Directors.**

Directors need not be stockholders unless so required by the Certificate of Incorporation or these Bylaws, wherein other qualifications for directors may be prescribed. Each director shall hold office for the term to which he is elected or until his successor is elected and qualified or until his earlier death, resignation, or removal.

Bylaws of
CrossLink-D, Inc.

### 2.4.  Resignation and Vacancies.

#### 2.4.1.  Resignation.

Any director may resign at any time upon written notice to the corporation. When one or more directors so resigns and the resignation is effective at a future date, a majority of the directors then in office, including those who have so resigned, shall have power to fill such vacancy or vacancies, the vote thereon to take effect when such resignation or resignations shall become effective, and each director so chosen shall hold office as provided in this section in the filling of other vacancies.

#### 2.4.2.  Increase in Board Size – One Class of Voting Shares.

Unless otherwise provided in the Certificate of Incorporation or these Bylaws, vacancies and newly created directorships resulting from any increase in the authorized number of directors elected by all of the stockholders having the right to vote as a single class may be filled by a majority of the directors then in office, although less than a quorum, or by a sole remaining director.

#### 2.4.3.  Increase in Board Size – Multiple Classes of Voting Shares.

Whenever the holders of any class or classes of stock or series thereof are entitled to elect one or more directors by the provisions of the Certificate of Incorporation, vacancies and newly created directorships of such class or classes or series may be filled by a majority of the directors elected by such class or classes or series thereof then in office, or by a sole remaining director so elected.

#### 2.4.4.  Death or Resignation.

If at any time, by reason of death or resignation or other cause, the corporation should have no directors in office, then any officer or any stockholder or an executor, administrator, trustee, or guardian of a stockholder, or other fiduciary entrusted with like responsibility for the person or estate of a stockholder, may call a special meeting of stockholders in accordance with the provisions of the Certificate of Incorporation or these bylaws, or may apply to the Court of Chancery for a decree summarily ordering an election as provided in GCL Section 211.

#### 2.4.5.  Vacancy of a Majority of the Positions Authorized.

If, at the time of filling any vacancy or any newly created directorship, the directors then in office constitute less than a majority of the whole Board (as constituted immediately before any such increase), then the Court of Chancery may, upon application of any stockholder or stockholders holding at least ten percent (10%) of the total number of the shares at the time outstanding having the right to vote for such directors, summarily order an election to be held to fill any such vacancies or newly created directorships, or to replace the directors chosen by the directors then in office as aforesaid, which election shall be governed by the provisions of GCL Section 211 as far as applicable.

Bylaws of
CrossLink-D, Inc.

### 2.5.    Place of Meetings; Meetings by Telephone.
The Board of the corporation may hold meetings, both regular and special, and keep the books of the corporation either within or outside the State of Delaware. Unless otherwise restricted by the Certificate of Incorporation or these Bylaws, members of the Board, or any committee designated by the Board, may participate in a meeting of the Board, or any committee, by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at the meeting.

### 2.6.    First Meetings.
The first meeting of each newly elected Board shall be held at such time and place as shall be fixed by the vote of the stockholders at the annual meeting and no notice of such meeting shall be necessary to the newly elected directors in order legally to constitute the meeting, provided a quorum shall be present. In the event of the failure of the stockholders to fix the time or place of such first meeting of the newly elected Board, or in the event such meeting is not held at the time and place as shall be specified in a notice given as hereinafter provided for special meetings of the Board, or as shall be specified in a written waiver signed by all of the directors.

### 2.7.    Regular Meetings.
Subject to Section 12.1, regular meetings of the Board may be held without notice at such time and at such place as shall from time to time be determined by the Board. Except as otherwise provided by statute, any business may be transacted at any regular meeting of the Board.

### 2.8.    Special Meetings; Notice.
Special meetings of the Board for any purpose or purposes may be called at any time by the Chairman of the Board, the Chief Executive Officer, or the President on at least forty-eight hours' notice to each director as provided in Article 9. Special meetings shall be called by the President or the Secretary in like manner and on like notice on the written request of any two directors unless the Board consists of only one director, in which case special meetings shall be called by the President or Secretary in like manner and on like notice on the written request of the sole director. The notice of meeting shall include the substance of any proposal to make, repeal, alter, amend, or rescind any of these Bylaws.

### 2.9.    Quorum.
At all meetings of the Board, a majority of the authorized number of directors shall constitute a quorum for the transaction of business and the act of a majority of the directors present at any meeting at which there is a quorum shall be the act of the Board, except as may be otherwise specifically provided by statute or by the Certificate of Incorporation or these Bylaws. If a quorum is not present at any meeting of the Board, then the directors present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum is present. A meeting at which a Quorum is initially present may continue to transact business notwithstanding the withdrawal of directors, if any action taken is approved by all the remaining directors, provided that the remaining directors constitute the required quorum for that meeting.

Bylaws of
CrossLink-D, Inc.

**2.10.   Waiver of Notice.**
Whenever notice is required to be given under any provision of the statutes, the Certificate of
Incorporation, or these Bylaws, a waiver thereof in writing or by telegraph, cable, or other
written form of recorded communication, signed by the person or persons entitled to the notice,
whether before or after the time stated therein, shall be deemed equivalent to notice.  Attendance
of a person at a meeting shall constitute a waiver of notice to such person of such meeting,
except when the person objects at the beginning of the meeting to the transaction of any business
because the meeting is not lawfully called or convened.  Neither the business to be transacted at,
nor the purpose of, any regular or special meeting of the directors, or members of a committee of
directors, need be specified in any written waiver of notice unless so required by the Certificate
of Incorporation or these Bylaws.

**2.11.   Board Action by Written Consent Without a Meeting.**
Unless otherwise restricted by statute, the Certificate of Incorporation, or these Bylaws, any
action required or permitted to be taken at any meeting of the Board, or of any committee
thereof, may be taken without a meeting if all members of the Board or committee, as the case
may be, consent thereto in writing and the writing or writings are filed with the minutes of
proceedings of the Board or committee.

**2.12.   Fees and Compensation of Directors.**
Unless otherwise restricted by the Certificate of Incorporation or these Bylaws, the Board shall
have the authority to fix the compensation of directors.

**2.13.   Approval of Loans to Officers.**
The corporation may lend money to, or guarantee any obligation of, or otherwise assist any
officer or other employee of the corporation or of its subsidiary, including any officer or
employee who is a director of the corporation or its subsidiary, whenever, in the judgment of the
directors, such loan, guaranty, or assistance may reasonably be expected to benefit the
corporation.  The loan, guaranty, or other assistance may be with or without interest and may be
unsecured, or secured in such manner as the Board shall approve, including, without limitation, a
pledge of shares of stock of the corporation.  Nothing contained in this Section 2.13 shall be
deemed to deny, limit, or restrict the powers of guaranty or warranty of the corporation at
common law or under any statute.

**2.14.   Removal of Directors.**
Unless otherwise restricted by statute, by the Certificate of Incorporation or by these bylaws, any
director or the entire Board may be removed, with or without cause, by the holders of a majority
of the shares then entitled to vote at an election of directors; provided, however, that, so long as
shareholders of the corporation are entitled to cumulative voting, if less than the entire Board is
to be removed, no director may be removed without cause if the votes cast against his removal
would be sufficient to elect him if then cumulatively voted at an election of the entire Board.  No
reduction of the authorized number of directors shall have the effect of removing any director
prior to the expiration of such director's term of office.

Bylaws of
CrossLink-D, Inc.

## 3. COMMITTEES

### 3.1.    Committees of Directors.

The Board may, by resolution passed by a majority of the whole Board, designate one or more committees, with each committee to consist of one or more of the directors of the corporation. The Board may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. In the absence or disqualification of a member of a committee, if no alternate members have been appointed, the member or members thereof present at any meeting and not disqualified from voting, whether or not he or they constitute a quorum, may unanimously appoint another member of the Board to act at the meeting in the place of any such absent or disqualified member. Any such committee, to the extent provided in the resolution of the Board or in the Bylaws of the corporation, shall have and may exercise all the powers and authority of the Board in the management of the business and affairs of the corporation, and may authorize the seal of the corporation to be affixed to all papers that may require it; but no such committee shall have the power or authority to (i) amend the Certificate of Incorporation (except that a committee may, to the extent authorized in the resolution or resolutions providing for the issuance of shares of stock adopted by the Board as provided in the GCL, fix the designations and any of the preferences or rights of such shares relating to dividends, redemption, dissolution, any distribution of assets of the corporation, or the conversion into, or the exchange of such shares for, shares of any other class or classes or any other series of the same or any other class or classes of stock of the corporation or fix the number of shares of any series of stock or authorize the increase or decrease of the shares of any series), (ii) adopt an agreement of merger or consolidation under the GCL, (iii) recommend to the stockholders the sale, lease, or exchange of all or substantially all of the corporation's property and assets, (iv) recommend to the stockholders a dissolution of the corporation or a revocation of a dissolution, or (v) amend the Bylaws of the corporation; and, unless the Board resolution establishing the committee, the Bylaws, or the Certificate of Incorporation expressly so provide, no such committee shall have the power or authority to declare a dividend, to authorize the issuance of stock, or to adopt a certificate of ownership and merger pursuant to the GCL.

### 3.2.    Committee Minutes.

Each committee shall keep regular minutes of its meetings and report the same to the Board when required.

### 3.3.    Meetings and Action of Committees.

Meetings and actions of committees shall be governed by, and held and taken in accordance with, the provisions of Article 2, Section 2.5 (place of meetings and meetings by telephone), Section 2.7 (regular meetings), Section 2.8 (special meetings and notice), Section 2.9 (quorum), Section 2.10 (waiver of notice), and Section 2.11 (action without a meeting), with such changes in the context of those Bylaws as are necessary to substitute the committee and its members for the Board and its members; provided, however, that the time of regular meetings of committees may be determined either by resolution of the Board or by resolution of the committee, that special meetings of committees may also be called by resolution of the Board, and that notice of

Bylaws of
CrossLink-D, Inc.

special meetings of committees shall also be given to all alternate members, who shall have the right to attend all meetings of the committee. The Board may adopt rules for the government of any committee not inconsistent with the provisions of these Bylaws. If a committee is comprised of an odd number of members, a quorum shall consist of a majority of that number. If the committee is comprised of an even number of members, a quorum shall consist of one-half of that number. If a committee is comprised of two members, a quorum shall consist of both members.

## 4. OFFICERS

### 4.1.    Officers.
The officers of the corporation shall be a President, a Secretary, and a Treasurer. The corporation may also have, at the discretion of the Board, a Chairman of the Board, a Chief Executive Officer, one or more Vice Presidents, one or more Assistant Secretaries, one or more Assistant Treasurers, and any such other officers as may be appointed in accordance with the provisions of Section 4.3. Any number of offices may be held by the same person.

### 4.2.    Appointment of Officers.
The officers of the corporation, except such officers as may be appointed in accordance with the provisions of Sections 4.3 or 4.5, shall be appointed by the Board and each shall serve at the pleasure of the Board, subject to the rights, if any, of any officer under any contract of employment.

### 4.3.    Subordinate Officers.
The Board may appoint, or empower the Chief Executive Officer or the President to appoint, such other officers and agents as the business of the corporation may require, each of whom shall hold office for such period, have such authority, and perform such duties as are provided in these Bylaws or as the Board may from time to time determine. Officers appointed by the Board shall constitute executive officers of the corporation. Officers appointed by the President or Chief Executive Officer shall be subordinate officers, unless otherwise specified by the Board.

### 4.4.    Removal and Resignation of Officers.

#### 4.4.1.    Removal.
Any officer may be removed, either with or without cause, by an affirmative vote of the majority of the Board at any regular or special meeting of the Board or, except in the case of an officer chosen by the Board, by an officer upon whom such power of removal may be conferred by the Board, provided that such removal shall not prejudice the remedy of such officer under any contract of employment.

#### 4.4.2.    Resignation.
Any officer may resign at any time by giving written notice to the corporation. Any resignation shall take effect at the date of the receipt of that notice or at any later time specified in that notice; and, unless otherwise specified in that notice, the acceptance of

Bylaws of
CrossLink-D, Inc.

the resignation shall not be necessary to make it effective. Any resignation is without prejudice to the rights, if any, of the corporation under any contract to which the officer is a party.

**4.5.    Vacancies in Offices.**
Any vacancy occurring in any office of the corporation shall be filled by the Board if such officer was appointed by the Board, or by such other person as appointed by the Board to fill such vacancy.

**4.6.    Chairman of the Board.**
The Chairman of the Board, if such an officer be elected, shall, if present, preside at meetings of the Board and exercise and perform such other powers and duties as may from time to time be assigned to him by the Board or as may be prescribed by these Bylaws. If there is no Chief Executive Officer or President, then the Chairman of the Board shall also be the Chief Executive Officer of the corporation and shall have the powers and duties prescribed in Section 4.7.

**4.7.    Chief Executive Officer.**
Subject to such supervisory powers, if any, as may be given by the Board to the Chairman of the Board, if there be such an officer, the Chief Executive Officer of the corporation shall, subject to the control of the Board, have general supervision, direction, and control of the business and the officers of the corporation. He shall preside at all meetings of the stockholders and, in the absence or nonexistence of a Chairman of the Board, at all meetings of the Board. The Chief Executive Officer shall have the general powers and duties of management usually vested in the chief executive officer of a corporation and shall have such other powers and duties as may be prescribed by the Board or these Bylaws.

**4.8.    President.**
Subject to such supervisory powers, if any, as may be given by the Board to the Chairman of the Board or the Chief Executive Officer, if there be such officers, the President shall have general supervision, direction, and control of the business and other officers of the corporation. The President shall have the general powers and duties of management usually vested in the office of president of a corporation and shall have such other powers and duties as may be prescribed by the Board or these Bylaws.

**4.9.    Vice Presidents.**
In the absence or disability of the Chief Executive Officer and President, the Vice Presidents, if any, in order of their rank as fixed by the Board or, if not ranked, a Vice President designated by the Board, shall perform all the duties of the President and when so acting shall have all the powers of, and be subject to all the restrictions upon, the President and Chief Executive Officer. The Vice Presidents shall have such other powers and perform such other duties as from time to time may be prescribed for them respectively by the Board, these Bylaws, the President, Chief Executive Officer, or the Chairman of the Board.

Bylaws of
CrossLink-D, Inc.

**4.10. Secretary.**

**4.10.1. Minutes.**

The Secretary shall keep or cause to be kept, at the principal executive office of the corporation or such other place as the Board may direct, a book of minutes of all meetings and actions of directors, committees of directors, and stockholders. The minutes shall show the time and place of each meeting, whether regular or special (and, if special, how authorized and the notice given), the names of those present at directors' meetings or committee meetings, the number of shares present or represented at stockholders' meetings, and the proceedings thereof.

**4.10.2. Share Register.**

The Secretary shall keep, or cause to be kept, at the principal executive office of the corporation or at the office of the corporation's transfer agent or registrar, as determined by resolution of the Board, a share register, or a duplicate share register, showing the names of all stockholders and their addresses, the number and classes of shares held by each, the number and date of certificates evidencing such shares, and the number and date of cancellation of every certificate surrendered for cancellation.

**4.10.3. Notice of Meetings.**

The Secretary shall give, or cause to be given, notice of all meetings of the stockholders and of the Board required to be given by law or by these Bylaws. He shall keep the seal of the corporation, if one be adopted, in safe custody and shall have such other powers and perform such other duties as may be prescribed by the Board or by these Bylaws.

**4.11. Treasurer.**

**4.11.1. Chief Financial Officer.**

The Treasurer shall be the Chief Financial Officer of the corporation, shall keep and maintain, or cause to be kept and maintained, adequate and correct books and records of accounts of the properties and business transactions of the corporation, including accounts of its assets, liabilities, receipts, disbursements, gains, losses, capital, retained earnings, and shares. The books of account shall at all reasonable times be open to inspection by any director as provided in Section 7.2.

**4.11.2. Deposits.**

The Treasurer shall deposit all moneys and other valuables in the name and to the credit of the corporation with such depositories as may be designated by the Board. He shall disburse the funds of the corporation as may be ordered by the Board, shall render to the Chief Executive Officer, President, and directors, whenever they request it, an account of all his transactions as Treasurer and of the financial condition of the corporation, and shall have other powers and perform such other duties as may be prescribed by the Board or these Bylaws.

Bylaws of
CrossLink-D, Inc.

## 4.12.  Assistant Secretary.

The assistant secretary, or, if there is more than one, the assistant secretaries in the order determined by the stockholders or the Board (or if there be no such determination, then in the order of their election) shall, in the absence of the secretary or in the event of his or her inability or refusal to act, perform the duties and exercise the powers of the secretary and shall perform such other duties and have such other powers as the Board or the stockholders may from time to time prescribe.

## 4.13.  Assistant Treasurer.

The assistant treasurer, or, if there is more than one, the assistant treasurers, in the order determined by the stock holders or the Board (or if there be no such determination, then in the order of their election), shall, in the absence of the treasurer or in the event of his or her inability or refusal to act, perform the duties and exercise the powers of the treasurer and shall perform such other duties and have such other powers as the Board or the stockholders may from time to time prescribe.

## 4.14.  Representation of Shares of Other Corporations.

The Chairman of the Board, the Chief Executive Officer, the President, the Vice President, the Treasurer, the Secretary or Assistant Secretary of the corporation, or any other person authorized by the Board or the Chief Executive Officer or the President, is authorized to vote, represent, and exercise on behalf of the corporation all rights incident to any and all shares of any other corporation or corporations standing in the name of the corporation.  The authority granted herein may be exercised either by such person directly or by any other person authorized to do so by proxy or power of attorney duly executed by such person having the authority.

## 4.15.  Authority and Duties of Officers.

In addition to the foregoing authority and duties, all officers of the corporation shall respectively have such authority and perform such duties in the management of the business of the corporation as may be designated from time to time by the Board or the stockholders.

# 5.  MEETINGS OF STOCKHOLDERS

## 5.1.  Place of Meetings.

Meetings of stockholders shall be held at any place, within or outside the State of Delaware, designated by the Board.  In the absence of any such designation, stockholders' meetings shall be held at the registered office of the corporation.

## 5.2.  Annual Meeting.

The annual meeting of stockholders shall be held each year on a date and at a time designated by the Board.  At the meeting, directors shall be elected and any other proper business may be transacted.

Bylaws of
CrossLink-D, Inc.

### 5.3. Special Meetings.

#### 5.3.1. Called by the Board or Authorized Officers.

A special meeting of the stockholders may be called at any time by the Board, the Chairman of the Board, the Chief Executive Officer, the President, or one or more stockholders holding shares in the aggregate entitled to cast not less than ten percent of the votes at that meeting.

#### 5.3.2. Called by Other Persons.

If a special meeting is called by any person or persons other than the Board, the Chairman of the Board, the Chief Executive Officer, or the President, the request shall be in writing, shall specify the time of such meeting and the general nature of the business proposed to be transacted, and shall be delivered personally, or sent by certified or express mail or by telegraphic or other facsimile transmission to the Chairman of the Board, the Chief Executive Officer, the President, or the Secretary of the corporation. No business may be transacted at such special meeting otherwise than specified in such notice. The officer receiving the request shall cause notice to be promptly given to the stockholders entitled to vote, in accordance with the provisions of Sections 5.4 and 5.5, that a meeting will be held at the time requested by the person or persons who called the meeting, not less than thirty-five (35) nor more than sixty (60) days after the receipt of the request. If the notice is not given within twenty (20) days after the receipt of the request, the person or persons requesting the meeting may give the notice. Nothing contained in this subsection 5.3.2 shall be construed as limiting, fixing, or affecting the time when a meeting of stockholders called by action of the Board may be held.

### 5.4. Notice of Stockholders' Meetings.

All notices of stockholders' meetings shall be in writing and shall be sent or otherwise given in accordance with Section 5.5 not less than ten (10) nor more than sixty (60) days before the date of the meeting to each stockholder entitled to vote at such meeting. The notice shall specify the place, date, and hour of the meeting, and, in the case of a special meeting, the purpose or purposes for which the meeting is called.

### 5.5. Notice Procedure.

#### 5.5.1. Manner of Giving Notice; Affidavit of Notice.

Written notice of any meeting of stockholders, if mailed, is given when deposited in the United States mail, postage prepaid, directed to the stockholder at the stockholder's address as it appears on the records of the corporation. An affidavit of the Secretary or an Assistant Secretary or of the transfer agent of the corporation that the notice has been given shall, in the absence of fraud, be prima facie evidence of the facts stated therein.

#### 5.5.2. Undeliverable Notices.

If any notice addressed to a stockholder at the address of such stockholder appearing on the books of the corporation is returned by the United States Postal Service marked to indicate that the United States Postal Service is unable to deliver the notice to the

Bylaws of
CrossLink-D, Inc.

stockholder at such address, all future notices shall be deemed to have been duly given
without further mailing if the same shall be available to the stockholder upon written
demand of the stockholder at the principal executive office of the corporation for a period
of one year from the date of the giving of such notice.

## 5.6. Quorum.

A majority of the stock issued and outstanding and entitled to vote at any meeting of the
stockholders, the holders of which are present in person or represented by proxy, shall constitute
a quorum at all meetings of the stockholders for the transaction of business except as otherwise
provided by statute, the Certificate of Incorporation, or these Bylaws.  A quorum, once
established, shall not be broken by the withdrawal of enough votes to leave less than a quorum
and the votes present may continue to transact business until adjournment provided that any
action taken (other than adjournment) is approved by at least a majority of the shares required to
constitute a quorum.  If, however, such quorum is not present or represented at any meeting of
the stockholders, then either (a) the chairman of the meeting or (b) a majority of the voting stock
represented in person or by proxy, shall have power to adjourn the meeting from time to time,
without notice other than announcement at the meeting, until a quorum is present or represented.
At such adjourned meeting at which a quorum is present or represented, any business may be
transacted that might have been transacted at the meeting as originally noticed.

## 5.7. Adjourned Meeting; Notice.

When a meeting is adjourned to another time or place, unless these Bylaws otherwise require,
notice need not be given of the adjourned meeting if the time and place thereof are announced at
the meeting at which the adjournment is taken.  If the adjournment is for more than thirty (30)
days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of
the adjourned meeting shall be given to each stockholder of record entitled to vote at the
meeting.

## 5.8. Conduct of Business.

The chairman of any meeting of stockholders shall determine the order of business and the
procedure at the meeting, including such regulation of the manner of voting and the conduct of
business.

## 5.9. Voting.

### 5.9.1. Percentage Required.

When a quorum is present at any meeting, the vote of the holders of a majority of the
stock having voting power present in person or represented by proxy shall decide any
question brought before such meeting, unless the question is one upon which by express
provision of the statutes, the Certificate of Incorporation, or these Bylaws, a different
vote is required, in which case such express provision shall govern and control the
decision of such question.

Bylaws of
CrossLink-D, Inc.

### 5.9.2.    Voting Power.

Except as may be otherwise provided in the Certificate of Incorporation, each stockholder shall be entitled to one vote for each share of capital stock having voting power, registered in the name of such stockholder on the books of the corporation on the record date set by the Board as provided in Section 5.12.

## 5.10.   Waiver of Notice.

Whenever notice is required to be given under the provisions of the statutes, the Certificate of Incorporation, or these Bylaws, a waiver thereof in writing, or by telegraph, cable, or other written form of recorded communication, signed by the person or persons entitled to the notice, whether before or after the time stated therein, shall be deemed equivalent to notice. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person objects at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the stockholders need be specified in any written waiver of notice unless so required by the Certificate of Incorporation or these Bylaws.

## 5.11.   Stockholder Action by Written Consent Without a Meeting.

### 5.11.1.   Written Consent Authorized.

Unless otherwise provided in the Certificate of Incorporation, any action required by the statutes to be taken at any annual or special meeting of stockholders of the corporation, or any action that may be taken at any annual or special meeting of such stockholders, may be taken without a meeting, without prior notice, and without a vote if a consent in writing, setting forth the action so taken, is signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted.

### 5.11.2.   Notice of Action by Written Consent.

Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing. If the action which is consented to is such as would have required the filing of a certificate under any section of the GCL if such action had been voted on by stockholders at a meeting thereof, then the certificate filed under such section shall state, in lieu of any statement required by such section concerning any vote of stockholders, that written notice and written consent have been given as provided in the GCL.

## 5.12.   Record Date for Stockholder Notice; Voting; Giving Consents.

### 5.12.1.   Designation of Record Date.

To determine the stockholders entitled (a) to notice of or to vote at any meeting of stockholders or any adjournment thereof, (b) to consent to corporate action in writing without a meeting, (c) to receive payment of any dividend or other distribution or allotment of any rights, (d) to exercise any rights in respect of any change, conversion, or

Bylaws of
CrossLink-D, Inc.

exchange of stock or for the purpose of any other lawful action, the Board may fix, in advance, a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board and which shall not be more than (i) sixty (60) nor less than ten (10) days before the date of such meeting; (ii) ten (10) days after the date upon which the resolution fixing the record date is adopted by the Board for consents to corporate action without a meeting; or (iii) sixty (60) days prior to any other action.

### 5.12.2.  Deemed Record Date Where None is Set

If the Board does not fix a record date as permitted by subsection 5.12.1:

(a)  The record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held.

(b)  The record date for determining stockholders entitled to consent to corporate action in writing without a meeting, when no prior action by the Board is necessary, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the corporation's principal place of business or its registered office in Delaware.

(c)  The record date for determining stockholders entitled to consent to corporate action in writing without a meeting, when prior action by the Board is necessary, shall be at the close of business on the day on which the Board adopts the resolution taking such prior action.

(d)  The record date for determining stockholders for any other purpose shall be at the close of business on the day on which the Board adopts the resolution relating thereto.

(e)  A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting unless the Board fixes a new record date for the adjourned meeting.

## 5.13.  Proxies.

Each stockholder entitled to vote at a meeting of stockholders or to express consent or dissent to corporate action in writing without a meeting may authorize another person or persons to act for the stockholder by a written proxy, signed by the stockholder and filed with the Secretary of the corporation. No such proxy shall be voted or acted upon after three (3) years from its date unless the proxy provides for a longer period. A proxy shall be deemed signed if the stockholder's name is placed on the proxy (whether by manual signature, typewriting, telegraphic transmission, or otherwise) by the stockholder or the stockholder's attorney-in-fact. The revocability of a proxy that states on its face that it is irrevocable shall be governed by the provisions of the GCL.

Bylaws of
CrossLink-D, Inc.

### 5.14.  List of Stockholders Entitled to Vote.

The officer or agent who has charge of the stock ledger of the corporation shall prepare and make, at least ten (10) days before every meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting, arranged in alphabetical order, and showing the address of each stockholder and the number of shares registered in the name of each stockholder. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, during ordinary business hours, for a period of at least ten (10) days before the meeting, either at a place within the city where the meeting is to be held, which place shall be specified in the notice of the meeting, or, if not so specified, at the place where the meeting is to be held. The list shall also be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any stockholder who is present.  Such list shall presumptively determine the identity of the stockholders entitled to examine such list or to vote at the meeting and the number of shares held by each of them.

### 5.15.  Inspectors of Election.

Before any meeting of stockholders, the Board may appoint an inspector or inspectors of election to act at the meeting or its adjournment.  If no inspector of election is so appointed, the chairman of the meeting may, and on the request of any stockholder or a stockholder's proxy shall, appoint an inspector or inspectors of election to act at the meeting.  The number of inspectors shall be either one (1) or three (3).  If inspectors are appointed at a meeting pursuant to the request of one (1) or more stockholders or proxies, the holders of a majority of shares or their proxies present at the meeting shall determine whether one (1) or three (3) inspectors are to be appointed.  If any person appointed as inspector fails to appear or fails or refuses to act, the chairman of the meeting may, and upon the request of any stockholder or a stockholder's proxy shall, appoint a person to fill that vacancy.  Such inspectors shall:

(a)  determine the number of shares outstanding and the voting power of each, the number of shares represented at the meeting, the existence of a quorum, and the authenticity, validity, and effect of proxies;

(b)  receive votes, ballots, or consents;

(c)  hear and determine all challenges and questions in any way arising in connection with the right to vote;

(d)  count and tabulate all votes or consents;

(e)  determine when the polls shall close;

(f)  determine the result; and

(g)  do any other acts that may be proper to conduct the election or vote with fairness to all stockholders.

Bylaws of
CrossLink-D, Inc.

## 6. INDEMNITY

### 6.1.    Third Party Actions.

The corporation shall indemnify any person who was or is a party or is threatened to be made a party to, or otherwise becomes involved in, any threatened, pending, or completed action, suit, or proceeding, whether civil, criminal, administrative, or investigative, formal or informal (other than an action by or in the right of the corporation), by reason of any action or inaction on the part of such person by reason of the fact that he is or was a director or officer of the corporation, or any subsidiary of the corporation, or, while a director or officer of the corporation, or any subsidiary of the corporation, that such person is or was serving at the request of the corporation as a director, officer, employee, agent, or trustee of another corporation, partnership, joint venture, trust, employee benefit plan, or other enterprise (collectively "Agent"); against expenses (including attorneys' fees, court costs, and the cost of appeal, attachment, and similar bonds), judgments, fines, and amounts paid in settlement (if such settlement is approved in advance by the corporation, which approval shall not be unreasonably withheld) actually and reasonably incurred by him in connection with such action, suit, or proceeding if he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful.  The termination of any action, suit, or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the corporation, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his conduct was unlawful.  For purposes of this Article 6, the term "officer" shall mean an individual holding the position of Chairman of the Board, Chief Executive Officer, President, Vice President, Secretary, Assistant Secretary, Treasurer, or Assistant Treasurer.

### 6.2.    Actions by or in the Right of the Corporation.

The corporation shall indemnify any person who was or is a party or is threatened to be made a party to, or otherwise becomes involved in, any threatened, pending, or completed action, suit, or proceeding by or in the right of the corporation, or any subsidiary of the corporation, to procure a judgment in its favor by reason of the fact that he is or was an Agent (as defined in Section 6.1) against expenses (including attorneys' fees, court costs, and the cost of appeal, attachment, and similar bonds) and, to the fullest extent permitted by law, amounts paid in settlement, in each case to the extent actually and reasonably incurred by him in connection with the defense or settlement of such action or suit if he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the corporation and except that no indemnification shall be made in respect of any claim, issue, or matter as to which such person shall have been adjudged to be liable to the corporation unless and only to the extent that the Delaware Court of Chancery or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the relevant circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the Delaware Court of Chancery or such other court shall deem proper.

Bylaws of
CrossLink-D, Inc.

### 6.3.    Successful Defense.

To the extent that an Agent of the corporation has been successful on the merits or otherwise, including the dismissal of an action without prejudice, in defense of any action, suit, or proceeding referred to in Sections 6.1 and 6.2, or in defense of any claim, issue, or matter therein, he shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by him in connection therewith. For purposes of this Section 6.3, the termination of any action, suit, or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself create a presumption that the person did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the corporation, and with respect to any criminal action or proceeding, had reasonable cause to believe that his conduct was unlawful.

### 6.4.    Determination of Conduct.

Any indemnification under Sections 6.1 and 6.2 (unless ordered by a court) shall be made by the corporation only as authorized in the specific case upon a determination that the indemnification of the Agent is proper in the circumstances because he has met the applicable standard of conduct set forth in Sections 6.1 and 6.2. Such determination shall be made within forty-five (45) days of the date when the request for indemnification was received (1) by the Board by a majority vote of a quorum consisting of directors who were not parties to such action, suit, or proceeding, or (2) if such quorum is not obtainable or, even if obtainable, a quorum of disinterested directors so directs, by independent legal counsel in a written opinion, or (3) by the stockholders.

### 6.5.    Payment of Expenses in Advance.

The corporation shall pay to Agents expenses incurred in defending a civil or criminal action, suit, or proceeding in advance of the final disposition of such action, suit, or proceeding upon receipt of an undertaking by or on behalf of the Agent to repay such amount if it shall ultimately be determined that he is not entitled to be indemnified by the corporation as authorized in this Article 6. Such expenses incurred by an Agent in prosecuting a civil action, suit, or proceeding may be so paid upon such terms and conditions, if any, as the Board deems appropriate.

### 6.6.    Indemnity Not Exclusive.

The indemnification and advancement of expenses provided or granted pursuant to this Article 6 shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under the GCL, the Certificate of Incorporation, any bylaw, agreement, vote of stockholders or disinterested directors, or otherwise, both as to action in his official capacity and as to action in another capacity while holding such office.

### 6.7.    Insurance Indemnification.

The corporation shall have the power to purchase and maintain insurance on behalf of any person who is or was an Agent or other employee or agent against any liability asserted against him and incurred by him in any such capacity, or arising out of his status as such, whether or not the corporation would have the power to indemnify him against such liability under the provisions of this Article 6.

Bylaws of
CrossLink-D, Inc.

**6.8.    The Corporation.**
For purposes of this Article 6, references to "the corporation" shall include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, employees, or agents, so that any person who is or was an agent of the corporation or such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee, or agent of another corporation, partnership, joint venture, trust, or other enterprise, shall stand in the same position under and subject to the provisions of this Article 6 (including, without limitation the provisions of Section 6.4) with respect to the resulting or surviving corporation as he would have with respect to such constituent corporation if its separate existence had continued.

**6.9.    Employee Benefit Plans.**
For purposes of this Article 6, references to "other enterprises" shall include employee benefit plans; references to "fines" shall include any excise taxes assessed on a person with respect to an employee benefit plan; and references to "serving at the request of the corporation" shall include any service as a director, officer, employee, or agent of the corporation which imposes duties on, or involves services by, such director, officer, employee, or agent with respect to an employee benefit plan, its participants, or beneficiaries; and a person who acted in good faith and in a manner he reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "not opposed to the best interests of the corporation" as referred to in this Article 6.

**6.10.    Indemnity Fund.**
At the request of an Agent and upon resolution passed by the Board, the corporation may establish a trust or other designated account, grant a security interest, or use other means (including, without limitation, a letter of credit), to ensure the payment of certain of its obligations arising under this Article 6 and/or agreements which may be entered into between the corporation and its Agents from time to time. If such fund is established upon the request of an Agent, such fund or security may not be liquidated or released without the consent of the Agent for whose benefit the fund or security was established.

**6.11.    Indemnification of Other Persons.**
The provisions of this Article 6 shall not be deemed to preclude the indemnification of, or advancement of expenses to, any person who is not an Agent (as defined in Section 6.1), but whom the corporation has the power or obligation to indemnify under the provisions of the GCL or otherwise. The corporation may, in its sole discretion, indemnify, or advance expenses to, an employee, trustee, or other agent as permitted by the GCL. The corporation shall indemnify an employee, trustee, or other agent where required by law.

**6.12.    Savings Clause.**
If this Article 6 or any portion thereof shall be invalidated on any ground by any court of competent jurisdiction, then the corporation shall nevertheless indemnify each Agent against expenses (including attorney's fees), judgments, fines, and amounts paid in settlement and shall

Bylaws of
Crosslink-D, Inc.

advance expenses with respect to any action, suit, proceeding, or investigation, whether civil, criminal or administrative, and an action or suit brought by or in the right of the corporation, to the full extent permitted by any applicable portion of this Article 6 that shall not have been invalidated, or by any other applicable law.

### 6.13.   Continuation of Indemnification and Advancement of Expenses.

The indemnification and advancement of expenses provided by, or granted pursuant to, this Article 6 shall, unless otherwise provided when authorized or ratified, continue as to a person who has ceased to be a director, officer, employee, or agent of the corporation and shall inure to the benefit of the heirs, executors, and administrators of such a person.

## 7.   RECORDS AND REPORTS

### 7.1.   Maintenance and Inspection of Records.

#### 7.1.1.   Records.

The corporation shall, either at its principal executive office or at such place or places as designated by the Board, keep a record of its stockholders listing their names and addresses and the number and class of shares held by each stockholder, a copy of these Bylaws to date, accounting books, and other records.

#### 7.1.2.   Shareholder Inspection.

Any stockholder of record, in person or by attorney or other agent, shall, upon written demand under oath stating the purpose thereof, have the right during the usual hours for business to inspect for any proper purpose the corporation's stock ledger, a list of its stockholders, and its other books and records and to make copies or extracts therefrom. A proper purpose shall mean a purpose reasonably related to such person's interest as a stockholder. In every instance where an attorney or other agent is the person who seeks the right to inspection, the demand under oath shall be accompanied by a power of attorney or such other writing that authorizes the attorney or other agent to so act on behalf of the stockholder. The demand under oath shall be directed to the corporation at its registered office in Delaware or at its principal place of business.

### 7.2.   Inspection by Directors.

Any director shall have the right to examine the corporation's stock ledger, a list of its stockholders, and its other books and records for a purpose reasonably related to his position as a director. The Delaware Court of Chancery is hereby vested with the exclusive jurisdiction to determine whether a director is entitled to the inspection sought. The Court may summarily order the corporation to permit the director to inspect any and all books and records, the stock ledger, and the stock list and to make copies or extracts therefrom. The Court may, in its discretion, prescribe any limitations or conditions with reference to the inspection, or award such other and further relief as the Court may deem just and proper.

Bylaws of
CrossLink-D, Inc.

### 7.3. Annual Statement to Stockholders.

The Board shall present at each annual meeting, and at any special meeting of the stockholders when called by vote of the stockholders, a full and clear statement of the business and condition of the corporation.

## 8. GENERAL MATTERS

### 8.1. Checks.

From time to time, the Board shall determine by resolution which person or persons may sign or endorse all checks, drafts, other orders for payment of money, notes or other evidences of indebtedness that are issued in the name of or payable to the corporation, and only the persons so authorized shall sign or endorse those instruments.

### 8.2. Execution of Corporate Contracts and Instruments.

The Board may, in its discretion, determine the method and designate the statutory officer or officers, or other person or persons, to execute any corporate instrument or document, or to sign the corporate name without limitation, except where otherwise provided by law, and such execution or signature shall be binding upon the corporation. Unless otherwise specifically determined by the Board, formal contracts of the corporation, promissory notes, mortgages, evidences of indebtedness, conveyances or other instruments in writing, and any assignment or endorsement thereof, executed or entered into between the corporation and any person, shall be signed by the Chairman of the Board, the Chief Executive Officer, the President or any Vice President and the Secretary, any Assistant Secretary and the Treasurer. Unless so authorized or ratified by these Bylaws, the Board or within the agency power of an officer, no officer, agent or employee shall have any power or authority to bind the corporation by any contract or engagement or to pledge its credit or to render it liable for any purpose or for any amount.

### 8.3. Stock Certificates.

The shares of the corporation shall be represented by certificates, provided that the Board of the corporation may provide by resolution or resolutions that some or all of any or all classes or series of its stock shall be uncertificated shares. Any such resolution shall not apply to shares represented by a certificate until such certificate is surrendered to the corporation. Notwithstanding the adoption of such a resolution by the Board, every holder of stock represented by certificates and upon request every holder of uncertificated shares shall be entitled to have a certificate signed by, or in the name of the corporation by the Chairman of the Board, or the President or a Vice-President, and by the Treasurer or an Assistant Treasurer, or the Secretary or an Assistant Secretary of the corporation representing the number of shares registered in certificate form. Any or all of the signatures on the certificate may be a facsimile. In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate has ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the corporation with the same effect as if he were such officer, transfer agent or registrar at the date of issue.

Bylaws of
CrossLink-D, Inc.

### 8.4.    Partly Paid Shares.

The corporation may issue the whole or any part of its shares as partly paid and subject to call for the remainder of the consideration to be paid therefor. Upon the face or back of each stock certificate issued to represent any such partly paid shares, or upon the books and records of the corporation in the case of uncertificated partly paid shares, the total amount of the consideration to be paid therefor and the amount paid thereon shall be stated. Upon the declaration of any dividend on fully paid shares, the corporation shall declare a dividend upon partly paid shares of the same class, but only upon the basis of the percentage of the consideration actually paid thereon.

### 8.5.    Designation on Certificates.

If the corporation is authorized to issue more than one class of stock or more than one series of any class, then the powers, the designations, the preferences, and the relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights shall be set forth in full or summarized on the face or back of the certificate that the corporation shall issue to represent such class or series of stock; provided, however, that, except as otherwise provided in the GCL, in lieu of the foregoing requirements there may be set forth on the face or back of the certificate that the corporation shall issue to represent such class or series of stock a statement that the corporation will furnish without charge to each stockholder who so requests the powers, the designations, the preferences, and the relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights.

### 8.6.    Lost Certificates.

Except as provided in this Section 8.6, no new certificates for shares shall be issued to replace a previously issued certificate unless the latter is surrendered to the corporation and cancelled at the same time. The Board, the Secretary, or the Chief Financial Officer each may direct the issuance of a new certificate for stock or uncertificated shares in the place of any certificate theretofore issued by it, alleged to have been lost, stolen or destroyed; and the Board may, in its discretion and as a condition precedent to the issuance thereof, require the owner of the lost, stolen or destroyed certificate, or his legal representative, to give the corporation a bond in such form and substance and with such surety as it may direct to indemnify it against any claim that may be made against it on account of the alleged loss, theft or destruction of any such certificate or the issuance of such new certificate or uncertificated shares.

### 8.7.    Construction; Definitions.

Unless the context requires otherwise, the general provisions, rules of construction, and definitions in the GCL shall govern the construction of these Bylaws. Without limiting the generality of this provision, the singular number includes the plural, the plural number includes the singular, and the term "person" includes both a corporation and a natural person.

Bylaws of
CrossLink-D, Inc.

## 8.8. Dividends.

### 8.8.1. Declaration.

The directors of the corporation, subject to any restrictions contained in the GCL or the Certificate of Incorporation, may declare and pay dividends upon the shares of its capital stock. Dividends may be paid in cash, in property, or in shares of the corporation's capital stock.

### 8.8.2. Reserves.

The directors of the corporation may set apart out of any of the funds of the corporation available for dividends such sum or sums as the Board from time to time, in its absolute discretion, deems proper as a reserve or reserves for any proper purpose and may abolish any such reserve in its absolute discretion. Such purposes shall include but not be limited to equalizing dividends, repairing or maintaining any property of the corporation, meeting contingencies, and such other purpose as the Board shall deem conducive to the interests of the corporation.

## 8.9. Fiscal Year.

The fiscal year of the corporation shall be fixed by resolution of the Board and may be changed by the Board.

## 8.10. Seal.

The corporation may adopt a corporate seal, which may be altered at pleasure, and may use the same by causing it or a facsimile thereof, to be impressed or affixed or in any other manner reproduced.

## 8.11. Transfer of Stock.

Upon surrender to the corporation or the transfer agent of the corporation of a certificate for shares duly endorsed or accompanied by proper evidence of succession, assignation or authority to transfer, it shall be the duty of the corporation to issue a new certificate to the person entitled thereto, cancel the old certificate, and record the transaction in its books.

## 8.12. Stock Transfer Agreements.

The corporation shall have power to enter into and perform any agreement with any number of stockholders of any one or more classes of stock of the corporation to restrict the transfer of shares of stock of the corporation of any one or more classes owned by such stockholders in any manner not prohibited by the GCL.

## 8.13. Registered Stockholders.

The corporation shall be entitled to recognize the exclusive right of a person registered on its books as the owner of shares to receive dividends and to vote as such owner, shall be entitled to hold liable for calls and assessments the person registered on its books as the owner of shares, and shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of another person, whether or not it shall have express or other notice thereof, except as otherwise provided by the laws of the State of Delaware.

Bylaws of
CrossLink-D, Inc.

## 9. NOTICES

### 9.1.  Method.

Whenever, under the provisions of the statutes, the Certificate of Incorporation, or these Bylaws, notice is required to be given to any director, it shall not be construed to require personal notice, but such notice may be given in writing, by mail, addressed to such director, at his address as it appears on the records of the corporation (unless before the mailing of such notice he shall have filed with the Secretary a written request that notices intended for him be mailed to some other address, in which case such notice shall be mailed to the address designated in the request) with postage thereon prepaid, and such notice shall be deemed to be given at the time when the same shall be deposited in the United States mail; provided, however, that in the case of notice of a special meeting of the Board, if such meeting is to be held within seven calendar days after the date of such notice, notice shall be deemed given as of the date such notice shall be accepted for delivery by a courier service that provides "next business day" delivery, so long as at least one attempt shall have been made, on or before the date such notice is accepted for delivery by such courier service, to provide notice by telephone to each director at his principal place of business and at his principal residence. Notice to directors may also be given by telegram, by personal delivery, or by telephone and shall be deemed given as of the date such notice is received by the director or his authorized agent. Unless expressly stated to the contrary, nothing in these Bylaws is intended to restrict the corporation from giving notice as applicable law may authorize. Notice communicated to a recipient at a director's office, residence, or other location will be deemed to have been given to the director at that time if the person communicating the notice reasonably believes that the recipient will promptly forward the notice to the director.

### 9.2.  Waiver.

Whenever any notice is required to be given under the provisions of the statutes, the Certificate of Incorporation, or these Bylaws, a waiver thereof in writing, or by telegraph, cable, or other written form of recorded communication, signed by the person or persons entitled to the notice, whether before or after the time stated therein, shall be deemed equivalent thereto.

## 10. DISSOLUTION

### 10.1.  Board Action.

If it should be deemed advisable in the judgment of the Board of the corporation that the corporation should be dissolved, the board, after the adoption of a resolution to that effect by a majority of the whole Board at any meeting called for that purpose, shall cause notice to be mailed to each stockholder entitled to vote thereon of the adoption of the resolution and of a meeting of stockholders to take action upon the resolution.

### 10.2.  Shareholder Action.

At the meeting a vote shall be taken for and against the proposed dissolution. If a majority of the outstanding stock of the corporation entitled to vote thereon votes for the proposed dissolution, then a certificate stating that the dissolution has been authorized in accordance with the

Bylaws of
CrossLink-D, Inc.

provisions of GCL Section 275 and setting forth the names and residences of the directors and officers shall be executed, acknowledged, and filed and shall become effective in accordance with GCL Section 103. Upon such certificate's becoming effective in accordance with GCL Section 103, the corporation shall be dissolved.

### 10.3.  Action Without Meeting.
Whenever all the stockholders entitled to vote on a dissolution consent in writing, either in person or by duly authorized attorney, to a dissolution, no meeting of directors or stockholders shall be necessary. The consent shall be filed and shall become effective in accordance with GCL Section 103. Upon such consent's becoming effective in accordance with GCL Section 103, the corporation shall be dissolved. If the consent is signed by an attorney, then the original power of attorney or a photocopy thereof shall be attached to and filed with the consent. The consent filed with the Secretary of State shall have attached to it the affidavit of the secretary or some other officer of the corporation stating that the consent has been signed by or on behalf of all the stockholders entitled to vote on a dissolution; in addition, there shall be attached to the consent a certification by the secretary or some other officer of the corporation setting forth the names and residences of the directors and officers of the corporation.


## 11. CUSTODIAN

### 11.1.  Appointment of the Custodian in Certain Cases.
The court of Chancery, upon application of any stockholder, may appoint one or more persons to be custodians and, if the corporation is insolvent, to be receivers, of and for the corporation when:

(a)  at any meeting held for the election of directors the stockholders are so divided that they have failed to elect successors to directors whose terms have expired or would have expired upon qualification of their successors; or

(b)  the business of the corporation is suffering or is threatened with irreparable injury because the directors are so divided respecting the management of the affairs of the corporation that the required vote for action by the Board cannot be obtained and the stockholders are unable to terminate this division; or

(c)  the corporation has abandoned its business and has failed within a reasonable time to take steps to dissolve, liquidate or distribute its assets.

### 11.2.  Duties of Custodian.
The custodian shall have all the powers and title of a receiver appointed under GCL Section 291, but the authority of the custodian shall be to continue the business of the corporation and not to liquidate its affairs and distribute its assets, except when the Court of Chancery otherwise orders and except in cases arising under GCL Sections 226(a)(3) or 352(a)(2).

Bylaws of
CrossLink-D, Inc.

## 12. AMENDMENTS

### 12.1.  Amendments by the Board.

Except as otherwise expressly provided in a bylaw adopted by the stockholders as hereinafter provided, and if authorized in the Certificate of Incorporation, the directors, by the affirmative vote of a majority of the whole Board and without the assent or vote of the stockholders, may at any meeting, provided the substance of the proposal shall have been stated in the notice of the meeting, make, repeal, alter, amend, or rescind any of these Bylaws.

### 12.2.  Amendments by Stockholders.

In addition to the powers of the Board pursuant to Section 12.1, the stockholders, by the affirmative vote of a majority of the shares represented and voting at a duly held meeting at which a quorum is present (which shares voting affirmatively also constitute at least a majority of the required quorum), may at any meeting make, repeal, alter, amend, or rescind any of these Bylaws.

## CERTIFICATE OF SECRETARY

KNOW ALL BY THESE PRESENTS:

That the undersigned does hereby certify that the undersigned is the Secretary of Crosslink-D, Inc., a corporation duly organized and existing under and by virtue of the laws of the State of Delaware; that the above and foregoing Bylaws of the corporation were duly and regularly ratified as such by the Board of the corporation; and that the above and foregoing Bylaws are now in full force and effect.

Dated:  August 1, 2006

Kent C. Cochrum, Secretary

## EMPLOYMENT CONTRACT ASSIGNMENT – LARGEY

This EMPLOYMENT CONTRACT ASSIGNMENT (this "Assignment"), dated effective as of _MAY 18_ , 2005, by and between ARES LABORATORIES, LLC, a California limited liability company ("Grantor"), and CROSSLINK-D, INC., a Delaware corporation ("Grantee").

### WITNESSETH:

WHEREAS, Grantor is the contracting party with Joseph A. Largey for the employment of Mr. Largey for executive and management services, all as set forth in that certain Employment Agreement, dated as of November 1, 2004, a copy of which is attached hereto (the "Largey Employment Agreement"); and

WHEREAS, Grantor desires to transfer, assign, and dispose of its rights in and to the Largey Employment Agreement to Grantee, and in exchange for which, Grantee is willing to assume the duties, obligations and liabilities under that Agreement.

NOW, THEREFORE, in consideration of the promises set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Grantor agrees as follows:

1.    ASSIGNMENT.  Grantor hereby grants, conveys, and assigns to Grantee all of Grantor's right, title and interest in and to the Largey Employment Agreement;

2.    ASSUMPTION OF AGREEMENT.  In exchange for the assignment of the Largey Employment Agreement, Grantee hereby agrees to assume and accept as it own all obligations, debts and liabilities arising under the Agreement.  By its execution hereto, Joseph A. Largey consents to this assumption of the Agreement by Grantee.

3.    COVENANTS.  Grantor covenants and agrees to execute all applications, papers or instruments necessary or required by Grantee, its successors, assigns and legal representatives, to carry into effect any of the provisions of this instrument, and generally to do everything possible to aid said Grantee, its successors, assigns, and legal representatives, to obtain and enforce the Largey Employment Agreement.

4.    POWER OF ATTORNEY.

   4.1    AUTHORIZATION.  Grantor hereby authorizes Grantee to:

      4.1.1    Make, constitute, and appoint any representative of Grantee as Grantee may select, in its sole discretion, as Grantor's true and lawful attorney-in-fact, with power to endorse Grantor's name on all applications, documents, papers, and instruments necessary or desirable for Grantee to give effect to the provisions of this Assignment and the intent of the parties hereto.

      4.1.2    Take any other actions with respect to the property consistent with this Assignment, as Grantee deems in the best interest of Grantee.

RLF RLF:KEC 4902567251_1 DOC

PLAINTIFF'S
EXHIBIT
_C_

5.    SEVERABILITY.  The provisions of this Assignment are severable, and if any clause or provision is held invalid or unenforceable in whole or in part in any jurisdiction, then such invalidity or unenforceability will affect only such clause or provisions, or part thereof, in such jurisdiction, and will not in any manner affect such clause or provision in any other jurisdiction, or any other clause or provisions of this Assignment.

6.    BINDING EFFECT; BENEFITS.  This Assignment will be binding upon Grantor and its respective successors and assigns and will inure to the benefit of Grantee, its nominees, successors and assigns.

7.    GENERAL.  This Assignment will inure to the benefit of and be binding upon Grantor, Grantee and their respective successors and assigns.  No party is liability for its breach if such breach is due to an event beyond its reasonable control  All required notices must be in writing.  No failure or delay to enforce a provision will be deemed a waiver thereof.  This Assignment is governed by the laws of the State of California, is the entire and exclusive set of terms and conditions for the assignment and disposition of the property, supersedes conflicting terms of any letters or other documents issued under it, and may only be modified by a writing signed by all parties.

IN WITNESS WHEREOF, the parties have executed this Assignment by their signature or the signature of their duly authorized representatives below.

CROSSLINK-D, INC.

Dated: _May 18 2005_          By: _Kent C Cocher_
                              Its: _____

ARES LABORATORIES, LLC

Dated: _May 18, 2005_         By: _Kent C Coch_
                              Its: _____

APPROVED:

Dated: _MAY 18 2005_          _Joseph A. Largey_
                              Joseph A. Largey

ALLRLLKEC 1902\6733\ _1 DOC

2

CERTIFICATE
NUMBER
3

SHARES
**200,000 **

# CROSSLINK-D, INC.

A Delaware Corporation

16,000,000 Authorized Shares of Common Stock)

THIS CERTIFIES THAT JOSEPH A. LARGEY is the owner of **TWO HUNDRED THOUSAND** Shares of Common Stock of CrossLink-D, Inc. transferable only on the books of the Corporation by the holder hereof in person or by Attorney, upon surrender of this Certificate properly endorsed or assigned. This certificate and the shares represented hereby are issued and shall be held subject to the Articles of Incorporation and the Bylaws of the corporation, as amended from time to time, in which the holder of this certificate, by acceptance hereof, assents.

THIS SECURITY HAS NOT BEEN REGISTERED OR QUALIFIED PURSUANT TO THE SECURITIES ACT OF 1933 OR THE SECURITIES LAWS OF CALIFORNIA OR ANY OTHER STATE AND MAY BE OFFERED AND SOLD ONLY IF REGISTERED AND QUALIFIED UNDER THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS OR IF AN EXEMPTION FROM SUCH REGISTRATION OR QUALIFICATION IS APPLICABLE.

THE SHARES EVIDENCED BY THIS CERTIFICATE ARE SUBJECT TO THE RESTRICTIONS ON TRANSFERABILITY AND SUCH OTHER RESTRICTIONS, LIMITATION AND PROCEDURES SET FORTH IN THAT CERTAIN COMMON STOCK PURCHASE AGREEMENT EXECUTED BY THE HOLDER HEREOF ON FILE AT THE CORPORATE OFFICES.

IN WITNESS WHEREOF, the said Corporation has caused this Certificate to be signed by its duly authorized officers and to be sealed with Seal of the Corporation this _____ 18th _____ day of _____ may _____, 2005.

_President_

_Secretary_

PLAINTIFF'S
EXHIBIT
D

## ACTION BY MAJORITY WRITTEN CONSENT
## TO REMOVE DIRECTOR OF CROSSLINK-D, INC.

I, Kent Cochrum, holder of 1,200,000 shares of Common Stock in CrossLink-D, Inc. (the "Company"), a Delaware corporation, hereby provide notice of my election to remove Joseph Largey as a director of the Company, effective immediately.

By:

_Ku & Cua_

Shares:

Date: _may 18, 2006_

PLAINTIFF'S
EXHIBIT
_E_

# CALIFORNIA JURAT WITH AFFIANT STATEMENT

State of California

County of ___Yolo___ } ss.

☒ See Attached Document (Notary to cross out lines 1–6 below)
☐ See Statement Below (Lines 1–5 to be completed only by document signer[s], not Notary)

1 _____

2 _____

3 _____

4 _____

5 _____

6 _____
　Signature of Document Signer No. 1　　　　Signature of Document Signer No. 2 (if any)

Subscribed and sworn to (or affirmed) before me on this

__18__ day of __May__, __2006__, by
　Date　　　　　Month　　　　　Year

(1)___Kent Cochrun___
　　　　　Name of Signer

☐ Personally known to me
☒ Proved to me on the basis of satisfactory evidence
　to be the person who appeared before me (.) (,)

(2)___None___
　　　　　Name of Signer
　　　　　(and

☐ Personally known to me
☐ Proved to me on the basis of satisfactory evidence
　to be the person who appeared before me.)

_____
　　　　　Signature of Notary Public

[Notary Seal: DIANE M. CECCHETTINI / COMM. #1587342 / NOTARY PUBLIC - CALIFORNIA / YOLO COUNTY / Comm. Exp. JUNE 22, 2009]

Place Notary Seal Above

————— OPTIONAL —————

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Further Description of Any Attached Document**

Title or Type of Document: __Action by Majority Written Consent__

Document Date: __May 18 2006__　Number of Pages: __1__

Signer(s) Other Than Named Above: __None__

RIGHT THUMBPRINT OF SIGNER #1
Top of thumb here

RIGHT THUMBPRINT OF SIGNER #2
Top of thumb here

## ACTION BY MAJORITY WRITTEN CONSENT
## TO REMOVE DIRECTOR OF CROSSLINK-D, INC.

We, Jerold Howard Theis and Gwen San May Theis, as trustees of the Jerold Howard Theis and Gwen San May Theis, holders of 32,000 shares of Common Stock in CrossLink-D, Inc. (the "Company"), a Delaware corporation, hereby provide notice of my election to remove Joseph A. Largey as a director of the Company, effective immediately.

By:

_Jerold Howard Theis_

Date: 5-18-06

State of California County of
YOLO

Subscribed and sworn to (or affirmed)
Before me on this 18 day of MAY, 2006 by
GERALD HOWARD THEIS
personally Known to me or proved to me on
the basis of satisfactory evidence to be the
person(s) who appeared before me.

Signature _____

(Seal)

LYNN CHRISTENSEN
Commission # 1446786
Notary Public - California
Yolo County
My Comm. Expires Nov 19, 2007

By:

_Gwen San May Theis_

Date: 5.15.06

State of California County of
YOLO

Subscribed and sworn to (or affirmed)
Before me on this 15 day of MAY 2006 by
GWENDOLINE SAN MAY THEIS
personally Known to me or proved to me on
the basis of satisfactory evidence to be the
person(s) who appeared before me.

Signature _____

(Seal)

LYNN CHRISTENSEN
Commission # 1446786
Notary Public - California
Yolo County
My Comm. Expires Nov 19, 2007

## ACTION BY MAJORITY WRITTEN CONSENT
## TO REMOVE DIRECTOR OF CROSSLINK-D, INC.

I, Garrett Lee, holder of 6,000 shares of Common Stock in CrossLink-D, Inc. (the "Company"), a Delaware corporation, hereby provide notice of my election to remove Joseph A. Largey as a director of the Company, effective immediately.

By:

_____

Date:   5-19-06

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of _San Francisco_ }ss.

On _May 19 2006_, before me, _SHIRLEY E LEVY_
Date                                              Name and Title of Officer (e.g., "Jane Doe, Notary Public")

personally appeared _GARRETT LEE_
                                         Name(s) of Signer(s)

☐ personally known to me

☒ proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

**SHIRLEY E. LEVY**
Commission # 1612666
Notary Public - California
San Francisco County
My Comm. Expires Nov 8, 2007

WITNESS my hand and official seal.

_Shirley E. Levy_
Signature of Notary Public

Place Notary Seal Above

──────── OPTIONAL ────────

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

## Description of Attached Document

Title or Type of Document: _____

Document Date: _____  Number of Pages: _____

Signer(s) Other Than Named Above: _____

## Capacity(ies) Claimed by Signer(s)

Signer's Name: _____

☐ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

Signer Is Representing: _____

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

Signer's Name: _____

☐ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

Signer Is Representing: _____

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

© 2004 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402    Item No. 5907    Reorder: Call Toll-Free 1-800-876-6827

### ACTION BY MAJORITY WRITTEN CONSENT
### TO REMOVE DIRECTOR OF CROSSLINK-D, INC.

I, Susan Jemtrud, holder of 100,000 shares of Common Stock in CrossLink-D, Inc. (the "Company"), a Delaware corporation, hereby provide notice of my election to remove Joseph A. Largey as a director of the Company, effective immediately.

By:

_Susan Jemtrud_

Date:  5-17-06

# CALIFORNIA JURAT WITH AFFIANT STATEMENT

State of California

County of _Yolo_ } ss.

☒ See Attached Document (Notary to cross out lines 1–6 below)
☐ See Statement Below (Lines 1–5 to be completed only by document signer[s], *not* Notary)

1 _____

2 _____

3 _____

4 _____

5 _____

6 _____

Signature of Document Signer No. 1          Signature of Document Signer No. 2 (if any)

Subscribed and sworn to (or affirmed) before me on this

_17th_ day of _May_, _2006_, by
Date        Month        Year

(1) _SUSAN   TEMTRUD_
Name of Signer

☐ Personally known to me
☒ Proved to me on the basis of satisfactory evidence
to be the person who appeared before me (.) ☒

C. D. MARIN
Commission # 1452406
Notary Public - California
Yolo County
My Comm. Expires Nov 21, 2007

(2) _____
Name of Signer

☐ Personally known to me
☐ Proved to me on the basis of satisfactory evidence
to be the person who appeared before me.)

_C. D. Marin_
Signature of Notary Public

Place Notary Seal Above

— OPTIONAL —

Though the information below is not required by law, it may prove
valuable to persons relying on the document and could prevent
fraudulent removal and reattachment of this form to another document.

Further Description of Any Attached Document

Title or Type of Document: _Action By Majority Written Consent To Remove Director of Crosslink-D, One._

Document Date: _May 17, 2006_   Number of Pages: _1_

Signer(s) Other Than Named Above: _None_

RIGHT THUMBPRINT
OF SIGNER #1
Top of thumb here

RIGHT THUMBPRINT
OF SIGNER #2
Top of thumb here

## ACTION BY MAJORITY WRITTEN CONSENT
## TO REMOVE DIRECTOR OF CROSSLINK-D, INC.

I, Kent Cochrum, holder of 1,200,000 shares of Common Stock in CrossLink-D, Inc. (the "Company"), a Delaware corporation, hereby provide notice of my election to remove Daniel Sueflohn as a director of the Company, effective immediately.

By:

_Kent A Coel_

Shares:

Date: May 18, 2006

# CALIFORNIA JURAT WITH AFFIANT STATEMENT

State of California

County of Yolo _____ } ss.

☑ See Attached Document (Notary to cross out lines 1–6 below)
☐ See Statement Below (Lines 1–5 to be completed only by document signer[s], not Notary)

1 _____
2 _____
3 _____
4 _____
5 _____
6 _____
  Signature of Document Signer No. 1          Signature of Document Signer No. 2 (if any)

Subscribed and sworn to (or affirmed) before me on this

18 day of May , 2006 , by
  Date        Month              Year

(1) Kent Cochran _____
                    Name of Signer

☐ Personally known to me
☑ Proved to me on the basis of satisfactory evidence
  to be the person who appeared before me (.) (,)
                                          (and

(2) None _____
                    Name of Signer

☐ Personally known to me
☐ Proved to me on the basis of satisfactory evidence
  to be the person who appeared before me.)

_____
Signature of Notary Public

DIANE M. CECCHETTINI
COMM. 81587342
NOTARY PUBLIC ● CALIFORNIA
YOLO COUNTY
Comm. Exp. JUNE 22, 2009

Place Notary Seal Above

—— OPTIONAL ——

Though the information below is not required by law, it may prove
valuable to persons relying on the document and could prevent
fraudulent removal and reattachment of this form to another document.

Further Description of Any Attached Document

Title or Type of Document: Action by Majority Written Consent

Document Date: May 18 2006 _____ Number of Pages: 1

Signer(s) Other Than Named Above: None

RIGHT THUMBPRINT
OF SIGNER(S)
Top of thumb here

RIGHT THUMBPRINT
OF SIGNER(S)
Top of thumb here

## ACTION BY MAJORITY WRITTEN CONSENT
## TO REMOVE DIRECTOR OF CROSSLINK-D, INC.

We, Jerold Howard Theis and Gwen San May Theis, as trustees of the Jerold Howard Theis and Gwen San May Theis Trust, holders of 32,000 shares of Common Stock in CrossLink-D, Inc. (the "Company"), a Delaware corporation, hereby provide notice of my election to remove Daniel Sueflohn as a director of the Company, effective immediately.

By:

*Jerold Howard Theis*

Date: 5-18-06

State of California County of
YOLO
Subscribed and sworn to (or affirmed)
Before me on this 18 day of MAY, 20 06, by
GEROLD HOWARD THEIS
personally-Known to me or proved to me on
the basis of satisfactory evidence to be the
person(s) who appeared before me.

Signature _____

(Seal)

LYNN CHRISTENSEN
Commission # 1446786
Notary Public - California
Yolo County
My Comm. Expires Nov 19, 2007

By:

*Gwen San May Theis*

Date: 5-18-06

State of California County of
YOLO
Subscribed and sworn to (or affirmed)
Before me on this 18 day of MAY, 20 06, by
GWENDOLINE SAN THEIS
personally Known to me or proved to me on
the basis of satisfactory evidence to be the
person(s) who appeared before me.

Signature _____

(Seal)

LYNN CHRISTENSEN
Commission # 1446786
Notary Public - California
Yolo County
My Comm. Expires Nov 19, 2007

## ACTION BY MAJORITY WRITTEN CONSENT
## TO REMOVE DIRECTOR OF CROSSLINK-D, INC.

I, Garrett Lee, holder of 6,000 shares of Common Stock in CrossLink-D, Inc. (the "Company"), a Delaware corporation, hereby provide notice of my election to remove Daniel Sueflohn as a director of the Company, effective immediately.

By:

_____

Date:    5 - 1 9 - 0 6

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of *San Francisco* } ss.

On *May 19 2006*, before me, *SHIRLEY E LEVY*
_____Date_____                    _____Name and Title of Officer (e.g., "Jane Doe, Notary Public")_____

personally    appeared    *GARRETT LEE*
                                          _____Name(s) of Signer(s)_____

☐ personally known to me

☑ proved to me on the basis of satisfactory evidence
to be the person(s) whose name(s) is/are subscribed
to the within instrument and acknowledged to me that
he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s), or the
entity upon behalf of which the person(s) acted,
executed the instrument.

WITNESS my hand and official seal.

_____Signature of Notary Public_____

Place Notary Seal Above

---------------------- OPTIONAL ----------------------

*Though the information below is not required by law, it may prove valuable to persons relying on the document
and could prevent fraudulent removal and reattachment of this form to another document.*

**Description of Attached Document**

Title or Type of Document: _____

Document Date: _____  Number of Pages: _____

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _____ | Signer's Name: _____
☐ Individual | ☐ Individual
☐ Corporate Officer — Title(s): _____ | ☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General | ☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact | ☐ Attorney in Fact
☐ Trustee | ☐ Trustee
☐ Guardian or Conservator | ☐ Guardian or Conservator
☐ Other: _____ | ☐ Other: _____

RIGHT THUMBPRINT OF SIGNER
Top of thumb here.

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

Signer Is Representing: _____ | Signer Is Representing: _____

© 2004 National Notary Association • 9350 De Soto Ave. P.O. Box 2402 • Chatsworth, CA 91313-2402    Item No. 5907    Reorder: Call Toll-Free 1-800-876-6827

## ACTION BY MAJORITY WRITTEN CONSENT
## TO REMOVE DIRECTOR OF CROSSLINK-D, INC.

I, Susan Jemtrud, holder of 100,000 shares of Common Stock in CrossLink-D, Inc. (the "Company"), a Delaware corporation, hereby provide notice of my election to remove Daniel Sueflohn as a director of the Company, effective immediately.

By:

_____

Date:  5 - 17 - 0 6

# CALIFORNIA JURAT WITH AFFIANT STATEMENT

State of California

County of ___Yolo___ } ss.

☒ See Attached Document (Notary to cross out lines 1–6 below)
☐ See Statement Below (Lines 1–5 to be completed only by document signer[s], *not* Notary)

1 _____

2 _____

3 _____

4 _____

5 _____

6 _____

Signature of Document Signer No. 1              Signature of Document Signer No. 2 (if any)

Subscribed and sworn to (or affirmed) before me on this
___17th___ day of ___May___ ___2006___ by
Date            Month            Year

(1) ___SUSAN GJEMTRUD___
Name of Signer

☐ Personally known to me
☒ Proved to me on the basis of satisfactory evidence
to be the person who appeared before me (.)

(2) _____
Name of Signer

☐ Personally known to me
☐ Proved to me on the basis of satisfactory evidence
to be the person who appeared before me.)

___C. D. Marin___
Signature of Notary Public

C. D. MARIN
Commission # 1452406
Notary Public - California
Yolo County
My Comm. Expires Nov 21, 2007

Place Notary Seal Above

— OPTIONAL —

*Though the information below is not required by law, it may prove
valuable to persons relying on the document and could prevent
fraudulent removal and reattachment of this form to another document.*

Further Description of Any Attached Document

Title or Type of Document: ___Action By Majority Written Consent To Remove Director) of Crosslink-D, Inc.___

Document Date: ___May 17, 2006___ Number of Pages: ___1___

Signer(s) Other Than Named Above: ___none___

RIGHT THUMBPRINT
OF SIGNER
Top of thumb here

RIGHT THUMBPRINT
OF SIGNER
Top of thumb here

©2004 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org    Item #5910    Reorder: Call Toll-Free 1-800-876-6827

# MARKETING AGREEMENT
## BETWEEN
## CROSSLINK-D, LLC
### AND
## SILVERBACK7 LLC

This **MARKETING AGREEMENT** ("Agreement") is entered into as of the ___ day of March 2006, by and between CROSSLINK-D, LLC, 3480 Industrial Blvd., Suite 105, West Sacramento, CA 95691("CROSSLINK-D" or "Principal") and Silverback7 LLC ("Silverback7" or "Federal Representative") of 300 Ellicott Street, Suite A, Occoquan, Virginia 22125, each being a "Party" and collectively the "Parties."

**WHEREAS**, Principal has developed BLOXX rapid clotting agent that is currently pending approval by the United States Food and Drug Administration ("FDA") and Principal intends and expects to obtain FDA approval for BLOXX; and

**WHEREAS**, Federal Representative is a service-disabled veteran-owned small business that is qualified as a Federal Government contractor and is eligible for set-aside contracting preferences under Federal procurement rules, and Federal Representative's officers and employees have experience and expertise in relation to certain agencies of the United States Federal Government identified on Schedule A to this Agreement, which agencies Federal Representative believes may have a need for a product with the specifications of BLOXX (each agency listed on Schedule A, individually and collectively, is referred to herein as "Client"); and

**WHEREAS**, the Parties to this Agreement, having carefully assessed their respective product and service offerings, mutual qualifications and interests, and have concluded that it would be advantageous to the Parties to enter into this Agreement, enhancing the likelihood of award of a contract or grant for BLOXX; and

**WHEREAS**, Federal Representative intends to serve as the Federal Representative for Principal to the Client to market and to represent Principal and to submit various contract proposals to supply BLOXX to various subdivisions, departments and agencies of the Client and to assist Principal in the negotiation of any research and development contract or grant ("R&D grant") between Principal and the Client ("Proposal");

**WHEREAS**, Principal has selected Federal Representative as the exclusive Federal Representative and marketing agent to the Client to solicit contract(s), orders and/or grant(s) for BLOXX from the Client; and

**NOW THEREFORE**, in consideration of the foregoing and the mutual covenants, promises, and conditions set forth herein, the Parties agree as follows:

1.    Responsibilities of the Parties

     a.    Federal Representative shall:



PLAINTIFF'S
EXHIBIT

F

Draft dated: 7/25/2006

CROSSLINK-D and Silverback7
Marketing Agreement
Page 2

     i.    arrange and present continuing education and marketing seminars for Client's medical and program staff with responsibility for emergency medicine that includes pharmaceuticals and medical devices relating to blood clotting and provide information and materials relating to BLOXX, which information and materials have been approved in advance by Principal;

     ii.    maintain an informational booth and supply materials relating to BLOXX, using information and materials approved in advance by Principal, at meetings of Client's medical and program staff with responsibility for pharmaceuticals and medical devices relating to blood clotting;

     iii.    propose to sell BLOXX exclusively in the Proposal to the Client with Federal Representative identified as the prime governmental contractor and Principal as the subcontractor;

     iv.    seek, in the name of Principal, R&D grants related to BLOXX from Client where Federal Representative is aware that such R&D grants may be available;

     v.    provide overall program management for the marketing effort to sell BLOXX to the Client;

     vi    prepare any Proposal for an R&D grant in the name of Principal to the Client, but subject to Principal's input and Principal's written final approval and grant of authority, for Federal Representative to deliver the approved Proposal to the Client;

     vi.    prepare any Proposal as Federal Representative for a BLOXX supply contract to the Client, but subject to Principal's input as to content, pricing, quantity and other terms and subject to Principal's written final approval, for Federal Representative to deliver the approved Proposal to the Client;

     vii.    furnish to Principal all information and technical data needed by Principal to perform its responsibilities under this Agreement;

     viii.    provide Principal with monthly (or more frequently as deemed appropriate) written reports on the significant developments, leads, opportunities, events and deadlines relating to Proposals and grants and other matters in the grant and/or procurement process (the procurement process includes pre-Proposal activities, preparation and submission of the Proposal, any negotiations or discussions with the Client, and submission of the best and final offers);

     ix.    Conduct all contacts and communications with the Client; and

     x.    Coordinate, when requested by Principal, the shipment or delivery of Principal's product to Client.

     b.    Principal shall:

CROSSLINK-D and Silverback 7
Marketing Agreement
Page 3

     i.     permit Federal Representative, and only Federal Representative, exclusively to market BLOXX and any product derived from the technology utilized in BLOXX to the Client and to represent Principal to any agency, department, branch or instrumentality of the Client pursuant to the terms of this Agreement;

     ii.     pay Federal Representative twenty-five percent (25%) of Actual Gross Receipts for BLOXX sales to the Client made during the term of this Agreement. For purposes of this Agreement, "Actual Gross Receipts" shall mean dollars actually received by Principal from the Client, subject to reduction for any credit to the Client for returned product, refunds, defective goods or other Client offsets.

     iii.     issue 52,760 shares of Principal's nonassessable, voting Common Stock (constituting approximately two percent (2%) of the issued and outstanding shares of Principal's Common Stock as of the date of this Agreement) subject to dilution to the same extent as other shares of Common Stock;

     iv.     grant Federal Representative the irrevocable option to purchase, at the times and on the conditions set forth in Schedule B attached hereto, 52,760 shares of Principal's nonassessable, voting Common Stock at a price of four dollars per share ($4.00), with such price adjusted for any share splits or recapitalizations, subject to dilution to the same extent as other shares of Common Stock;

     v.     provide timely technical, management, and other supporting documentation describing Principal's organization and all salient characteristics and applications of BLOXX as requested by Federal Representative. Such information and support includes, but is not limited to, support of Federal Representative's oral presentations, product technical information/specifications, pricing information, testing data and other past performance information, and other such information reasonably necessary for Federal Representative to perform its responsibilities under this Agreement;

     vi.     to the extent deemed reasonably necessary by the Parties, participate in (a) the preparation and negotiation of the Proposal, and (b) contacts and communications with Client relating to or affecting the sale of BLOXX;

     vii.     reimburse Federal Representative the amount of its direct, out-of-pocket reasonable costs for marketing materials such as brochures, videos, and other materials and for reasonable travel (no first or business class) directly related to marketing of BLOXX so long Principal has been advised in advance and has approved the dollar amount of such travel or other costs; reimbursement to be made within 30 days from the submission by Federal Representative of an invoice and supporting documentation for the direct costs incurred and approved by Principal; and

     viii.     reimburse Federal Representative the amount of its direct, out-of-pocket reasonable costs for the preparation and submission of R&D grant applications to the Client, provided such costs have been approved in advance by Principal; reimbursement

CROSSLINK-D and Silverback7
Marketing Agreement
Page 4

to be made within 30 days from the submission by Federal Representative of an invoice and supporting documentation for the direct costs incurred and approved by Principal.

2.    **Relationship of the Parties**

a.    Federal Representative shall have the exclusive right to market BLOXX and to represent Principal to the Client during the term of this Agreement. During the term of this Agreement, Federal Representative shall not present, market, offer or represent to the Client any other product or medical device that constitutes or may be considered a blood-clotting agent or a medical device competitive to BLOXX.

b.    Principal and Federal Representative are independent contractors. Each party shall be solely responsible for and shall pay all federal, state or local income, franchise, sales, use, personal property, ad valorem, value added, stamp or other taxes, levies or fees, together with all penalties, fines and interest, imposed upon such party that arise out of the Procurement; *provided, however,* that the parties acknowledge that sales to Client are exempt from state and local franchise, sales, use, personal property, *ad valorem*, value added, stamp or other taxes. Federal Representative shall provide Principal with any information requested by Principal to substantiate Client's exemption from federal, state and local taxation.

3.    **Effective Date, Term and Expiration of the Agreement**

This Agreement shall bind the Parties when it has been executed by each of them. ("Effective Date") The primary Term of this Agreement shall begin when Federal Representative receives written notice that Principal has received approval from the FDA for the sale and distribution of BLOXX (the "FDA Approval Date"), and shall terminate on the second anniversary of the FDA Approval Date, subject to early termination or renewal as provided herein. Upon notice of the FDA approval, the parties shall execute an amendment to this Agreement mutually acknowledging the FDA Approval Date, to avoid any uncertainty of that date.

a.    Renewal. There shall be three (3) one-year renewal periods, with all terms and conditions of this Agreement remaining in full force and effect. This Agreement shall be automatically renewed for each one-year renewal period, without any notice from one party to the other, provided the Milestones set forth in Schedule C are timely met or waived by Principal.

b.    Termination.

(1).    If any Milestone set forth in Schedule C is not timely met or is not waived by Principal, Principal shall have the right to terminate this Agreement by giving Federal Representative notice of termination thirty (30) days in advance of the termination date stated in the notice; *provided, however,* that the Parties shall continue to perform this Agreement for any supply contract or R&D grant that has already been awarded by Client prior to the date of termination and any resulting contract under a Proposal (submitted before the date of termination and not withdrawn by Principal) that can be and is lawfully accepted by the Client after the date

CROSSLINK-D and Silverback7
Marketing Agreement
Page 5

of termination without further action by Federal Representative and further provided that the fee payable to Federal Representative under Section 1.b.ii shall be reduced to 12% from and after the date of termination with respect to any such continuing contracts or grants.

(2). In the event that Principal becomes contractually bound to sell or license all or substantially all of Principal's common stock, assets and/or intellectual property, Principal shall have the right to terminate this Agreement by giving a written notice of termination to Federal Representative thirty (30) days in advance of the termination date stated in the notice, provided that Principal pays Federal Representative, on the termination date, the Termination Fee. The Termination Fee payable to the Federal Representative before the first anniversary date of this Agreement shall be an amount equal to 25% of the $500,000 Milestone stated in Schedule C, amounting to $125,000. The Termination Fee payable to the Federal Representative before the second anniversary date of this Agreement shall be an amount equal to 25% of the $8,000,000 Milestone stated in Schedule C, amounting to $2,000,000. The Termination Fee payable to the Federal Representative after the second anniversary date and before the fifth anniversary date of this Agreement shall be an amount equal to the fees paid Federal Representative generated from Actual Gross Receipts in the twelve months preceding the termination date.

c. In the event that this Agreement terminates at the expiration of third renewal period (i.e., five years after the FDA Approval Date), the Parties shall continue to perform this Agreement for any supply contract or R&D grant that has already been awarded by Client prior to the date of termination and any resulting contract under a Proposal (submitted before the termination and not withdrawn by Principal) that can be and is lawfully accepted by the Client after the date of termination without further action by Federal Representative.

4.    Proprietary Information

a. For purposes of this Agreement, "Proprietary Information" means all information identified as confidential or proprietary at the time of disclosure, of whatever kind, whether in written or oral form, that relates to either Party and is disclosed to the other Party. Proprietary Information includes, but is not limited to, all technical formulae, specification, data and information, computer programs, source code and documentation, manuals, formulae, processes, methods, compositions, ideas, improvements, inventions, and any and all information relating to BLOXX and related products and services, sales, sales volume, sales and marketing methods, sales and marketing proposals, , amount or kind of Client purchases of BLOXX, Principal's sources of supply of any materials used by either Party, and all other confidential or proprietary information disclosed or made available by Principal to Federal Representative. Federal Representative acknowledges and agrees that all of the foregoing Proprietary Information is owned by and belongs to Principal, regardless of who is or was the originating party of such information or materials. Principal acknowledges and agrees that Federal Representative's Proprietary Information consists of lists of the Client, names of key purchasing personnel in the employ of Client or any prospective Client, Federal Representative's purchases or other contractual arrangements with any Client not related to BLOXX, and Federal Representative's sources of supply of materials, and that such Propriety Information of Federal Representative is owned by and belongs to Federal Representative. For purposes of clarification, all product,

CROSSLINK-D and Silverback7
Marketing Agreement
Page 6

marketing, sales and financial information and data, in whatever form or medium, relating to Principal's products, including BLOXX, is and will become the exclusive Propriety Information of Principal, and Federal Representative shall have no proprietary, property or intellectual right or interest in or to such Proprietary Information of Principal.

    b.    The Parties shall hold in confidence, and withhold from third parties, all Proprietary Information disclosed, directly by one Party to the other, shall hold Proprietary Information in trust and shall use proprietary Information solely and exclusively in the discharge of the Party's responsibilities and obligations under this Agreement and for no other purpose unless the owning Party agrees or in writing signed by such Party. Each Party agrees to safeguard from theft, loss and disclosure the other Party's Proprietary Information that it receives by using the same degree of care as the receiving Party uses to safeguard its own Proprietary Information from theft, loss and disclosure, but not less than reasonable care, and to limit access to Proprietary Information to those officers, directors and employees within the receiving Party's organization who reasonably require such access to perform the obligations under this Agreement.

    c.    All Proprietary Information disclosed in written or other permanent form by one Party to the other shall be identified as Proprietary Information by appropriate stamp, legend or otherwise, but the Parties acknowledge that all information relating to BLOXX shall be deemed confidential and proprietary unless and until its disclosure is approved by Principal.

    d.    Neither Party may disclose the other's Proprietary Information without the prior written consent of the owning Party. Prior to any disclosure, Federal Representative will obtain the appropriate non-disclosure and confidentiality agreement from Client or any party to whom disclosure is contemplated, for the purpose of the disclosure of Proprietary Information by Federal Representative to the Client as part of the Proposal contemplated herein, and Federal Representative agrees to mark all such Proprietary Information with the appropriate stamp, legend or other clear and conspicuous written identification which unambiguously indicates the information being provided is the originating Party's Proprietary Information.

    e.    Proprietary Information shall remain the property of the Party owning such property as provided herein and shall be returned to such Party upon request. Neither this Agreement nor the disclosure of Proprietary Information under this Agreement grants to either Party any right or license under any invention, patent, trademark, copyright or other right owned or controlled by either Party, nor shall any disclosure constitute any representation, warranty, assurance, guarantee or inducement concerning the infringement of any patent, trademark, copyright or other rights of others; provided, however, that use by Federal Representative and disclosure to the Client, in accordance with and in the performance of this Agreement, of any patent, trademark, copyright, or information subject thereto shall not constitute infringement by the Federal Representative.

    f.    In the event that a Party inadvertently discloses Proprietary Information of the other Party, the Party who inadvertently caused disclosure shall promptly notify that Party of the disclosure, take all reasonable steps to retrieve the inadvertently disclosed Proprietary Information and immediately take steps to preclude further disclosure. Any inadvertent

CROSSLINK-D and Silverback7
Marketing Agreement
Page 7

disclosure of Proprietary Information does not relieve either Party from its continued adherence to the terms and conditions in this Agreement. The Party who inadvertently disclosed Proprietary Information also shall exert reasonable efforts to assist the Party whose Proprietary Information was inadvertently disclosed in the execution of a Proprietary Information agreement with each third Party to whom the inadvertent disclosure was made.

g.    If the receiving Party is faced with judicial or governmental action to disclose Proprietary Information received hereunder, the receiving Party must use reasonable efforts legally to resist disclosing the Party's Proprietary Information, and shall promptly notify such Party of any such action. Upon notice to the Party owning the Proprietary Information, that Party must either join in contesting such disclosure or provide the recipient with permission to make the disclosure. In the event that government action to disclose Proprietary Information is the result of any pre-award or post-award audit right of Client in connection with a Proposal submitted hereunder by Federal Representative, the disclosing Party shall be notified of such government action before disclosure and the Parties shall claim that the Proprietary Information is exempt from public disclosure to the extent permitted by the Freedom of Information Act, Trade Secrets Act, Privacy Act, and other statutes governing disclosure of information by the Federal Government.

h.    The rights, duties and obligations of each Party set forth in this Section with respect to Proprietary Information survive the termination of this Agreement.

i.    The following individuals are designated as the primary points of contact for receipt of proprietary information under this Agreement:

Principal:
                        CROSSLINK-D, LLC
                        3480 Industrial Blvd.
                        Suite 105
                        West Sacramento, CA 95691
                        Tel:
                        Fax:

Federal Representative:  Steven Wade
                        Director, Operations
                        Silverback7 LLC
                        300 Ellicott Street
                        Suite A
                        Occoquan, Virginia 22125
                        Tel:    703-972-9528
                        Fax:    703-490-9001

Each Party may change its designation at any time by written notice to the other.

5.    Inventions, Patents and Performance

CROSSLINK-D and Silverback7
Marketing Agreement
Page 8

a.     Neither Party shall acquire, directly or by implication, any rights in any patents, inventions, copyrighted works, or other Proprietary Information of the other party developed, authored, conceived or reduced to practice prior to the date of this Agreement, including, but not limited to, inventions described and claimed in applications for U.S. Letters Patent filed prior to the date of this Agreement.

b.     Principal shall own and retain title and all intellectual property rights to any data, information, copyrighted works or inventions developed, authored, conceived or reduced to practice by either Principal or Federal Representative during the performance of this Agreement relating to the development, marketing, sale or any other exploitation of Principal's present or future products, including BLOXX. Other than to the extent authorized under this Agreement, no license, express or implied, shall inure to the benefit of the other participating party to prepare copies and derivative works of such copyrighted works and to make, use and sell Products or processes incorporating such data, information, copyrighted works or inventions.

c.     In the event of inventions or copyrighted works developed by Federal Representative during the performance of this Agreement, which invention or copyrighted work necessarily derives from and incorporates written Proprietary Information disclosed by Principal, it being understood that such derivation or incorporation shall occur only with the express written consent of Principal, such invention and/or copyrighted works shall be the property of Principal;

d.     The rights, duties and obligations of each party set forth in this Section shall survive any termination or expiration of this Agreement.

e.     Each Party (the "Indemnifying Party") agrees to indemnify, to defend and to hold harmless the other Party (the "Indemnified Party") from any claims, demands or actions alleging any failure to perform a contract, subcontract or grant agreement, from any product liability of Federal Representative for Principal's supply of BLOXX in the performance of a contract, subcontract or grant agreement, or relating to material or product furnished by the Indemnifying Party to the Indemnified Party for which a third party makes a claim that such material or product infringes a patent, copyright, or trade secret right, or for any unauthorized misrepresentation by Federal Representative to any Client relating to BLOXX. If a claim for infringement has occurred or, in the Indemnifying Party's judgment, is likely to occur, the Indemnified Party agrees to allow the Indemnifying Party at such Party's option to procure the right for the Indemnified Party to use the infringing material in accordance with the terms hereof, or to replace or modify the same so as to render it non-infringing. If neither of the foregoing is available on terms that are reasonable in the Indemnifying Party's judgment, the Indemnified Party, upon written request by the Indemnifying Party, shall return the material claimed to be infringing.

f.     The Indemnifying Party shall have no obligation under § 5.f hereof to the Indemnified Party with respect to any claim of infringement of proprietary rights based upon the Indemnified Party's modification of the material furnished and/or the combination, operation or use of such material with data or materials not supplied by the Indemnifying Party.

g.     The Indemnified Party shall (1) give prompt written notice to the Indemnifying

CROSSLINK-D and Silverback,
Marketing Agreement
Page 9

Party of any claim, demand or action for which indemnity is sought; (2) fully cooperate in the defense or settlement of any such claim, demand, or action; (3) obtain the prior written agreement of the Indemnifying Party to any settlement or proposal of settlement (which agreement shall not unreasonably be withheld).

6.    Publicity

No press release, public announcement, advertisement or publicity relating to this Agreement, any proposal made pursuant to this Agreement, or any agreement resulting from the Procurement, shall be made or released without the prior written consent and approval of both the Principal and the Federal Representative.

7.    Disputes

The Parties agree to attempt to settle any dispute or controversy arising between them under this Agreement through consultation and negotiation in good faith and a spirit of mutual cooperation. If Principal or Federal Representative fails to perform a material obligation under this Agreement, the non-breaching party shall give written notice by Certified Mail, return receipt requested, to the alleged breaching party of such alleged breach, describing in reasonable detail any alleged deficiency. The alleged breaching Party shall have thirty (30) days from the receipt of notice to respond and a reasonable period to correct any deficiency. Any claim, controversy, or dispute concerning questions of fact or law arising out of or relating to this Agreement, to performance by either party hereunder, or to the threatened, alleged, or actual breach thereof by either party, which is not disposed of by mutual agreement within a period of thirty (30) days after one party has provided written notice of the dispute to the other, shall be subject to executive-level review by the Principal and Federal Representative. If this review process is not successful within ninety (90) days of the initial written notice, the Parties shall proceed to alternative dispute resolution, first by mediation, and then, if mediation is unsuccessful, through arbitration. If the Parties cannot agree on a mediator, the Party alleging the breach shall engage the American Arbitration Association in Washington, D.C., to select a mediator. The mediator shall conclude the mediation within sixty (60) days of appointment. If the mediation is unsuccessful, then the dispute shall be arbitrated pursuant to the Commercial Rules of the American Arbitration Association before an arbitrator mutually agreed to by the parties; provided, however, the discovery rules of the Federal Rules of Civil procedure shall apply in such proceeding. Any such arbitration shall be held in the Washington, D.C. metropolitan area, or elsewhere as mutually agreed to by the parties. The decision of the arbitrator shall be final and conclusive upon the parties. Judgment upon an award rendered by the arbitrator may be entered in any court of competent jurisdiction. Neither Party shall institute any other action or proceeding against the other Party in any court with respect to any dispute which is or could be the subject of a claim or proceeding pursuant to this Article; provided, however, that nothing in this provision will prevent either Party from resorting to judicial proceedings at any time (a) to enforce alternative dispute resolution, or (b) to obtain preliminary injunctive relief to prevent serious and irreparable injury to one Party or to others, including the wrongful disclosure or use of Proprietary Information.

8.    Representations and Warranties

CROSSLINK-D and Silverback /
Marketing Agreement
Page 10

(a)    Each Party warrants that it has the right to enter into this Agreement and fully perform all obligations herein taken.

(b)    Each Party warrants that the products, services, data, information and other material furnished to the other Party do not infringe any third-party rights in any patent, copyright or trade secret.

9.    Safety and Compliance

(a)    Principal shall provide Federal Representative with all appropriate information for the safe, proper and effective use of BLOXX, about interactions of BLOXX with other drugs and medical devices, and about potential side effects of BLOXX.

(b)    Principal shall be solely responsible for compliance with all applicable drug and medical device approval and licensing, environmental, export, import, and other laws, rules, regulations, governmental approvals, and governmental requirements applicable to the manufacturing, storage, sale, transportation, application and delivery of BLOXX.  The Parties acknowledge and agree that Principal is the exclusive owner and operator of Principal's facilities, and that all operations of Principal's facilities are conducted solely under the direction and control of Principal.   Nothing in this Agreement is intended or should be construed as indicating that Federal Representative has the ability to control Principal's facilities.

10.    Miscellaneous

a.    This Agreement is the entire Agreement between the parties and supersedes all prior oral or written agreements, commitments, understandings or communications with respect to the subject matter of this Agreement.  This Agreement may not be modified except in writing, signed by both parties.

b.    Neither Party may assign its rights under these terms and conditions without the other Party's prior written consent, which will not be unreasonably withheld or delayed in the event of a transfer to any successor corporation in the event that any Party shall merge with or into another corporation:

c.    The invalidity or unenforceability of any provision of these terms and conditions or portion of a provision shall not affect the validity or enforceability of any other provision of these terms and conditions or the remaining portion of the applicable provision.

d.    The failure of Principal or Federal Representative to insist upon performance of any of the terms or conditions contained in this Agreement, to exercise any right or privilege conferred by these terms and conditions, or the waiver by Principal or Federal Representative of any breach of any of the terms or conditions contained in this Agreement shall not be construed as a subsequent waiver of any such terms or conditions, but the same shall continue and remain in full force and effect as if no such forbearance or waiver had occurred.  No waiver shall be effective unless it is in writing and signed by an authorized representative of the waiving party.

CROSSLINK-D and Silverback /
Marketing Agreement
Page 11

     e.     The validity, construction, scope and performance of this Agreement shall be governed by the laws of the Commonwealth of Virginia, without giving effect to any choice of law rules that may require the application of the laws of another jurisdiction, except as to any provisions of this Agreement which are governed by the laws of the United States of America, as to which provisions such laws of the United States shall govern.

The parties have caused this Agreement to be executed by their duly authorized representatives as of the date first appearing above.

CROSSLINK-D, LLC                                        Silverback7 LLC

By: _____          By: _____

Name:                                                          Name: Steven Wade
Title:                                                           Title: Director, Operations

CROSSLINK-D and Silverback
Marketing Agreement
Page 12


## SCHEDULE A

LIST OF AGENCIES OF THE FEDERAL GOVERNMENT CONSTITUTING THE "CLIENT":

1.      DEPARTMENT OF DEFENSE, INCLUDING WITHOUT LIMITATION THE DEPARTMENTS OF THE NAVY, ARMY, AIR FORCE, AND MARINES AND ALL SPECIAL FORCES UNITS;

2.      DEPARTMENT OF HOMELAND SECURITY, INCLUDING THE COAST GUARD;

3.      CENTRAL INTELLIGENCE AGENCY;

4.      DEPARTMENT OF JUSTICE;

5.      DEPARTMENT OF STATE.

6       ON A NON-EXCLUSIVE BASIS, UNITED STATES GENERAL SERVICES ADMINISTRATION, THE MILITARY DEPARTMENTS OF THE GOVERNMENTS OF AUSTRALIA, GREAT BRITAIN, CANADA AND NEW ZEALAND.

For purposes of clarification, the Veterans' Administration is excluded as a Client.


## SCHEDULE B

TERMS AND CONDITIONS FOR EXERCISE OF OPTION TO PURCHASE SHARES

Federal Representative is granted the irrevocable option (the "Federal Representative's Option") to purchase 52,760 shares of Principal's nonassessable, voting Common Stock at a price of four dollars per share ($4.00) adjusted for any share splits or recapitalizations but subject to dilution to the same extent as other shares of Common Stock at the following times and conditions:

| Minimum Exercise Amount | Last Day to Exercise Option on Minimum Amount | Purchase Price for Minimum Amount | Remaining Shares Available to Exercise |
|---|---|---|---|
| 10,552 Shares | TBD* | $42,208 | 42,208 Shares |
| 10,552 Shares | March 1, 2007 | $42,208 | 31,656 Shares |
| 10,552 Shares | March 1, 2008 | $42,208 | 21,104 Shares |
| 10,552 Shares | March 1, 2009 | $42,208 | 10,552 Shares |
| 10,552 Shares | March 1, 2010 | $42,208 | 0 Shares |

*  This date only shall be the fifth business day after the FDA Approval Date.

CROSSLINK-D and Silverbat
Marketing Agreement
Page 13

The following conditions apply to the Federal Representative's Option:

1.    The Remaining Shares Available to Exercise shall be reduced to zero (0) if any of the Milestones set forth in Schedule C are not timely met or waived by Principal. For example, if Federal Representative has not generated $500,000 in Projected Contract Revenues from all Clients by the first anniversary of the FDA Approval Date, all Remaining Shares Available to Exercise will be reduced to zero, forfeited and no longer available for purchase by Federal Representative.

2.    If Federal Representative fails or declines to exercise the option for the Minimum Amount by the Last Day to Exercise Option on Minimum Amount, the Remaining Shares Available to Exercise shall be reduced to zero (0). For example, if Federal Representative declines to exercise the option on the Minimum Amount by March 1, 2007, the 31,656 Remaining Shares Available to Exercise shall be reduced to zero, forfeited and no longer available for purchase by Federal Representative.

3.    Federal Representative shall exercise the Federal Representative's Option by giving Principal timely written notice of the exercise, declaring the amount exercised, with such notice accompanied by the payment in good funds of the purchase price for the shares to be purchased.

## SCHEDULE C

MILESTONES

1.    By not later than the first anniversary of the FDA Approval Date, the activities of Federal Representative shall have generated aggregate Projected Contract Revenues, as defined below, from all Clients of not less than $500,000 since the FDA Approval Date;

2.    By not later than the second anniversary of the FDA Approval Date, the activities of Federal Representative shall have generated aggregate Projected Contract Revenues from all Clients of not less than $8,000,000 during the preceding 24-month period;

3.    By not later than the third anniversary of the FDA Approval Date, the activities of Federal Representative shall have generated aggregate Actual Gross Receipts and/or Projected Contract Revenues from all Clients of not less than $15,000,000 during the preceding 36-month period;

4.    By not later than the fourth anniversary of the FDA Approval Date, the activities of Federal Representative shall have generated aggregate Actual Gross Receipts and/or Projected Contract Revenues from all Clients of not less than $25,000,000 during the preceding 48-month period.

For purposes of the Milestones, "Projected Contract Revenues" shall mean the dollars that Federal Representative and Principal are reasonably projected to receive or

CROSSLINK-D and Silverba
Marketing Agreement
Page 14

have received for the term of the executed and accepted contract or grant with the Client, including any optional renewal periods. "Actual Gross Receipts" shall mean dollars actually received by Federal Representative and Principal from any Client, whether under contract or grant, subject to reduction for any credit to the Client for returned product, refunds, defective goods or other Client offsets.

## CROSSLINK-D, INC.

## NOTICE OF SPECIAL MEETING OF STOCKHOLDERS

Time and Date:  Noon, local time, on Tuesday, August 1, 2006

Place:  The Offices of CrossLink-D, Inc., 3480 Industrial Blvd., Suite 105, West Sacramento, California

Items of Business:  (1) To remove all of the directors of the corporation.

(2) To confirm the portion of Section 2 of Article III of the Bylaws of the corporation that provides as follows:  "The authorized number of directors shall be one (1) until changed by an amendment to this Bylaw approved by the shareholders".

(3) To adopt new bylaws.

(4) To elect a new director or directors.

Kent C. Cochrum intends to stand for re-election as a director and to nominate Douglas B. Evans as a director.

No other business shall be transacted.

You are entitled to vote only if you were a CrossLink-D stockholder of record as of the close of business on July 20, 2006.

There will be no provision for attending by means of remote communication.

July 21, 2006

_Kent C Cochrum_
Kent C. Cochrum, Secretary

PLAINTIFF'S EXHIBIT
G

## LITTLER MENDELSON

August 4, 2006

Courtney B. Wilson
Direct: 305.400.7565
Direct Fax: 305.489.6375
cwilson@littler.com

VIA HAND-DELIVERY

Mr. Joe Largey
2316 Beach Haven #101
Virginia Beach, VA 23451

Re:   CrossLink-D

Dear Mr Largey:

Pursuant to an August 2, 2006 resolution by the Director of CrossLink-D (hereinafter "the Company"), this Firm has been engaged to represent the Company with respect to your employment as Chief Executive Officer ("CEO") of the Company.

In the course of that engagement, we have reviewed and analyzed the November 1, 2004 letter Employment Agreement between you and ARES Laboratories, LLC ("ARES"), which was subsequently assigned to the Company on May 18, 2005 ("the Agreement")  We are advised that for a period of weeks or even months, you have failed to perform the essential functions of your position as CEO including, but not limited to, your complete failure to respond to repeated inquiries from the Company's majority shareholder and Director concerning the performance of your duties and the satisfaction of the Company's objectives.

Your abandonment of your duties under paragraph 1(a) of the Agreement constitutes a repudiation of the Agreement as well as a material breach of the Agreement. Accordingly, the Company has the right to treat your employment as terminated upon the date you ceased performing your duties under the Agreement and, in any event, no later than your receipt of this notice. In addition, the Company may be entitled to recover damages from you for breach of the Agreement and breach of your common law duties to the Company.

Despite the fact that you have repudiated and breached the terms of the Agreement, failed to fulfill other conditions such as the requirement that you invest a minimum of $50,000 in the Company (Agreement ¶ 7(b)), and have not even provided the minimal two weeks written notice required to effect your resignation (Agreement ¶ 3(e)), the Company is willing to treat your termination as a resignation under paragraph 3(e) of the Agreement, and to pay your salary through the date of this letter.

We also note that the Agreement provided that you would have the right to purchase stock equal to 10% of the outstanding shares of the Company for cash, cancellation of

PLAINTIFF'S
EXHIBIT
H

Mr. Joe Largey
August 4, 2006
Page 2

indebtedness. or a full-recourse promissory note. However, we are advised that no such
purchase/payment for Company stock ever occurred. Therefore, even assuming you had
fulfilled the conditions of the Agreement, such as the investment of $50,000, and had not
otherwise repudiated or breached the Agreement, you would not be entitled to any stock.
Had such stock been purchased in accordance with the Agreement, the Company would have
the option under paragraph 5(c) of the Agreement to repurchase the portion of those shares
that had not vested pursuant to paragraph 5(d) of the Agreement, at the same price "as that
paid by you for such Unvested Shares ... ." Accordingly, to the extent you contend that you
complied with the terms of the Agreement and purchased shares of stock from the Company,
then the Company hereby exercises its right to repurchase the Unvested Shares at the price
"paid by you."

Finally, you are reminded that the restrictive covenants set forth in paragraph 6 of the
Agreement survive the termination of your employment. During the course of your
employment, the Company disclosed to you trade secrets and other proprietary confidential
information, including, without limitation, all discoveries, concepts, ideas, information and
improvements that relate to the Company's homeostatic products and technologies, as well
as product and business plans defined during the term of your employment.  Such
information derives economic value from not being generally known or readily ascertainable
by the Company's competitors and is subject to the Company's reasonable efforts to
maintain its secrecy.  In this regard, the Agreement prohibits your disclosure or use of this
confidential information and further prohibits your employment or other involvement with
any competitor of the Company.  Because the Company has disclosed trade secrets and
confidential information to you, it is inevitable that your employment in a similar capacity
with a competitor would result in a disclosure of confidential information and trade secrets in
violation of your Agreement and applicable laws.  In addition to the express provisions of the
Agreement, applicable law requires you to act exclusively and in the utmost good faith in
protecting the Company's confidential information and trade secrets from disclosure or
misappropriation.  Further, while your "non-compete" restrictions are ostensibly limited to a
two (2) year period, applicable law and the confidentiality provisions of the Agreement
provide protection for the Company's trade secrets and confidential information *for so long
as that information remains confidential and/or qualifies as a trade secret.*

PLEASE GOVERN YOURSELF ACCORDINGLY

Sincerely,

Courtney B. Wilson

CBW:cof

-----Original Message-----
From: devans@crosslink-d.com
To: devans@crosslink-d.com
Cc: kcochrum@crosslink-d.com
Sent: Fri, 8 Sep 2006 10:01 PM
Subject: CrossLink-D Financing Plans

In my e-mail of August 22 I noted that CrossLink-D would be seeking additional capital. Based on the budget projections we have done, CrossLink-D needs approximately $1m to fund operations until March of next year, or $500k through the balance of this year. That includes an allowance for extraordinary legal expenses, commencement of manufacturing, and some very limited hiring (new CEO, chemist, tech, market analyst, and two consultants to round out a team). I am writing to provide more detail on how we intend to raise that.
Our core objectives with respect to this financing are to:

1. Raise money quickly, despite the various risk factors and problems noted in my last two letters to you – To accomplish this, we will position this round as a bridge financing and will apply a discount formula that is consistent with common market rates for such financings. Early investors will realize a significantly better potential ROI than later investors.

2. Limit the amount of money raised to the lowest amount reasonably required to meet our objectives, so as to limit dilution to existing investors – To accomplish this, we have drafted very careful budgets that limit our cash expenditures to amounts necessary to achieve primary objectives.

3. Provide our current investors the first opportunity to participate – We have a number of individuals who have expressed interest to participate in amounts more than sufficient to meet our goals, but want to make sure that our current investors are given the first opportunity to participate in order to protect their current pro rata equity holdings. I very much hope you will consider participating, and request that you please provide some expression of your interest by Friday, September 15. After that time we will open the offering up to new participants.

The amount you would need to invest in total to maintain your current percentage holding would calculated simply by multiplying your current percentage interest by the total amount raised in this round (up to $1m). For this purpose, following is what I record as the current cap table for the company:

| Class | # Shares Outstanding | % of Total Outstanding | % of Total (fully diluted) |
|---|---|---|---|
| Current Capitalization | | | |
| Kent Cochran | 1,200,000 | 46.9% | 45.87% |
| Dan Stueßohn | 500,000 | 19.5% | 19.53% |
| Susan Jemrud | 100,000 | 3.9% | 3.91% |
| Joseph Largey | 122,222 | 4.8% | 4.77% |
| Donald Johnson | 200,000 | 7.8% | 7.81% |
| Raymond Schultz | 400,000 | 15.6% | 15.62% |
| Jerry Theis | 32,000 | 1.2% | 1.25% |
| Garrett Lee | 6,000 | 0.2% | 0.23% |
| Total Current Outstanding | 2,560,222 | 100% | 100.00% |[1]

---

[1] The total number of shares issued to Joseph Largey is based upon shares originally issued less those that were the subject of the notice of repurchase of unvested shares


PLAINTIFF'S
EXHIBIT

For purposes of this financing, we are ascribing a current pre-money valuation to the company of approximately $3.2m. That value is affected by the various legacy and current problems affecting the company[2]. We assume those will resolve over time, and that the value will rise according (particularly as we commence sales and if we get a deal in place with Baxter). We also intend to provide incentives to invest sooner than later, and so have structured the financing to effect a step up in valuation upon specified dates.

As for exit strategy (and hence the timing on liquidity for investors), we think the right strategy is to pursue a deal with Baxter or a similar major medical device maker, and if that proves unattractive pursue a targeted licensing strategy combined with some direct sales in specific markets. We have done the financial planning to build a direct sales force, but that does not appear to be the most effective strategy to yield value to our shareholders in the near- to mid-term. We do not plan to do any significant ramp-up of operations until April 2007. In the interim we will focus on corporate and business development, with sales limited to those initiated by Silverback 7.

We believe the right approach at this juncture is to do a bridge financing that allows the company to minimize the dilution to existing shareholders by deferring conversion into equity of the amount raised until the valuation is higher. Please note that we assume we intend to maintain the S-corporation status for the time-being.

In order to minimize dilution, we are targeting $500k now, but will make the total raise be for up to $1m – we will need the additional money in the first quarter of 2007. We do not have to take the additional money if we do not think we need it. We will, however, need a significant amount of money by May 2007 (like $2.5m) to fund a projected ramp-up of operations if we do not do a deal with someone like Baxter before then.

Cash flow with the above scenario is in the chart below.

---

delivered to Mr. Largey on August 7, 2006. The company has no record of either Mr. Largey or Mr. Sueflohn having paid for their shares, and so may be required to take action to force payment for or cancellation of their shares.
[2] The near term valuation is affected by legal risk arising from three circumstances. First, the company has a variety of legacy problems (outlined in my letter of shareholders of Aug. 9) that will require considerable effort and cost to address. Second, Dan Sueflohn is suing Dr. Cochrum in an action that directly affects the company. Third, the company may be required to institute legal action to force payment for or cancellation of shares issued to two individuals who do not appear to have made required payment



The terms we propose for this $1m will be as follows:

1. For amounts invested by Oct. 1, 10% of the principal will be applied to purchase of Common Stock at a value of $1.25 per share, and 90% will be carried as a convertible note. The note will convert upon closing of a Qualified Financing (i.e. one in which the company raises an amount in excess of $2m at a valuation greater than $10m), at the value per share and into the instrument issued in that financing. To effect a discount on that conversion, those who invest prior to October 1 will also be given warrants to purchase additional shares of common stock at an exercise price of $1.25 per share in a total amount equal to 30% of the total shares issued upon conversion. In the event the company is acquired (i.e. upon sale of substantially all of its assets or stock), the balance on the note will convert into Common Stock at $3.00 per share and upon conversion the investor will be issued warrants to purchase additional shares of common stock at an exercise price of $1.25 per share and in a total amount equal to 20% of the total shares issued upon conversion.

2. For amounts invested after October 1 but by November 1, 10% of the principal will be applied to purchase of Common Stock at a value of $1.75 per share, and 90% will be carried as a convertible note. The note will convert upon closing of a Qualified Financing at the value per share and into the instrument issued in that financing. To effect a discount on that conversion, these investors will also be given warrants to purchase additional shares of common stock at an exercise price of $1.75 per share and in a total amount equal to 20% of the total shares issued upon conversion. In the event the company is acquired or there is no Qualified Financing occurs by May 1, 2007, the balance on the note will convert into Common Stock at $3.00 per share and upon conversion the investor will be issued warrants to purchase additional shares of common stock at an exercise price of $1.75 per share and in a total amount equal to 10% of the total shares issued upon conversion.

3. For amounts greater invested after November 1 but by January 1, 2007, 10% of the principal will be applied to purchase of Common Stock at a value of $2.25 per share, and 90% will be carried as a convertible note. The note will convert upon closing of a Qualified Financing at the value per share and into the instrument issued in that financing. To effect a discount on that conversion, these investors will also be given warrants to purchase additional shares of common stock at an exercise price of $2.25 per share and in a total amount equal to 10% of the total shares issued upon conversion. In the event of an

acquisition or no Qualified Financing occurs by May 1, 2007, the balance on the note will convert into Common Stock at $3.00 per share.

I know it is tempting to focus solely on the discount applicable to the initial issuance of Common stock, but I think that is misleading. I think one should focus on the total blended price (i.e. the average price per share of the initial issuance plus the shares issued upon subsequent conversion and warrant exercise).

To give examples:

a.    An investor who pays in $100,000 by October 1 would be issued 8,000 shares of Common Stock, and carry a note for $90,000 at 8% interest. If the company then raises money in a Qualified Financing at an effective share price of $4, the balance of the note would convert into 23,570 shares in the new issuance. Assuming the investor also exercises their warrant as to an additional 7,071 Common shares, they would hold a total of 38,641 shares at an effective purchase price of $2.82 per share. On the other hand, if the company is acquired prior to a Qualified Financing the investor would have an opportunity to own a total of 45,712 shares at a blended share price of $2.36.

b.    An investor who pays in $100,000 by November 1 would be issued 5,714 shares of Common Stock, and carry a note for $90,000 at 8% interest. If the company then raises money in a Qualified Financing at an effective share price of $4, the balance of the note would convert into 23,410 shares in the new issuance. Assuming the investor also exercises their warrant as to an additional 4,682 Common shares, they would hold a total of 33,807 shares at an effective purchase price of $3.20 per share. On the other hand, if the company is acquired prior to a Qualified Financing the investor would have an opportunity to own a total of 40,050 shares at a blended share price of $2.63.

c.    An investor who pays in $100,000 after November 1 would be issued 4,444 shares of Common Stock, and carry a note for $90,000 at 8% interest. If the company then raises money in a Qualified Financing at an effective share price of $4, the balance of the note would convert into 23,100 shares in the new issuance. Assuming the investor also exercises their warrant as to an additional 2,310 Common shares, they would hold a total of 29,854 shares at an effective purchase price of $3.52 per share. On the other hand, if the company is acquired prior to a Qualified Financing the investor would have an opportunity to own a total of 35,244 shares at a blended share price of $2.84

If you apply these same scenarios to a sale of the company in advance of a Qualified Financing at three assumed values, the ROI looks like this:

| | Valuation | | |
|---|---|---|---|
| | $20,000,000 | $30,000,000 | $40,000,000 |
| Share Price | $7.46 | $11.19 | $14.92 |
| | Return | | |
| Example a | $340,979 | $511,468 | $681,957 |
| Example b | $298,741 | $448,111 | $597,482 |
| Example c | $262,894 | $394,340 | $525,787 |
| | Investment | | |
| Example a | $107,857 | $107,857 | $107,857 |
| Example b | $105,462 | $105,462 | $105,462 |
| Example c | $100,000 | $100,000 | $100,000 |
| | ROI | | |
| Example a | 316% | 474% | 632% |
| Example b | 283% | 425% | 567% |
| Example c | 263% | 394% | 526% |

The foregoing must be considered estimates only, and not a guaranty of any return. The company reserves the right to withdraw this financing at any time, to amend its terms at any time, or to reject any offer to participate. This e-mail does not constitute an offer for sale of securities. Should you indicate your desire to participate in this financing, the company will provide appropriate documentation.

Please let me know if you have any questions. I will be happy to meet with any of you in person at your convenience.

Best regards,

Douglas B. Evans
415-505-6099

Check out the new AOL. Most comprehensive set of free safety and security tools, free access to millions of high-quality videos from across the web, free AOL Mail and more.